| | |
|---|---|
| UNITED STATES GYPSUM COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| Counterdefendant, | ) |
| | ) |
| v. | ) No. 03 C 6027 |
| | ) |
| LAFARGE NORTH AMERICA, INC., | ) |
| | ) |
| | ) |
| Defendant, | ) |
| Counterplaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| LAFARGE S.A., DANIEL C. MYSLINSKI, | ) |
| DAVID DOWNS, JOHN D. YOCKEY, TOM | ) |
| HUFFER, CHARLES JETT, ED GREEN, | ) |
| WILLIAM HARTFORD, WALTER WELDON, | ) |
| KURT F. KRUZSHAK, and SIDNEY SPEAR, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

In its Second Amended Complaint, plaintiff United States
Gypsum Company ("USG") alleges that defendant LaFarge North
America, Inc. ("LNA") has infringed certain claims of USG's U.S.
Patent No. 5,683,635 related to producing foamed gypsum
wallboard. Defendant LaFarge, S.A. ("LSA"), a French corporation
that owns a majority share of LNA, is also alleged to be liable

for patent infringement.[1]  Also named as defendants are ten
individuals (collectively, the "Individual Defendants") who are
current or former employees of LNA and who worked for USG prior
to being employed by LNA.  The Individual Defendants are Daniel
Myslinski, David Downs, John Yockey, Tom Huffer, Charles Jett, Ed
Green, William Hartford, Walter Weldon, Kurt Kruzshak, and Sidney
Spear.  In addition to the federal patent claims against the
Corporate Defendants, the Corporate Defendants and Spear are
alleged to have violated two federal statutes, the Stored
Communications Act ("SCA"), 18 U.S.C. §§ 2701-12, and the
Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.  All
other claims are based on state law.[2]  All defendants are alleged
to be liable for misappropriation of USG trade secrets and
conversion.  The Individual Defendants are all also alleged to be
liable for breach of fiduciary duty, and some are alleged to be
liable for breach of contract.  The Corporate Defendants are
also alleged to be liable for unfair competition, tortious
interference with contract, inducement of breach of fiduciary
duty, and unjust enrichment.

---

[1]Collectively, LNA and LSA will be referred to as the
"Corporate Defendants."

[2]To the extent state law must be considered in resolving
the pending motions for summary judgment, the parties assume
either that Illinois law applies or that the applicable state law
does not differ from Illinois law.

- 2 -

LNA brings a five-count Counterclaim against USG. Each count seeks declaratory relief only. The respective Counterclaim counts seek declarations that: (I) LNA did not infringe the '635 patent; (II) claims of the '635 patent are invalid; (III) the '635 patent is unenforceable because of inequitable conduct; (IV) USG cannot claim infringement based on the doctrine of equivalents in that it would cause the claims to read on prior art; and (V) positions the patentee took before the United States Patent and Trademark Office ("PTO") estop USG from making certain contentions regarding the '635 patent.

Each side has engaged in extensive discovery, all of which is complete. Presently pending are cross motions for summary judgment. Defendants move for summary judgment dismissing all counts of the Second Amended Complaint. To the extent any claims against them are not dismissed on other grounds, LSA and four Individual Defendants (Hartford, Huffer, Myslinski, and Jett) seek dismissal of the claims against them on the ground that there is no personal jurisdiction over them in this court. LNA also moves for summary judgment on Counts I and III of its Counterclaim. USG moves for summary judgment dismissing the Corporate Defendants' patent infringement affirmative defense of inequitable conduct, as well as Count III of LNA's Counterclaim which also raises inequitable conduct. USG also moves for summary judgment that there is personal jurisdiction over LSA and the four Individual Defendants.

In this case, Federal Circuit law controls as to substantive patent issues. As to procedural issues such as summary judgment procedure, however, the Federal Circuit holds that a district court should follow the law of the circuit in which it is located. Applied Medical Resources Corp. v. United States Surgical Corp., 435 F.3d 1356, 1364 (Fed. Cir. 2006); Arthur A. Collins, Inc. v. Northern Telecom Ltd., 216 F.3d 1042, 1047-48 (Fed. Cir. 2000); Vivid Technologies, Inc. v. American Science & Engineering, Inc., 200 F.3d 795, 807 (Fed. Cir. 1999); Massey v. Del Laboratories, Inc., 118 F.3d 1568, 1572 (Fed. Cir. 1997); Kim v. Conagra Foods, Inc., 2004 WL 626140 *1 n.2 (N.D. Ill. March 26, 2004). Seventh Circuit law also applies to issues such as the admissibility of evidence, Micro Chemical, Inc. v. Lextron, Inc., 317 F.3d 1387, 1390-91 (Fed. Cir. 2003); general credibility issues, Applied Medical, 435 F.3d at 1364; and the sufficiency of evidence supporting non-patent claims, Duro-Last, Inc. v. Custom Seal, Inc., 321 F.3d 1098, 1106 (Fed. Cir. 2003).

As to each side's motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. Eiencorp, Inc. v. Rocky Mountain Radar, Inc., 398 F.3d 962, 965 (7th Cir. 2005); Estate of Moreland v. Dieter, 395 F.3d 747, 758 (7th Cir.), cert. denied, 545 U.S. 1115 (2005); Hall v. Bennett, 379 F.3d 462, 464 (7th Cir. 2004); Hudson v. Chicago Transit Authority, 375 F.3d 552, 558 (7th Cir. 2004).

The burden of establishing a lack of any genuine issue of material fact rests on the movant. Outlaw v. Newkirk, 259 F.3d 833, 837 (7th Cir. 2001); Wollin v. Gondert, 192 F.3d 616, 621-22 (7th Cir. 1999). The nonmovant, however, must make a showing sufficient to establish any essential element for which he or it will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Binz v. Brandt Construction Co., 301 F.3d 529, 532 (7th Cir. 2002); Traylor v. Brown, 295 F.3d 783, 790 (7th Cir. 2002). The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. Celotex, 477 U.S. at 324. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. See Yasak v. Retirement Board of Policemen's Annuity & Benefit Fund of Chicago, 357 F.3d 677, 679 (7th Cir. 2004); NLFC, Inc. v. Devcom Mid-America, Inc., 45 F.3d 231, 236 (7th Cir.), cert. denied, 515 U.S. 1104 (1995); Covalt v. Carey Canada, Inc., 950 F.2d 481, 485 (7th Cir. 1991); Collins v. Associated Pathologists, Ltd., 844 F.2d 473, 476-77 (7th Cir.), cert. denied, 488 U.S. 852 (1988); Shyman v. UNUM Life Insurance Co. of America, 2004 WL 609280 *2 (N.D. Ill. March 25, 2004), aff'd, 427 F.3d 452 (7th Cir. 2005). As the Seventh Circuit has summarized:

> The party moving for summary judgment
> carries the initial burden of production to
> identify "those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Logan v. Commercial Union Ins. Co., 96 F.3d 971, 978 (7th Cir. 1996) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (citation and internal quotation omitted)). The moving party may discharge this burden by "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325, 106 S. Ct. 2548. Once the moving party satisfies this burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The nonmovant must do more, however, than demonstrate some factual disagreement between the parties; the issue must be 'material.'" Logan, 96 F.3d at 978. "Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute." Id. (citation omitted). In determining whether the nonmovant has identified a "material" issue of fact for trial, we are guided by the applicable substantive law; "[o]nly disputes that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." McGinn v. Burlington Northern R.R. Co., 102 F.3d 295, 298 (7th Cir. 1996) (citation omitted). Furthermore, a factual dispute is "genuine" for summary judgment purposes only when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Hence, a "metaphysical doubt" regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and "the nonmovant fails to demonstrate a genuine issue for trial 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party . . . .'" Logan, 96 F.3d at 978 (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

Outlaw, 259 F.3d at 837.

Unless otherwise indicated, the facts set forth below resolve all factual disputes and draw all reasonable inferences in favor of USG. Both sides move for summary judgment regarding inequitable conduct and personal jurisdiction. On those issues, it will be indicated whether particular facts are undisputed and therefore applicable to each side's motion or genuinely in dispute and therefore different factual assumptions apply to each side's motion.

Defendants contend that USG's Local Rule 56.1 statements are so riddled with insufficient support or improper argument that they should be stricken in their entirety and defendants' factual statements deemed admitted. USG's factual submissions will not be stricken. To the extent any factual assertion in a Local Rule 56.1 statement is not properly and adequately supported, that particular factual assertion will not be taken as true. This will be done on a paragraph-by-paragraph basis, not by a wholesale striking of either side's factual statements. Cf. Dominion Nutrition, Inc. v. Cesca, 2006 WL 560580 *4-5 (N.D. Ill. March 2, 2006); Ogborn v. United Food & Commercial Workers, Local No. 881, 2000 WL 1409855 *2-3 & nn.2-4 (N.D. Ill. Sept 25, 2000), aff'd, 305 F. 3d 763 (7th Cir. 2002).

## I. PATENT ISSUES

### A. Patent Infringement

As to the infringement issues raised on summary judgment,
the parties agree as to many of the pertinent facts. Their
primary disagreements concern the construction of certain terms
of the pertinent patent claims. USG contends claims 25, 36, and
37 of its '635 patent were infringed by a foam injection method
of manufacturing gypsum wallboard that was used at a number
of LNA plants (the "LNA Method"). Claim 37 is dependent on
claim 36. The parties agree that, for purposes of summary
judgment, it is unnecessary to separately consider Claim 37.

The two claims at issue read as follows (emphasis added):

> 25. A method of preparing a foamed gypsum
> board comprising, continuously and concurrently:
>
>> inserting calcined gypsum and water into a
>> mixing chamber through one or more inlets;
>>
>> agitating the contents of the mixing chamber
>> to form an aqueous dispersion of the
>> calcined gypsum;
>>
>> discharging the contents of the mixing
>> chamber through a discharge outlet into a
>> discharge conduit;
>>
>> inserting an aqueous foam through an inlet
>> into the discharge conduit, such that **the
>> foam is mildly agitated** to thereby minimize
>> destruction of the foam while uniformly
>> dispersing the foam in the aqueous gypsum
>> dispersion;
>>
>> discharging the resultant dispersion from
>> the discharge conduit and depositing the
>> dispersion onto a moving cover sheet:

applying a second cover sheet over the
deposited dispersion; and

allowing the **resultant assembly** to set and
dry such that the calcined gypsum forms set
gypsum having **voids uniformly dispersed
therein**.

\* \* \*

36. A method of preparing a foamed gypsum
board having a hard edge or edges, comprising,
continuously and concurrently:

mixing and agitating calcined gypsum and
water to form an aqueous dispersion of the
calcined gypsum;

dividing the aqueous dispersion to form a
core stream of the aqueous dispersion and
one or more edge streams of the aqueous
dispersion;

mixing an aqueous foam into the core stream,
such that **the foam is mildly agitated** to
thereby minimize destruction of the foam
while uniformly dispersing the foam in the
aqueous dispersion;

depositing the core stream onto a moving
cover sheet;

**depositing the edge stream** or streams onto
the cover sheet **contiguous to one or both
edges of the deposited core stream;**

applying a second cover sheet over the
deposited streams; and

allowing the resultant assembly to set and
dry such that the calcined gypsum forms set
gypsum and the set gypsum in the deposited
core stream has **voids uniformly dispersed
therein**.

As to both claims, defendants contend the LNA Method did
not infringe because the LNA Method involved turbulent and

- 9 -

violent agitation of the foam, not a method in which "the foam is mildly agitated." As to Claim 25, defendants also contend the LNA Method does not include "voids uniformly dispersed" across the "resultant assembly" because LNA produced boards with hard edges, with the voids only being uniformly dispersed within the core stream and not the entire assembly, that is, not the hard edges as well. As to claim 36, defendants contend the LNA Method also does not infringe because claim 36 provides that the core stream is deposited prior to the edge stream, whereas the LNA Method deposits the edge stream prior to the core stream. Defendants additionally contend the LNA Method does not infringe claim 36 because the LNA Method does not deposit the edge stream contiguous to the core stream. Instead, the edge stream is deposited first and the core stream is subsequently deposited and then spread out to meet the edge stream.

The basic process of manufacturing gypsum wallboard begins with the delivery of natural or synthetic gypsum to a plant. The gypsum is ground and then subjected to calcining (a method for removing water), which results in a fine powder called "stucco." The stucco is combined with water and other additives (such as fiberglass, starch, and/or foam) and mixed in a mechanical mixer to create "slurry." The slurry travels through a tube-like structure called a "boot" and is deposited in the center of a continuous sheet of paper that is traveling on a conveyor system. The paper is commonly called "face paper" and

- 10 -

will be one side of a finished panel of wallboard. As it moves along the plant line, the slurry spreads out along the width of the paper. A second continuous sheet of paper (the "back paper") comes down from above. In the claims at issue, the face paper and back paper are referred to as "cover sheets." The two sheets of paper come together, essentially creating a sandwich of slurry between two sheets of paper. This sandwich passes through a forming station, where it is shaped to the desired thickness and the paper is folded over the side edges. The formed board continues to move down the line while the slurry "sets." Eventually it reaches the point where it is cut and the board sections are placed into a huge dryer. After drying, the sections are moved, lifted, and "booked" together, that is placed face-to-face with another section. The sections are eventually cut into saleable lengths, bundled, placed on pallets, and transferred to a warehouse to await shipping.

One common additive to the stucco is soap, which is used to create an aqueous foam. This produces air bubbles in the wallboard. If the air bubbles do not escape before hardening, voids are set in the gypsum product which lowers the density of the product. Foamed wallboard is lighter than unfoamed wallboard and therefore easier to handle for installation. A disadvantage of foamed wallboard is that it is more fragile than unfoamed wallboard and subject to crumbling when a nail is driven in it. Another disadvantage is that a foamed core is not as good at

adhering to the paper sheets. The first problem is often
addressed by using unfoamed slurry to create "hard edges." The
second problem is often addressed by placing a thin layer of
higher density or unfoamed slurry on the paper sheet. The
process of applying this thin layer on the paper using a roller
is known as "skim coating."

The LNA Method used at a number of LNA's United States
plants combines stucco, water, and a small amount of foam (and
sometimes other additives) in a main mixer called a pin mixer.
Because little foam is used, this creates a "dense slurry."
Dense slurry exits the pin mixer at two points. At the rear (in
relation to the flow of the line), dense slurry exits through an
extractor and is used for the hard edges and skim coat. Toward
the front, dense slurry exits into a "gate" where it is mixed
with more foam to produce a less-dense slurry ("foamed slurry")
used for the core section of the wallboard.

The dense slurry that exits through the extractor port is
carried via a hose to a point on the face paper that is upstream
of both the mixer and the skim coat roller. The hose deposits
the dense slurry on the face sheet which carries it forward to
the skim coat roller. The dense slurry pools at the skim coat
roller, which leaves a thin coating at the core of the paper, but
allows thicker amounts to wrap around the edges of the roller
forming hard edge streams.

At the front end, dense slurry enters into a gate where it is mixed with foam that is injected into the gate through a hose. This mixture then travels to a canister before being deposited onto the face sheet as the core stream. Each side's expert offers an opinion[3] as to how the forces within the canister act together to agitate the mixture. The canister does not have its own power source. Any agitation that occurs within the canister results from the kinetic forces of the flow from the mixer and the injection of foam, as affected by the pressure created by the limited opening at the end of the canister. The end of the canister has a restricting ring called a "donut." There is no dispute that the agitation occurring in the canister is less than the agitation of the dense slurry that occurs in the mixer. USG's expert opines that the kinetic forces and turbulence that occur in the canister result in limited agitation. Defendants' expert opines that the kinetic forces react with the back pressure caused by the donut to produce

---

[3]As part of their reply, defendants object that certain opinions of USG expert Richard Lueptow should not be considered because not previously disclosed. See Def. Resp. to Pl. LR 56.1 Stmt. of Add'l Facts [229] ¶¶ 434-37, 445-67. Defendants do not point to any expert report or deposition of Lueptow in which he failed to adequately disclose these opinions. There is no basis for ignoring these opinions based on a failure to disclose. Also, defendants' own expert opines on this subject. Even if there was an inadequacy of disclosure, there is no indication that defendants have been prejudiced thereby and they are now aware of these opinions well prior to any trial. Cf. Commonwealth Insurance Co. v. Titan Tire Corp., 398 F.3d 879, 888 (7th Cir. 2004).

violent and turbulent agitation. On defendants' summary judgment
motion, USG's expert must be credited.

## 1. Claim 25

An element of Claim 25 is "allowing the resultant
assembly to set and dry such that the calcined gypsum forms set
gypsum having voids uniformly dispersed therein." Defendants
contend that "resultant assembly" means the entire board,
including edges. Defendants contend that this element should be
construed as requiring a uniform distribution of voids through
the entire board, including edges. It is undisputed that, in the
LNA Method which uses hard edges, voids in the edges are not
uniform with voids in the core.

As of the time that the '635 patent was issued, as well
as currently, nearly all commercial wallboard was manufactured
with hard edges. Unless defined by the patent as meaning
something else, words of a patent claim are to be interpreted in
accordance with their ordinary meaning, as they would be
understood by one skilled in the art. V-Formation, Inc. v.
Benetton Group SpA, 401 F.3d 1307, 1310-11 (Fed. Cir. 2005);
Merck & Co. v. Teva Pharmaceuticals USA, Inc., 395 F.3d 1364,
1369-70 (Fed. Cir.), cert. denied, 126 S. Ct. 488 (2005); Duhn
Oil Tool, Inc. v. Cooper Cameron Corp., ___ F. Supp. 2d ___,
2007 WL 331638 *4 (E.D. Cal. Feb. 1, 2007).

Claim 25 sets forth a method for preparing "a foamed
gypsum board." It lists the elements "comprising" that method.

- 14 -

In a patent claim, "comprising" means including. <u>Mars, Inc. v. H.J. Heinz Co.</u>, 377 F.3d 1369, 1375-76 (Fed. Cir. 2004); <u>Amgen Inc. v. Hoechst Marion Roussel, Inc.</u>, 314 F.3d 1313, 1344-45 (Fed. Cir. 2003); <u>Goff v. Harrah's Operating Co.</u>, 412 F. Supp. 2d 1090, 1094 (D. Nev. 2005). A method claim comprising certain elements does not need to set forth every step necessary to produce the identified product. <u>Mars</u>, <u>supra</u>; <u>Smith & Nephew, Inc. v. Ethicon, Inc.</u>, 276 F.3d 1304, 1311 (Fed. Cir. 2001); <u>Goff</u>, <u>supra</u>. Thus, the claim 25 preamble language ("A method of preparing a foamed gypsum board comprising . . .") does not indicate that the elements that follow are sufficient by themselves to produce a foamed gypsum board. Nevertheless, defendants contend that "resultant assembly," as used in the last phrase of the claim, should be understood as referring to "a foamed gypsum board" that appears in the preamble. Instead, a proper reading of "resultant assembly" is that it refers to the particular steps set forth in claim 25 following the preamble. Those steps include placing the dispersed material between two sheets and drying that assembly. The recited steps, however, do not exclude adding other materials or dispersions before adding the second cover sheet, nor is there any mention of the forming stage of wallboard production. The resultant assembly simply refers to the described dispersion being between two cover sheets. It is consistent with claim 25 to have edges composed of different materials. The only part of the resultant assembly

- 15 -

that need have uniformly dispersed voids is the deposited
dispersion described in claim 25.

Such a reading of claim 25 is consistent with how a
person skilled in the art would understand the claim. A person
skilled in the art would know that wallboard is manufactured with
edges that have a density different from that of the core. Such
a person would understand that claim 25 does not make any claim
regarding the edges of the board. Specifically, a person skilled
in the art would understand that the uniformly dispersed voids
exist only in the deposited dispersion described. A person
skilled in the art would understand that, in the usual
manufacturing process, a different dispersion with a different
density would be used for the edges.

The undisputed fact that the LNA Method produces
wallboard with differing densities in the core and edges does not
preclude the possibility that the LNA Method infringes claim 25.

## 2. Claim 36

Claim 36 relates to a method of preparing foamed gypsum
board having a hard edge or edges. In the LNA Method, the edge
streams are on the paper before the core stream. When the core
stream is deposited on the paper, it is allowed to spread to
reach the edge streams on each side of the paper. Defendants
contend this is different from claim 36, which they contend
provides that the core stream is deposited first and that, when
the edge streams are deposited onto the paper, they are

- 16 -

immediately next to the core stream. Defendants focus on the element of claim 36 that provides: "depositing the edge stream or streams onto the cover sheet contiguous to one or both edges of the deposited core stream." Focusing on "deposited" being in the past tense, defendants contend this should be construed as meaning the core stream is deposited on the paper first. Defendants also contend that this element should be read as requiring that the edge stream be deposited onto the paper immediately contiguous to the core stream. USG contends that the use of "concurrently" in the preamble and the lack of any express statement of an order is consistent with the stated steps of the process having no particular order. It also contends that having the core and edge streams be contiguous at any step of the process is sufficient.

The use of "concurrently" in the preamble cannot be read as meaning that all steps in the process occur at the same time or in no particular order. It is clear that the mixing and agitating of the gypsum and water must occur before foam is added. It is also clear that the core and edge streams must be separated before the foam is added to only the core stream. Also, the second cover sheet cannot be added over the two streams until after they are deposited on the lower cover sheet. The reference to "continuously and concurrently" should be read as a reference to a plant line, where all the steps are continually run at the same time on the line as a whole, but can occur at

different points of the line in a particular order as the materials move (stream) down the line. Claim 36 does not number each step of the process. However, the language used, basic grammar, understanding, or logic, and the understanding of wallboard production that a person skilled in the art would have indicate certain steps must be taken in a particular order. <u>See</u> <u>Altiris, Inc. v. Symantec Corp.</u>, 318 F.3d 1363, 1369-71 (Fed. Cir. 2003); <u>Taltech Ltd. v. Esquel Enterprises Ltd.</u>, 410 F. Supp. 2d 977, 998-99 (W.D. Wash. 2006). In appropriate situations, the specification may be considered in construing whether a claim requires a particular order. <u>Altiris</u>, 318 F.3d at 1370.

As previously indicated, stating that a second cover sheet is applied over deposited streams necessarily means that the streams must first be on the face paper and a person skilled in the art would also know that this is how wallboard is manufactured. Stating that foam is added to the core stream, necessarily means that the core stream has previously been separated out of the aqueous dispersion. Since the core stream comes from the aqueous dispersion and the aqueous dispersion is described as being created from mixed and agitated calcined gypsum and water, it is also evident that the gypsum and water must be mixed before the core stream is separated out. Logically, since the foam is added to the core stream, adding of the foam also must occur subsequent to the mixing and agitation

- 18 -

that created the aqueous dispersion. It is also noteworthy that each step that clearly must occur after another step is recited in order in claim 36. The question is whether any of the language supports that the core stream must be deposited before the edge stream.

In claim 36, the step of depositing the edge stream(s) is recited after the depositing of the core stream. This provides some support for reading claim 36 as providing that the core stream is deposited first. As defendants emphasize, stating that the method involves depositing the edge stream(s) when the core stream is deposited plainly provides that the core stream has already been previously deposited. USG contends that "deposited" is simply being used as a descriptive term to distinguish a core stream that has already had foam added from the core stream before being mixed with foam. The plain language of claim 36, however, is that the core stream is deposited first. USG does not point to any language in the specification supporting that the plain language of claim 36 should not be given its ordinary meaning.

Claim 36 is construed as providing that the core stream is to be deposited prior to the edge stream. Since the LNA Method deposits the edge stream prior to the core stream, there is no literal infringement.

Defendants also contend that the LNA Method does not involve the edge stream being deposited contiguously to the core

- 19 -

stream. Claim 36 does not require that an edge stream be deposited immediately next to the core stream. This element is sufficiently satisfied by the edge stream being deposited onto the cover sheet so that it streams down the line to be contiguous to the deposited core stream. Defendants are not entitled to summary judgment on noninfringement based on the contiguous element.

Although there is no literal infringement, USG contends there is infringement under the doctrine of equivalents. Defendants do not attempt to dispute the merits of this contention. USG presents evidence supporting that depositing the edge stream first performs the same function in the same way to obtain the same result as depositing the core stream first. Defendants, however, contend that USG has surrendered relying on the doctrine of equivalents.[4]

It is undisputed that the Second Amended Complaint does not expressly refer to the doctrine of equivalents. It is also undisputed that USG did not refer to the doctrine of equivalents when responding to contention interrogatories that required it to describe its infringement claims. The response to the contention

_____

[4]In footnote 12 of their reply, defendants also assert that prosecution history estoppel applies. This assertion is not supported by an argument. In any event, defendants only point to prosecution history regarding the order of other steps. They do not point to prosecution history regarding the core stream being placed on the cover sheet before the edge stream. See Def. Reply at 8-9 (quoting and citing App. 3, Tab 15 at 86).

interrogatories does expressly refer to the fact that the LNA
Method involves edge streams being placed on the face paper
upstream of the core stream and the fact that the core stream
spreads out to be contiguous with the edge stream that is already
on the face paper. See, e.g., App. 3, Tab 21 at 14-15. USG
contends that it is sufficient to state in a complaint that there
is infringement under 35 U.S.C. § 271 and to expressly raise the
doctrine of equivalents for the first time in response to a
motion for summary judgment.

A plaintiff is not required to expressly refer to the
doctrine of equivalents in a complaint, alleging infringement and
citing to § 271 is sufficient. Liquid Dynamics Corp. v. Vaughan
Co., 2002 WL 1769979 at *8 (N.D. Ill. Aug. 1, 2002), vacated &
remanded on other grounds, 355 F.3d 1361 (Fed. Cir. 2004); Revlon
Consumer Products Corp. v. Estee Lauder Cos., 2003 WL 21751833
*32 (S.D.N.Y. July 30, 2003). Here, however, the issue is
whether waiver has occurred by failing to expressly refer to the
doctrine of equivalents in response to a contention interrogatory
issued during discovery. In Revlon, the plaintiff raised the
doctrine of equivalents for the first time in a pretrial order
filed after the close of discovery. The doctrine had not been
relied on in any expert report. See id. at *31. The court cited
two cases in which the Federal Circuit had upheld, as not an
abuse of discretion, the preclusion of doctrine of equivalent
theories because the litigants had failed to assert such a

theory in certain discovery documents. See id. at *32 (citing
Genentech, Inc. v. Amgen, Inc., 289 F.3d 761, 773-74 (Fed. Cir.
2002); Nike Inc. v. Wolverine World Wide, Inc., 43 F.3d 644, 648
(Fed. Cir. 1994)). Revlon distinguished those cases in that
there had been no discovery violation by the patentee in Revlon
and allowed the patentee to pursue the doctrine of equivalents
theory. Revlon, 2003 WL 21751833 at *33.

Here, defendants contend the failure to expressly rely on
the doctrine of equivalents in response to the contention
interrogatories is a basis for precluding USG's present reliance
on the doctrine of equivalents. Defendants also point to the
court's statement at the time they moved to compel a further
response to the contention interrogatories.

> . . . I've read what you've said, and I've
> read what they've said, and I tend to think that
> their answer is incomplete for a patent
> infringement trial, but I don't know that.
> And so what I'm going to do is simply tell
> you this, that if you come to trial and don't
> have more detail than you have in the answers to
> interrogatories, I won't let you prove it up.
> And if I don't let you prove it up, then you may
> not be able to prove up your infringement claim.
> 
> * * *
> 
> But I'm warning you, if you come to trial,
> I'm going to hold you to a strict accountability
> in terms of proving up an infringement claim. I
> won't let you sandbag the other side. That may
> or may not be enough. I don't know. I don't
> know enough about the patent. I don't know
> enough about what you're trying to prove. It
> looks thin to me just looking at it, but I'm not
> going to do any more than give you 14 days to
> supplement as to that interrogatory.

Sept. 8, 2004 Tr. at 7-8 (App. 8, Tab 26). Thereafter, USG
supplemented the interrogatory responses, which are the
interrogatory responses defendants now contend are still
inadequate.

Seventh Circuit law applies in determining an appropriate
sanction, if any. Nike, 43 F.3d at 647-48. Precluding USG from
pursuing its doctrine of equivalents theory would only be
appropriate if defendants were prejudiced by the theory not being
expressly included in the interrogatory responses. United States
ex rel. Tyson v. Amerigroup Illinois, Inc., 230 F.R.D. 538,
541-42 (N.D. Ill. 2005); Thomas v. Ragland, 324 F. Supp. 2d 950,
966 (W.D. Wis. July 14, 2004); Heidelberg Harris, Inc. v.
Mitsubishi Heavy Industries, Ltd., 1996 WL 680243 *8-10 (N.D.
Ill. Nov. 21, 1996), reconsideration denied, 1997 WL 321686 (N.D.
Ill. June 6, 1997). Although USG did not expressly refer to the
doctrine of equivalents, it made clear in its interrogatory
responses that it contends the LNA Method infringes claim 36 even
with the edge streams being deposited before the core streams.
More importantly, defendants do not point to any prejudice they
suffered by the doctrine of equivalents first being raised in
response to summary judgment. Defendants do not contend that
they only prepared to defend against literal infringement claims.
They do not contend that they omitted taking any fact discovery
that would have only been necessary if the doctrine of
equivalents were at issue, nor do defendants contend that their

- 23 -

experts either have not opined or are unprepared to opine on the subject of equivalents. Moreover, LNA itself refers to the doctrine of equivalents in Count IV of its Countercomplaint. Additionally, the issue has been raised before the preparation of the final pretrial order, and well before any trial. Even if additional discovery were needed, defendants have had ample time to informally request additional information from USG or to formally move for additional discovery. This is not the type of sandbagging situation referenced at the motion hearing, where one side fails to have an opportunity to prepare for a previously unknown theory until it is time for a trial. USG will not be precluded from raising the doctrine of equivalents.

Doctrine of equivalents infringement of claim 36 (and dependent claim 37) will not be dismissed on summary judgment based on the LNA Method's sequence for depositing the edge streams and the core stream.

### 3. Mildly Agitate

Defendants also contend that there is no infringement of any of the patent claims because the LNA Method does not mildly agitate the aqueous foam when it is added to the core stream. USG contends that "mildly agitated," as used in each of the claims, means less agitation than is applied when mixing the gypsum and water to form the aqueous dispersion. Such a relative standard, however, is not expressly stated in claims 25 and 36. The claims themselves only use the term "mildly." Standing

alone, the terms "mild" or "mildly" ordinarily have the meaning
of a particular spot on an absolute scale. Claims 25 and 36 do
not qualify "mildly" (or "agitated") with a relative term such as
"less" or "more." That is unlike claims 1 and 13 of the '635
patent (and their respective dependent claims 2-12 and 14-24),
which expressly use the relative term "agitated less," as in "the
foam is agitated less than the calcined gypsum."

A patent can define a term as having a meaning different
from its ordinary meaning. USG contends that the '635 patent
defines "mildly agitated" as meaning less agitated than the
calcined gypsum. USG points to the preferred embodiment stating
that the invention is distinguished from prior art because it
involves agitating the foam less than the calcined gypsum.    '635
patent, col. 7, ll. 8-13. USG also points to a similar statement
in the summary. Id. col. 4, ll. 11-13.  Those statements,
however, are true even if "mildly agitated" is construed as an
absolute term.  Viewed as points on an absolute scale, "mildly
agitated" would involve less agitation than "agitating the
contents of the mixing chamber" as is stated in claim 25, or
"mixing and agitating calcined gypsum and water" as is stated in
claim 36.  USG's citation to the prosecution history is also
unconvincing that the term "mildly" should be given other than
its ordinary meaning of being on the low end of an absolute
scale.

Factual disputes exist as to whether the agitation of
foam that occurs in the canister of the LNA Method is mild or
not. Therefore, defendants are not entitled to summary judgment
based on the LNA Method not having the "mildly agitated" element
contained in claims 25, 36, and 37.

For the foregoing reasons, defendants are not entitled to
summary judgment based on noninfringement of any of the '635
claims, except that the claim that patent claims 36 and 37 were
literally infringed will be dismissed. As to claims 36 and 37,
USG may continue to pursue its claim that those patent claims
were infringed based on the doctrine of equivalents.

## B. Inequitable Conduct

Both sides move for summary judgment regarding
inequitable conduct. Defendants contend that a process used at
USG's Sweetwater plant from at least 1978 through 1995 was
material to claim 13 of the '635 patent and known by an inventor
of, and prosecuting attorney for, the '635 patent, but not
disclosed to the PTO. USG contends the process was not material
and evidence does not support the intent required for there to be
inequitable conduct. Claim 13 includes the novel element
"inserting an aqueous foam into the mixing chamber through an
inlet located closer to a discharge outlet of the mixing chamber
than the inlet or inlets for the calcined gypsum and water, such
that the foam is agitated less than the calcined gypsum." The

- 26 -

prior art USG process allegedly had such a location for the foam inlet.

A "'patent may be rendered unenforceable for inequitable conduct if an applicant, with intent to mislead or deceive the examiner, fails to disclose material information or submits materially false information to the PTO during prosecution.' Digital Control Inc. v. The Charles Mach. Works, 437 F.3d 1309, 1313 (Fed. Cir. 2006). The party urging unenforceability must show by clear and convincing evidence that the applicant met 'thresholds of both materiality and intent.' Molins PLC v. Textron, 48 F.3d 1172, 1178 (Fed. Cir. 1995)." Dippin' Dots, Inc. v. Mosey, 476 F.3d 1337, 1345 (Fed. Cir. 2007). Prior art that would render an invention obvious or anticipated satisfies materiality. Id. at *7; Duro-Last, 321 F.3d at 1107. The prior art need not actually anticipate the invention or render it obvious; it is sufficient that a reasonable examiner would have considered the prior art important in deciding whether to allow the patent. Dippin' Dots, 476 F.3d at 1345; Duro-Last, 321 F.3d at 1107. "'Smoking gun' evidence is not required in order to establish an intent to deceive. . . . Rather, this element of inequitable conduct[ ] must generally be inferred from the facts and circumstances surrounding the applicant's overall conduct." Dippin' Dots, 476 F.3d at 1345 (quoting Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc., 984 F.2d 1182, 1189 (Fed. Cir. 1993)) (ellipsis in Dippin' Dots). "Once threshold

findings of materiality and intent are established, the court must weigh them to determine whether the equities warrant a conclusion that inequitable conduct occurred." Dippin' Dots, 476 F.3d at 1346 (quoting Molins, 48 F.3d at 1178); Impax Laboratories, Inc. v. Aventis Pharmaceuticals Inc., 468 F.3d 1366, 1375 (Fed. Cir. 2006) (quoting Monsanto Co. v. Bayer Bioscience N.V., 363 F.3d 1235, 1239 (Fed. Cir. 2004)). "The more material the omission or misrepresentation, the less intent that must be shown to elicit a finding of inequitable conduct," and vice versa. Impax, 468 F.3d at 1375; Cargill, Inc. v. Canbra Foods, Ltd., 476 F.3d 1359, 1365 (Fed. Cir. 2007) (quoting Critikon, Inc. v. Becton Dickinson Vascular Access, Inc., 120 F.3d 1253, 1256 (Fed. Cir. 1997), cert. denied, 523 U.S. 1071 (1998)). If inequitable conduct occurred with respect to at least one claim of an application, the entire patent is unenforceable. Impax, 468 F.3d at 1375.

At his deposition, co-inventor Stewart Hinshaw testified that, as of the time the '635 patent was prosecuted, he was aware of the process used at USG's Sweetwater plant. Hinshaw drew a diagram of this process.[5] The diagram shows a mixer with a

---

[5]In their reply, defendants' concede that a genuine factual dispute exists regarding the prosecuting attorney's knowledge of the process. It would be sufficient if one co-inventor had the necessary knowledge and intent for inequitable conduct. Frank's Casing Crew & Rental Tools, Inc. v. PMR Technologies, Ltd., 292 F.3d 1363, 1377 (Fed. Cir. 2002); Stark v. Advanced Magnetics, Inc., 119 F.3d 1551, 1556 (Fed. Cir. 1997); McKesson Information Solutions Inc. v. Bridge Medical,

- 28 -

clockwise rotation. Looking down from above the mixer, the diagram shows water and stucco entering at approximately the 9:00-10:30 position, foam entering at approximately the 10:30-11:15 position, and a discharge at approximately the 5:00 o'clock position. While the discharge is indicated as being on the outer side of the mixer, the foam entry is indicated as entering nearer the center than the outer edger of the mixer. The stucco is indicated as entering closer to the outside than the foam. Water is indicated as entering all around the stucco, that is, some parts closer to the center and some parts farther from the center than the stucco and foam entries. Hinshaw testified that foam entering clockwise of the stucco/water did not necessarily result in the foam being upstream (and therefore closer) to the discharge. Hinshaw testified that positioning of the lump ring would affect centrifugal forces which would push the ingredients in indeterminate directions before eventually reaching the outer edges of the mixer where there would be a clockwise rotation that could be characterized as up or downstream from the discharge.

Defendants rely on the location of the inlets to show that the foam enters closer to the discharge than the stucco/water. They ignore that this element of claim 13 recites that the foam inlet is closer to the discharge such that the foam is subjected to less agitation. For less agitation to occur,

_____

Inc., 2006 WL 2583025 *7 n.6 (E.D. Cal. Sept. 6, 2006).

the foam must enter in a manner that results in a shorter
distance traveled and/or less forces (and thus less
mixing/agitation) before exiting through the discharge.
Defendants do not present any evidence supporting that, in the
Sweetwater process, the foam is subjected to less traveling,
mixing, or agitation than the stucco/water. Therefore, there is
no sufficient evidence to support that the Sweetwater process was
material to claim 13.

Since defendants cannot satisfy the threshold requirement
of materiality, they cannot succeed on their inequitable conduct
affirmative defense or counterclaim based on failure to disclose
the Sweetwater process.

Defendants contend they also have other grounds for
invoking inequitable conduct. USG contends all those grounds
were previously withdrawn. Contrary to USG's contention,
defendants' August 3, 2005 second supplemental response to
interrogatory no. 3 (App. 7, Tab 277 at 30-31) adds the
Sweetwater process to defendants' asserted grounds for applying
inequitable conduct. The supplement does not replace prior
inequitable conduct contentions with the one ground stated in the
supplement. The inequitable conduct affirmative defense and
counterclaim will only be dismissed to the extent based on the
Sweetwater process.

## II. TRADE SECRETS

Defendants move for summary judgment dismissing claims based on 13 specific trade secrets. Defendants contend any other possible trade secrets have not been adequately identified. USG contends it has adequately identified additional trade secrets. Each of the 13 trade secrets will be considered in turn, and then the dispute regarding whether any claims remain regarding other trade secrets. Only defendants move for summary judgment regarding trade secrets. Therefore, the facts set forth below resolve all genuine factual disputes in USG's favor.

The parties agree that, for purposes of resolving summary judgment issues, it can be assumed that Illinois law applies to the trade secret claims or, at least, that any other state law that applies is identical to Illinois law. Before discussing particular trade secrets, general principles of trade secret law will be set forth.

### A. Illinois Trade Secrets Act

Since 1988, trade secret claims under Illinois law have been governed by statute. See 765 ILCS 1065/8-9. The Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065, is patterned after the Uniform Trade Secrets Act ("UTSA"), which has been adopted by Illinois and 45 other states. See 765 ILCS 1065/1 (Supp. 2006) (annotation). Although patterned after UTSA, there is substantial variance between ITSA and the uniform version. See Melvin F. Jager, Trade Secrets Law § 3:31 at 3-85 to 3-90 (2005).

To prevail on any of its trade secret claims, USG must prove by a preponderance of the evidence that (1) the information at issue was a trade secret; (2) the information was misappropriated; and (3) the information was used in defendants' business. Multiut Corp. v. Draiman, 359 Ill. App. 3d 527, 834 N.E.2d 43, 49 (1st Dist. 2005); Learning Curve Toys, Inc. v. Playwood Toys, Inc., 342 F.3d 714, 721 (7th Cir. 2003); RKI, Inc. v. Grimes, 177 F. Supp. 2d 859, 877 (N.D. Ill. 2001).

In order to satisfy the first element of there being a trade secret, it must be shown both that the information was sufficiently secret to give it a competitive advantage and that affirmative measures were taken to prevent others from acquiring or using the information. 765 ILCS 1065/2(d); Multiut, 834 N.E.2d at 49; Learning Curve, 342 F.3d at 721. Illinois case law holds that six common law factors may also be considered in determining whether information is a trade secret: "(1) the extent to which the information is known outside of [the employer's] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the employer] to guard the secrecy of the information; (4) the value of the information to [the employer] and to his [or her] competitors; (5) the amount of effort or money expended by [the employer] in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." Arcor, Inc. v.

Haas, 363 Ill. App. 3d 396, 842 N.E.2d 265, 269-70 (1st Dist. 2005) (quoting Delta Medical Systems v. Mid-America Medical Systems, Inc., 331 Ill. App. 3d 777, 772 N.E.2d 768, 780 (1st Dist.), appeal denied, 201 Ill. 2d 564, 786 N.E.2d 182 (2002)); Learning Curve, 342 F.3d at 722.

Information that is generally known or understood within an industry, even if not known to the public at large, does not qualify as a trade secret. Learning Curve, 342 F.3d at 722 (quoting Pope v. Alberto-Culver Co., 286 Ill. App. 3d 512, 694 N.E.2d 615, 617 (1st Dist. 1998)). A corollary to this is that there generally can be no trade secret protection for a product that is available in the market. See Composite Marine Propellers, Inc. v. Van Der Woude, 962 F.2d 1263, 1267 (7th Cir. 1992); BondPro Corp. v. Siemens Power Generation, Inc., 463 F.3d 702, 709-10 (7th Cir. 2006) (Wisconsin UTSA); Chemetall GMBh v. ZR Energy, Inc., 138 F. Supp. 2d 1079, 1083 (N.D. Ill. 2001). Information that is derived from public sources, but requires laborious accumulation, culling, and/or analysis of the public information can still qualify as a trade secret. See Stampede Tool Warehouse, Inc. v. May, 272 Ill. App. 3d 580, 651 N.E.2d 209, 216 (1st Dist.), appeal denied, 163 Ill. 2d 589, 657 N.E.2d 639 (1995); RKI, 177 F. Supp. 2d at 873-74. In such situations, an accused party that contends the information could be acquired from public sources must show that it independently acquired the

information from public sources. See Hexacomb Corp. v. GTW

Enterprises, Inc., 875 F. Supp. 457, 466-67 (N.D. Ill. 1993);

Jager, § 3:31 at 3-87 to 3-88. The party asserting the trade

secret would still have the burden of first establishing that the

information qualified as a trade secret.

General knowledge, skill, and experience gained by an

employee during employment cannot be claimed as a trade secret.

> The protection afforded trade secrets
> reflects a balancing of conflicting social and
> economic interests. Where an employer has
> invested substantial time, money, and effort to
> obtain a secret advantage, the secret should be
> protected from an employee who obtains it through
> improper means. Nevertheless, in a competitive
> market, an employee must be entitled to utilize
> the general knowledge and skills acquired through
> experience in pursuing his chosen occupation.

Delta Medical, 772 N.E.2d at 780 (citations omitted) (quoted in

Multiut, 834 N.E.2d at 50).

Misappropriation is defined as including:

(1) acquisition of a trade secret of a
person by another person who knows or has reason
to know that the trade secret was acquired by
improper means; or
(2) disclosure or use of a trade secret of a
person without express or implied consent by
another person who:
(A) used improper means to acquire knowledge
of the trade secret; or
(B) at the time of disclosure or use, knew
or had reason to know that knowledge of the trade
secret was:
(I) derived from or through a person who
utilized improper means to acquire it;

- 34 -

(II) acquired under circumstances giving
        rise to a duty to maintain its secrecy or limit
        its use; or
            (III) derived from or through a person who
        owed a duty to the person seeking relief to
        maintain its secrecy or limit its use; or . . . .

765 ILCS 1065/2(b).

        "Improper means" is defined as including "theft, bribery,

misrepresentation, breach or inducement of a breach of a

confidential relationship or other duty to maintain secrecy or

limit use, or espionage through electronic or other means.

Reverse engineering or independent development shall not be

considered improper means." Id. 1065/2(a).

## B. Construction Specifications

        The Construction Specifications are a set of

specifications used in the construction of USG plants.  As of

March 1995, the Specifications consisted of 438 pages containing

99 individual specifications.  The Specifications have been

developed for more than 80 years and are repeatedly updated with

the most recent "best practices."  The Specifications are used by

outside contractors for construction work performed at USG

plants.  The Specifications are kept in a password-protected

computer system with only certain employees being entitled to

accesss.  USG Project Managers are responsible for maintaining

their copies in a safe and secure place.

USG's Engineering Support Manager provides a declaration in which he describes general practices regarding the Specifications. He states that outside contractors are only given those particular specifications that are pertinent to the particular project. He also states that the Specifications are provided under strict conditions of confidentiality with the contractors instructed not to use them for non-USG projects. Examples are provided of written confidentiality provisions contained in documents of a particular project. Two of the examples are contract provisions contained in the middle of lengthy documents. Another has statements on drawings. The statements, however, are not prominent on the drawings, just being printed notations in the margins.[6] The purported confidentiality provisions state USG's proprietary interest in the particular data, drawings, etc., and that they are not to be used for other purposes. None of the statements, however, expressly refer to confidentiality, secrecy, or other similar terms. One of the statements includes that the referenced items should not be duplicated or disclosed to others. Defendants submit a contract from the same project which contains no provision that USG contends is a confidentiality provision.

---

[6]One of the examples is so small it cannot even be read. It is possible, however, that the copy provided was reduced in size to fit it on a standard-size page.

Defendant Weldon worked for USG from 1985 to 1991 and from 1994 to February 21, 1997. He has worked for LNA (with a short time at a related entity) since December 1999. In 1994, Weldon signed an employee agreement that included a promise not to disclose USG "Confidential Information" and to return such documents upon termination of his employment. As the Project Manager for USG's Greenville Project, Weldon had a complete copy of the March 1995 version of the Construction Specifications. When his employment terminated, Weldon kept the copy of the Specifications. At the time, however, Weldon was retained as a consultant for litigation related to the Greenville Project.

When he went to work for LNA in 1999, Weldon still had the Specifications. The Specifications had no cover page. Weldon added a cover page which had a LaFarge logo, with "Construction Specifications" printed underneath. Weldon placed the Specifications on a bookshelf in the construction trailer for LNA's Palatka plant construction project. The shelf was accessible to the numerous employees coming in the trailer. Weldon states that he retained the Specifications in case he needed them regarding the Greenville litigation. In September 1997, however, Weldon was informed that the Greenville litigation had settled.[7] He did not return the Specifications at that time.

---

[7] Weldon denies that he was informed of the settlement, but contrary testimony by an attorney involved in the Greenville

Weldon states that he never used the Specifications for the Palatka project or any other LNA project. Three other LNA employees and two employees of outside contractors, all of whom worked on the Palatka project, state that they did not know of or use the Specifications for the project and that Weldon did not provide any specifications for the project. USG points to no specific aspect of the Palatka project that would have been based on a specification found in the Construction Specifications. USG's implicit position is that the presence of the Specifications in a location accessible to Palatka project workers is enough to infer that the Specifications were used for that project. Such an inference is not reasonable without identifying an aspect of the Palatka project that could have been based on the Specifications. See Rotec Industries, Inc. v. Mitsubishi Corp., 179 F. Supp. 2d 885, 894-95 (C.D. Ill. 2002). See also Tempco Electric Heater Corp. v. Temperature Engineering Co., 2004 WL 1254134 *8-11 (N.D. Ill. June 3, 2004).

Regarding the witnesses supporting defendants' version of the Construction Specifications facts--as well as many other witnesses supporting defendants' versions of other factual issues--USG contends the testimony should be rejected as self-serving and incredible. As the Seventh Circuit has repeatedly

---

litigation must be taken as true on defendants' summary judgment motion.

- 38 -

noted, testimony being self-serving is not by itself a basis for rejecting the testimony as noncredible. Most affidavits and much testimony are self-serving. Like any other testimony, self-serving testimony is to be accepted on summary judgment as long as it is based on personal knowledge, sufficiently specific, not disputed by contrary evidence of the nonmovant, and in compliance with any other evidentiary criteria applicable to the particular testimony. See Payne v. Pauley, 337 F.3d 767, 771-73 (7th Cir. 2003); Paz v. Wauconda Healthcare & Rehabilitation Centre, LLC, 464 F.3d 659, 664-65 (7th Cir. 2006); Kaba v. Stepp, 458 F.3d 678, 681 (7th Cir. 2006). Rejecting testimony as noncredible requires that there be specific evidence supporting that a witness's testimony is noncredible, such as contradictory accounts or other impeachment evidence. Harvey v. Office of Banks & Real Estate, 377 F.3d 698, 712 (7th Cir. 2004); Muhammed v. City of Chicago, 316 F.3d 680, 683-84 (7th Cir. 2002). Other than Weldon's testimony that he was not told about the settlement, which must be assumed to be untrue on summary judgment, USG does not point to any basis whatsoever for finding the witnesses to be noncredible. This misstatement by Weldon is not enough to discredit his entire testimony.

As long as adequate confidentiality restrictions are imposed on the outside contractors, documents that otherwise qualify as containing trade secrets will not lose that character

- 39 -

by being provided to outside contractors. USG, however, has not presented evidence sufficiently supporting that its disclosures of the Construction Specifications to outside contractors was done with adequate restrictions. Identifying information as proprietary is not the same as denominating it as confidential. Moreover, declarations of confidentiality and nondisclosure should be more prominent than the examples provided by USG. USG has failed to meet its burden of showing that the Construction Specifications were confidential.

But even assuming the Construction Specifications were adequately shown to contain trade secrets that were kept confidential, USG's claim based on the Specifications will be dismissed because USG fails to satisfy the element of showing that the Specifications were used in LNA's business. Rotec, 179 F. Supp. 2d at 894-95.

USG's trade secret claim based on the Construction Specifications will be dismissed. Since this claim is being dismissed for the reasons set forth above, it is unnecessary to consider defendants' other arguments regarding this trade secret.

## C. Kettle and Mixer Drawings and Hooker Booker Blueprints

As of May 2003, defendant Kruzshak was employed at USG's Stony Point, NY plant. On May 30, 2003, he accepted an offer to work as the Maintenance Manager at LNA's Buchanan, NY plant. A few days later, Kruzshak downloaded, onto an external hard drive,

drawings for USG's MBR kettle and mixer and blueprints for USG's high-speed hooker booker. At least for present purposes, defendants do not dispute that these drawings contain trade secrets. Kruzshak began working at LNA in June 2003. Shortly thereafter, he uploaded the files from the external hard drive to his LNA laptop computer. USG contends the files were also uploaded to the LNA computer network, but point to no competent evidence supporting that contention. USG cites to Kruzshak's deposition testimony, but that testimony only mentions uploading the files to his LNA laptop. See PSF[8] ¶ 76 (citing Kruzshak Dep. at 307, 310-11 (App. 6, Tab. 28)). In a declaration, Kruzshak expressly states that he did not upload the files to the LNA network. App. 8, Tab 6.

USG internal controls indicated that Kruzshak had accessed the files before he left USG's employ. In July 2003, USG wrote to Kruzshak and LNA demanding that the files be returned and that confidential information not be used. Either just before or shortly after this letter arrived, Kruzshak deleted the files from his laptop. In response to the letter and telephone calls, LNA personnel secured the laptop, but the files had already been deleted by Kruzshak. There were discussions of

---

[8]"PSF" refers to USG's statement of additional facts, docket entry [226]. The contents of the PSF are repeated in defendants' response thereto, which is docket entry [229].

having a third party conduct a forensic analysis of the computer, but it was instead agreed that the hard disk would be cleaned and sanitized.

There is no evidence that Kruzshak uploaded any of the files to LNA's computer network. There is also no evidence that Kruzshak otherwise disclosed any of the drawings' information to anyone at LNA.

This claim fails because there is no evidence that LNA used any of the kettle, mixer, or hooker booker information in its business. USG contends it could still be entitled to a royalty for the up to six-week period that Kruzshak had the files on the laptop. Such a royalty, however, would be "measured in terms of a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret." 765 ILCS 1065/4. As previously discussed, there is no evidence that Kruzshak used the trade secrets and also no evidence that he disclosed them to anyone else at LNA. There is no basis for awarding a royalty.

The trade secret claims based on the kettle and mixer drawings and hooker booker blueprints will be dismissed in their entirety.

## D. Fiberglass Feeder

Fiberglass is used as an additive in some wallboard. When being fed into the stucco mixture, fiberglass pieces can

stick to each other and the walls of the device feeding the fiberglass. USG developed a water cascade for cleaning the fiberglass inlet to the mixer.[9] USG has not used the Feeding Device since at least 1987. LNA uses the Feeding Device at its Silver Grove and Palatka plants.[10] USG contends that nondefendant Sylvan Lutey, a former USG employee working for LNA, suggested installing the Feeding Device at the two LNA plants.

USG contends that Lutey knew of the Feeding Device because he installed one while employed at a USG plant.[11] The evidence cited in support of this contention only supports that a feeding device using water and a funnel was installed at USG's Heath plant while Lutey worked there. See PSF ¶ 93 (citing Lutey Dep. at 17-18 (App. 6, Tab 30)). A different feeding device was being used when Lutey first arrived at the Heath plant, and a different one was installed before he left that plant. Lutey does not testify whether he was actually involved in the

---

[9]References to USG's design will be capitalized ("Feeding Device"). References to devices in general for feeding fiberglass will not be capitalized ("feeding devices").

[10]In their statement of facts, defendants assert facts supporting that the feeding device it uses at the two plants differ from USG's Feeding Device. In their motion and briefs, however, defendants do not argue that, for purposes of summary judgment, there is no genuine factual dispute that the LNA feeding device differs from the USG Feeding Device. For purposes of ruling on summary judgment, it is taken as true that the feeding devices of both companies are the same.

[11]Lutey worked for USG from 1980 to 1989. He also worked for a number of other employers before going to work at LNA.

installation of the water feeding device, but he does later testify that he was familiar with the design of the water feeding device and that it involved a funnel. See Lutey Dep. at 54. Lutey also testified that the Heath feeding device was "similar, but . . . quite a bit different" from the one installed at LNA's Silver Grove plant. Lutey Dep. at 54-55. Although not cited by USG, William Hodgson testified that the Heath plant had the USG Feeding Device. Hodgson Dep. at 28 (App. 2, Tab 9).[12] On summary judgment, it must be taken as true that Lutey was aware of the design of the USG Feeding Device.

In 1999, 12 or more years after Lutey observed the Feeding Device at the Heath plant, designs were being considered for a fiberglass feeding device at LNA's Silver Grove plant. Lutey and nondefendant Bruce Buell were responsible for overseeing the construction of the Silver Grove plant. There is

---

[12]Although USG's citation supporting that Lutey knew of the Feeding Device was deficient, it was disingenuous for defendants to deny that fact (see Def. Response to PSF ¶ 93) since they obviously would have been aware of other sufficient evidence supporting the assertion. On the other side, USG is not faultless for failing to cite adequate support. The parties' briefs and submissions are generally well organized and easy to follow, which has assisted the court in working through the large number of issues raised and lengthy factual presentation. Of course, less belligerence and knee-jerk disagreement on both sides would have further reduced the issues that were raised on summary judgment. Both sides' insistence on disputing many inconsequential facts and assertions often required clearing away much brush and weeds on the paths to determining the material factual issues contained in each side's statements of fact and the dispositive legal issues.

no evidence that Buell ever worked for USG. Lutey testified at his deposition and states in his declaration that he did not suggest the design for the feeding devices used at the Silver Grove or Palatka LNA plants. His testimony is that he rejected the type of feeding device initially suggested by outside contractor Gypsum Technologies, Inc. ("Gyptech") for installation at Silver Grove because he had experienced problems with that type of device at another plant. USG provides no evidence supporting that Lutey then suggested a feeding device using water for the Silver Grove plant, which was the design subsequently used at Palatka as well. Lutey's testimony is that, at a meeting with Gyptech, Leslie Holmes (who never worked for USG) first suggested using a device with water, because he had seen such a device in Europe. Lutey also testified that Buell was the one who eventually decided to go with a feeding device using water, and that Lutey went along with that decision. Holmes's recollection was that Buell first brought up the idea of using a feeding device with water and that Holmes saw such a device in Europe either before or after the meeting at which Buell brought up the suggestion.[13] The testimony of Lutey and Holmes is inconsistent as to who first suggested using a feeding device with water (Holmes or Buell), but both also indicated some

_____

[13]Neither side cites to any testimony from Buell.

uncertainty regarding their recollection on this issue. Neither of them, however, recalls Lutey making the suggestion or thereafter providing input as to the design of such a device. There is also no testimony from any Gyptech employee that Lutey had input into the design.

There is insufficient evidence for a reasonable trier of fact to find that Lutey was being untruthful when he testified that he did not contribute to the design of the Silver Grove feeding device or to find that he was being untruthful in denying that he made design suggestions based on a device he had observed 12 or more years before LNA installed the accused devices. The trade secrets claim based on the USG Feeding Device will be dismissed.

## E. Red Valve

An extractor is a piece of equipment that conveys slurry from the mixer into a slurry supply hose that feeds the hard edge and/or skim coating system. A persistent problem is that the supply hose and extractor clog with solidified slurry, especially when the flow of slurry has been interrupted. Generally, a rod is mechanically inserted into the extractor opening to scrape away any buildup of hardened slurry. A "Red Valve" is a commercially available pinch valve that is used to control the flow of slurry through an extractor. USG contends that its use of a commercial Red Valve is a trade secret because it

intermittently restricts, without cutting off, the flow of
slurry.

Defendants Green, Yockey, and Downey are former USG
employees who went to work for LNA. USG contends the three of
them, particularly Green, used their knowledge of USG's system
when LNA set up its extractor clearing system at the Silver Grove
and Palatka plants. All three were aware that USG used a pinch
valve for its extractor. Green was one of the LNA employees
responsible for developing operation methods for LNA's Silver
Grove and Palatka plants.

In their reply, defendants object that none of USG's
multiple listings of trade secrets that were provided in
discovery expressly mentioned the intermittent nature of the
pinch valve as part of this trade secret and therefore USG should
not be able to raise such a trade secret for the first time on
summary judgment. See USG's 2d Rev. Trade Secret List at 5
(App. 3, Tab 22); USG's "Fourth" Trade Secret List at 4-5
(App. 3, Tab 23). See also Owen Dep. at 98-99 (App. 2, Tab 23)
(innovation was how the valve was kept open). That issue need
not be decided because USG does not provide any sufficient
evidence that LNA used the intermittent feature. Defendants
admit that LNA uses a pinch valve supplied by "Red Valve" and
that this valve was first used after Green began working at LNA.
USG cites two LNA documents to support its contention that LNA

- 47 -

used the same pinch valve system as USG. See PSF ¶¶ 136-39 (citing App. 7, Tabs 161-62). One document is a May 17, 2001 email from Ed Green stating that a new extractor design is being used. Id. Tab 161. The email, however, only lists the sizes of the ports for water and slurry and the hose size and provides pictures of the extractor. The three-sentence text of the email mentions keeping velocity sufficient to prevent plugging, but says nothing about intermittent changes. The other document, id. Tab 162, is an October 24, 2001 email exchange between defendant Myslinski and Ed Garson. Garson states: "I talked with Howard about the extractor vs. this process used in Palatka, SG and Buchanan. He recommends this over what we have to get the skim coaters working. You should talk to Sylvan about this as they are about to go on line with the back coater." Garson replies: "Unfamiliar [with the] success at NY. However USG had a hard time keeping these running at slow speed plants (<300fpm) according to Downs and Yockey." While this exchange supports that a number of LNA plants used the same process, it does not show that LNA used USG's intermittent procedure in addition to using the same type of valve as USG.

Since there is no sufficient evidence that LNA used the purported trade secret of USG, the trade secret claim based on the Red Valve will be dismissed.

## F. Slotted Forming Plate

Forming plates shape wallboard. This includes shaping the edges of wallboard, which are generally tapered. Two common methods for creating the tapered edges are to use bolts to bend the edges of the forming plate or attach shims at the edges. USG's purported trade secret is to cut grooves or slots in the metal forming plate so as to make the metal more flexible and easier to bend. Defendants admit that former USG employees working at LNA used their knowledge from USG to implement the slotting technique at two LNA plants. Defendants, however, contend that the technique is not a trade secret because it is known in the industry and readily duplicated.

There is no genuine factual dispute that another wallboard manufacturer ("Manufacturer A") uses the same technique. Manufacturer A considers the technique to be a trade secret. Three LNA employees, none of whom previously worked for USG, independently considered cutting slots in the forming plate at a third LNA plant, Silver Grove. The employee primarily pushing the idea, Roger Jones, knew the technique had been used at another wallboard manufacturer ("Manufacturer B") at which he had previously worked. After a decision to use a slotted forming plate was made, other LNA employees (including former USG employees) were consulted. There is no sufficient evidence that the latter employees made any significant input. But even if the

former USG employees provided significant input, the Jones Group had previously formed the idea independently. Defendants also point to a number of patents, not related to wallboard, in which slots were used to provide more flexibility for metal.

Slotting metal to make it more flexible is a common practice. At least four different groups have independently come up with the idea of using slotted forming plates for wallboard manufacturing, i.e, USG, Manufacturer A, Manufacturer B, and the Jones group. On the evidence before the court on summary judgment, the only reasonable inference is that cutting slots in forming plates is a commonly known procedure that is easily implemented. USG's slotted forming plate is not a trade secret.[14] The trade secrets claim based on the slotted forming plate will be dismissed.

_____

[14] If USG and Manufacturer A were the only two using the technique and both maintained the secrecy of the technique, that would not be enough to conclusively find that the technique is not a trade secret. See DTM Research, L.L.C. v. AT & T Corp., 245 F.3d 327, 332-33 (4th Cir. 2001) (Maryland UTSA) (cited by USG). Here, however, the same or similar techniques were independently developed by two other manufacturers as well and the technique reflects a well-known quality of metals. Also, USG points to evidence that Manufacturer A believes its technique is a trade secret and has general procedures for maintaining the secrecy of trade secrets. See PSF ¶ 163; O'Leary Dep. II at 24-27 (App. 6, Tab 37). The Deponent was not asked whether, as to the slotting technique specifically, its secrecy has actually been maintained. Therefore, USG has not shown that Manufacturer A actually maintained the secrecy of its claimed trade secret.

## G. Cockle Reduction Technology

Belts move formed wallboard down the line while it is drying. As the wallboard is drying, imperfections (cockles), can form on the face paper. USG uses a technique of applying water to reduce cockles. Defendant Yockey implemented the same technique at LNA. It is undisputed that defendant Yockey did not learn of this technique while he worked for USG. Evidence supports that Yockey learned of the technique when interviewing a USG employee for a position at LNA. The employee never took a position with LNA and is still working at USG. Defendants contend this is not improper acquisition of information and therefore does not constitute misappropriation.

Since Yockey is a former USG employee, it can be inferred that he knew that USG had a policy that its employees should not disclose trade secrets. There is no evidence that, during the job interview, the USG employee expressly identified the cockle reduction technology as a trade secret. Yockey states that he did not believe it was a trade secret because the USG employee did not identify it as such and water is commonly used in wallboard manufacturing. There is evidence, however, that it was not generally recognized that water should be used in the manner of this trade secret and that use of the water is contrary to some teaching. It can be inferred that Yockey would have recognized that this technique was considered to be a USG trade

secret. On defendants' summary judgment motion, that inference must be drawn in USG's favor.

On summary judgment, it must be assumed that Yockey would have known that the USG employee's disclosure of the technology was contrary to the employee's duty to maintain secrecy. Thereafter using such information constitutes misappropriation. 765 ILCS 1065/2(b)(2)(B)(III).

The trade secrets claim based on the cockle reduction technology will not be dismissed.

## H. Sales Information

Nondefendant Andrew Haas was employed at USG from 1979 until March 2001, when he went to work for LNA. At the time he left USG, Haas was responsible for the sale of gypsum wallboard in northeast Ohio and western Pennsylvania. At LNA, Haas was responsible for selling gypsum wallboard in essentially the same area plus West Virginia. During discovery in this litigation, Haas (like many other former USG employees working at LNA) was asked to search his files for USG documents. Haas, who has a work office in his home, found a box in his basement that contained some USG documents. Other items, such as office supplies, were also in the box. Haas testified that he thought he had returned all USG documents when he left USG's employment and that he had been unaware the USG documents were in his house.

- 52 -

He also testified that he never used the USG documents while employed at LNA.

USG contends that Haas's testimony is not credible. It points to the fact that Haas twice moved residences while working at LNA, suggesting those would have been opportunities to notice the contents of the box. USG also points to LNA's expectations when hiring Haas and statements in annual appraisals that Haas's LNA manager completed. Haas was hired with the expectation that he would bring his experiences gained with USG to LNA and leverage his existing customer relationships to generate sales for LNA. In Haas's 2001 annual appraisal, it is stated that Haas "needs to share his customer & industry knowledge to strengthen the competitive advantage of" LNA. In his 2002 appraisal, it is stated that Haas "needs to use his customer & industry knowledge to drive results" and "needs to use his knowledge to create increased opportunities for" LNA.

USG does not contend that Haas's relationship with USG customers or his memory of USG customers are trade secrets. USG's trade secrets contention is based on two of the documents that were in Haas's house. One is a document entitled "Strategic Marketing by Product Line," App. 5, Tab 11, Exh. F, and the other is a document dated 2000 and entitled "East Region Business Plan." Id. Exh. G.

- 53 -

The Strategic Marketing document pertains to a number of products, with one page of bullet points for each category of product lines. In its Statement of Facts, USG overexaggerates the description of one of these pages as a "detailed summary of USG's marketing program for its wallboard product lines" and the document in general as providing "detail on the methodologies to be applied by account personnel in deploying USG's strategic plan." PSF ¶ 209. The one page on the wallboard product line that is described as being a "detailed summary" is so lacking in detail and anything helpful to a competitor that it can be quoted in its entirety in this opinion.

PRODUCT
- Preferred Brand
  - Superior Performance
  - Consistent Quality
  - Integrity
- Innovation/Technology Leader
- Complete Product Offering
- Complete Line of Interior Finishing Systems

PROMOTION
- Focus On The Contractor, Promote To The People Who Touch The Product
- Support USG SHEETROCK® Brand Name Products
- Promote Leadership Position Through Trades, Trade Shows, Organizations
- Technical Assistance/Leadership

PLACE (All Customers such as Residential Commercial, Retail, MH, R&R)
- Full Product Offering Countrywide
- Thorough Drywall Yards, MH Dealers, Retailers

PRICE
- Price Leader
- Best Perception=Premium

- Largest Producer/Capacity

App. 5, Tab 11, Exh. F at LFG46150.

USG's President and Chief Operating Officer, James Metcalf, states the "information [in the Strategic Marketing document] could serve as a punch list for anyone, including a competitor, on how to be successful in selling any one of these product lines." App. 5, Tab 11 ¶ 11. That statement is not supported by the contents of the document. A reasonable trier of fact could not find that the Strategic Marketing document would provide a competitive advantage to a competitor. Therefore, the document cannot be found to contain any trade secret.

The 2000 Business Plan is not quite as bare as the Strategic Marketing document, but is still generally lacking in detail and generally limited to broadly worded goals stated in conclusory, business school jargon. For example, a line of blocks on one of many charts consists of taking a USG strategic goal of "Improve our Value Proposition and use it to leverage our partnership and relationship selling strategy," which begets a regional strategic goal of "Improve our response time and frequency of contact with our customers," which in turn begets an area strategic goal of "Utilize Genesis and technology to improve our response to customer inquiries and lead information," which finally begets an action plan of: "Provide Genesis training at District meetings minimum once per quarter. Ensure all sales is

[sic] utilizing Genesis by synching each business day. Use e-mail to communicate with customers where applicable. Max. 48 hour response on price issues." App. 5, Tab 11, Exh. G at LFG46159. Such generalized statements, even when done 80 or more different times, does not produce anything of particular use to a competitor. USG does not attempt to point to any particular fact on these charts that would have been of use to LNA or any other competitor.

The 2000 Business Plan also includes some charts listing sales goal, basically taking 1999 figures and adding a percentage. With the exception of one chart listing sales goals for six categories of products going to 2003, there is nothing in the document that projects any later than 2000. Some of the charts include customer names, but no addresses, telephone numbers, or contacts for any particular customer. It is no surprise that Home Depot, Lowe's, TruServ, Do It Best, Ace, and other retailers are customers of USG, nor that it has a number of contractors as customers. Most of the charts do not list the amount of sales to a particular customer, just a goal stated in a percentage. USG does not point to any specific information about a customer that might have been useful to LNA or any other competitor. USG only points to the conclusory statement of its COO that: "A competitor could leverage the information contained in this document to identify potential customers, or to develop its own strategies and marketing program to target and obtain an

increased sales volume from USG's current customers." App. 5, Tab 11 ¶ 38.

Even taking as true that the 2000 Business Plan is a trade secret, no basis is presented for finding that LNA would have found anything in the Plan particularly useful. There is no sufficient basis for inferring that LNA actually used any of the information contained therein. In light of that fact and the weak impeachment evidence presented, Haas's testimony that he never used the documents while employed at LNA must be accepted as credible. The trade secrets claim based on the sales information will be dismissed.

## I. Ice Cleaner

USG contends it is a trade secret to put ice in a mixer and then run the mixer to clean hardened slurry off the walls of the mixer. There is undisputed evidence that at least two other wallboard manufacturers used this technique. Defendants also point to non-wallboard uses of ice to clean items. Additionally, it is common knowledge that ice has some abrasive characteristics and that it will eventually melt into water when used for such purposes. It is also a simple procedure to implement.

USG contends that this cannot be a commonly known technique because LNA did not use it until suggested by defendant Hartford, sometime after November 2001. Hartford had worked for USG from June 1998 until November 2001, when he took a position with LNA. When at USG, Hartford had observed employees throwing

cups of ice and icicles into mixers to clean them. At LNA, Hartford suggested to other employees that ice be used and those employees thereafter used bags of ice. Hartford also states that, prior to working at USG, he was aware that some companies used ice to clean sediment from industrial machinery.

Although LNA did not begin using ice for cleaning mixers until relatively recently, the fact that USG and at least two other companies previously used ice for cleaning slurry mixers, that ice is used for cleaning other items, and that it is common knowledge that ice has cleaning properties, a reasonable trier of fact could only find that the use of ice to clean slurry mixers is not a trade secret.

The trade secret claim based on using ice as a cleaner will be dismissed.

### J. Hose Shaker

Hoses used to convey slurry have a tendency to experience slurry buildup. One method for reducing buildup is to manually squeeze ("milk") the hose. An alternative implemented by LNA and USG is to have a motorized method of continually shaking the hose. In July 2001, defendant Yockey developed and installed a hose shaker at an LNA plant. The design, fabrication, and installation took less than eight hours and cost less than $500. In September 2003, USG first installed a hose shaker at one of its plants.

In the mid-nineties,[15] Gary Prebble had installed a hose

shaker at a New Zealand wallboard plant of his employer, Winstone

Wallboard, Ltd. Once he came up with the general idea, it took

Prebble less than an hour to implement it.  In 1999, Prebble

mentioned the technology to USG employees.  At the time, no hose

shaker was installed at a USG plant.  In 2000, Prebble mentioned

the concept to Yockey while Prebble was a consultant to USG.

After going to work at LNA, Yockey installed a hose shaker at

LNA.  More than two years later, USG began using a hose shaker

after Prebble became an employee of USG.

USG contends that Prebble's 1995 installation of a hose

shaker should be considered a USG trade secret under a technology

sharing agreement it had with Winstone.  That agreement expired

in 1996.  USG provides no copy of the agreement.  It only points

to testimony generally referring to the agreement.  USG does not

provide sufficient evidence to find that Prebble's 1995

development of a hose shaker would be a USG trade secret.  When

Prebble later mentioned the technology to Yockey, it was not for

purposes of installing such a device at a USG plant.  Even if it

was for such a purpose, Prebble's mention of technology he

developed for a different company would not then make that

technology a USG trade secret.  USG has not provided evidence

[15]Prebble testified it occurred in the mid or late
nineties.  On defendants' summary judgment motion, this lack of
clarity is resolved in favor of USG by assuming it occurred in
1995.

that would support that Yockey implemented a hose shaker for LNA that was based on a USG trade secret.

The trade secret claim based on the hose shaker will be dismissed.

## K. Board Formulation Sheets

The board formulation sheets are an Excel-based spreadsheet that contains the relationship between ingredients in wallboard production. The sheets can be used to calculate new formulas for modifications to the wallboard. For example, if the size or thickness of the wallboard is being changed, the formulation sheets quickly calculate the change in ingredients. Also, if one ingredient is increased or decreased, a formulation sheet would suggest changes to the other ingredients. The formulation sheets necessarily include the formula itself. When he went to work at LNA, Yockey brought two electronic formulation sheets with him. He concedes modifying one of them to use at LNA. There is no evidence that Yockey used the other sheet as a stand alone spreadsheet. It could be inferred, however, that he considered the formula contained therein. A genuine factual dispute exists as to whether he used the second sheet. On summary judgment, it must be assumed that he used both.

Defendants present undisputed evidence that each particular wallboard line needs a particular formula. They contend that this means that having the formula used elsewhere is of no assistance. In his declaration, however, Schooley explains

that knowing another manufacturer's formula can provide insight

as to changes that can be made to one's own formula.  For

example, there could be a particularly low level of one

ingredient that would suggest to another manufacturer decreasing

the amount of that ingredient in one or more of its formulas.  On

summary judgment, there is a factual dispute as to whether having

the formulas contained in the formulation sheets could have been

helpful to LNA.

Merely using an Excel spreadsheet (or another spreadsheet

program) to track and change wallboard formulas is not a trade

secret.  Anybody who can use a spreadsheet program and has

knowledge of his or her employer's formula(s) could do that.  Any

misappropriation of USG's trade secret would have to be based on

using information from the formula itself, including any

relationship between ingredients indicated by the formulation

sheet.  Defendants do not contend that undisputed facts show that

Yockey did not use information from the formulas themselves.  The

trade secrets claim based on the board formulation sheets will

not be dismissed.

## L. USG Power Points & 2000 Document

In their reply, defendants concede that USG has presented

sufficient evidence to support that information contained in

these documents was not completely stale and therefore could be

used to someone else's competitive advantage, and that it was

used by LNA.  Defendants also concede that defendant Spear took

the power points with him when he left USG and that defendant

Weldon had the cost document. Defendants, however, still contend

that USG has not sufficiently identified particular information

in the documents that qualifies as a trade secret. However, the

same information that USG can show was useful is the information

that should be considered trade secrets. The trade secrets

claims based on these two documents will not be dismissed.

## M. Other Trade Secrets

In opposing summary judgment, the party asserting a trade

secret must identify the trade secret with sufficient

specificity. IDX Systems Corp. v. Epic Systems Corp., 285 F.3d

581, 583-84 (7th Cir. 2002) (Wisconsin UTSA) (citing Composite

Marine, 962 F.2d at 1266 (ITSA); AMP Inc. v. Fleischhacker,

823 F.2d 1199, 1203 (7th Cir. 1987) (Illinois common law));

Charles Schwab & Co. v. Carter, 2005 WL 2369815 *10-12 (N.D. Ill.

Sept. 27, 2005); Do It Best Corp. v. Passport Software, Inc.,

2005 WL 743083 *12-13 (N.D. Ill. March 31, 2005). In IDX,

the Seventh Circuit held that it was insufficient to provide a

43-page description of a software program that included items

such as descriptions of the appearances of computer screens that

would have been readily ascertainable and did not specify any

line of computer code or an algorithm that might actually be a

trade secret. 285 F.3d at 584. In 3M v. Pribyl, 259 F.3d 587,

595-96 (7th Cir. 2001) (Wisconsin UTSA), it was sufficient to

point to 500 pages of operating procedures and manuals about a

particular process that involved much public material, but which could be considered a trade secret when combined together.

Here, USG contends that its 11,000-page Operating Bulletins, including the 500-page Expert System contained therein, are kept in confidence and constitute a trade secret. USG describes the Bulletins as a comprehensive accumulation of its business methods and practices, ranging from accounting and administration to manufacturing, quality control, and distribution. They reflect 100 years of experience. USG characterizes the Expert System as particularly useful in day-to-day wallboard manufacturing. Defendant Green took an electronic version of the Operating Bulletins when he left USG and went to work for LNA. USG points to pages 4 to 16 of its Second Revised Trade Secret List (App. 3, Tab 22) as specifying the trade secrets that have been misappropriated from the Operating Bulletins. Much of the information described on those pages concerns particular items among the 13 trade secrets that have been specifically addressed in §§ II(B)-(L), supra. The only additional items are the Bulletins specifically identified on page 9 of the Second Revised List, some of which are thereafter described on pages 11 to 14.

USG cannot simply point to an 11,000-page document covering many diverse topics and assert that the entire document constitutes a trade secret that defendants must refute page-by-page. In response to summary judgment, USG must at least point

to particular secrets within that document that it claims USG has used. Listing particular Bulletins, as it did on page 9 of its Second Revised List, is sufficient for identification purposes. Since defendants' motion for summary judgment does not raise factual issues regarding those items or otherwise specifically address them, USG was not required to raise specific facts in response thereto. See Outlaw, 259 F.3d at 837; AutoZone, Inc. v. Strick, 2005 WL 2978708 *3 (N.D. Ill. Nov. 3, 2005); Anderson v. Cornejo, 225 F. Supp. 2d 834, 845 (N.D. Ill. 2002), rev'd in part, vacated in part on other grounds, 355 F.3d 1021 (7th Cir. 2004). Trade secret claims based on the Bulletins listed on page 9 of the Second Revised List will not be dismissed. To the extent, however, that USG intends to proceed on such claims at trial, it must support those claims, including LNA's use of these trade secrets, with specific evidence.

In its opposition to defendants' summary judgment motion, USG also points to other trade secrets that it previously identified, but which were not specifically addressed in defendants' summary judgment motion. Trade secret claims based on the Gypsum Basics document (LFG40480-85); running speed (manufacturing capability) documents (LFG35683, 44941-42, 44944);[16] two cost documents (LFG35683, 39175), and its financial

---

[16]In its Second Revised List at 15, USG lists these documents as examples. No other examples were specifically identified. This trade secret claim will be limited to the documents that are specifically identified.

reporting analysis package will not be dismissed.  Again, at trial, these claims will have to be supported by specific evidence.

## N. Conclusion

The only remaining trade secrets claims are those based on (a) cockle reduction technology, (b) board formulation sheets, (c) power points, (d) the 2000 document, (e) certain Operating Bulletins listed on page 9 of USG's Second Revised List of Trade Secrets, (f) the Gypsum Basics document, (g) certain running speed documents, (h) certain cost documents, and (I) USG's financial reporting analysis package.  The arguments regarding LSA's and certain Individual Defendants' particular involvement in misappropriating trade secrets is separately considered in § V, infra.

## III.  OTHER STATE LAW CLAIMS

### A. Preemption of Non-contract Claims

Relying on ITSA's preemption provision, defendants contend all the state law claims other than the contract and interference with contract claims are preempted.  That section provides:

> (a) Except as provided in subsection (b), this Act is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret.

> (b) This Act does not affect:

(1) contractual remedies, whether or not based upon misappropriation of a trade secret, provided however, that a contractual or other duty to maintain secrecy or limit use of a trade secret shall not be deemed to be void or unenforceable solely for lack of durational or geographical limitation on the duty;

(2) other civil remedies that are not based upon misappropriation of a trade secret;

(3) criminal remedies, whether or not based upon misappropriation of a trade secret; or

(4) the definition of a trade secret contained in any other Act of this State.

765 ILCS 1065/8.

This bench recently considered the application of this provision, holding that a recent Seventh Circuit case has resolved conflicting views contained in district court cases.

> . . . The Seventh Circuit has narrowly construed the preemptive effect of § 8. The Seventh Circuit stated that "[m]isappropriation of a trade secret differs from other kinds of fiduciary defalcations, which the statute therefore does not affect. . . . Illinois courts have had very little to say about the effect of § 8(a), perhaps because it is unimaginable that someone who steals property, business opportunities, and the labor of the firm's staff would get a free pass just because none of what he filched is a trade secret." The Seventh Circuit also looked to other states' construction of UTSA and the official commentary to UTSA.
>> Because the Illinois Trade Secrets Act is based on the Uniform Trade Secrets Act of 1985, we can check our intuition about its preemptive force by asking how other states have understood its scope. The dominant view is that claims are foreclosed only when they rest on the conduct that is said to misappropriate trade secrets. <u>R.K. Enterprise, L.L.C. v. Pro-Comp Management,</u>

Inc., 356 Ark. 565, 158 S.W.3d 685 (2004);
Savor, Inc. v. FMR Corp., 812 A.2d 894 (Del.
2002); Weins v. Sporleder, 605 N.W.2d 488
(S.D. 2000). The Uniform Law Commissioners'
comment to the model act supports this
approach, stating: "The [provision] does
not apply to duties imposed by law that are
not dependent upon the existence of
competitively significant secret
information, like an agent's duty of loyalty
to his or her principal." We would be
shocked if the Supreme Court of Illinois
were to disagree; nothing in its
jurisprudence suggests that it would. This
is not a close question. An assertion of
trade secret in a customer list does not
wipe out claims of theft, fraud, and breach
of the duty of loyalty that would be sound
even if the customer list were a public
record.
Hecny [Transportation, Inc. v. Chu], 430 F.3d
[402,] 404-05 [(7th Cir. 2005)].

Dominion Nutrition, Inc. v. Cesca, 2006 WL 560580 *4 (N.D. Ill.

March 2, 2006). Following Hecny, it was concluded that: "breach

of fiduciary duty claims cannot possibly be preempted just as any

breach of loyalty or stealing of a business opportunity would not

be. Similarly, the interference with a business expectancy claim

is based on defendant taking away a business opportunity of

plaintiff. It need not be proven that [defendant] relied on any

confidential information." Cesca, 2006 WL 560580 at *4.

Here, USG labels its claims as conversion, breach of

fiduciary duty, unfair competition, inducement of breach of

fiduciary duty, and unjust enrichment. The breach of fiduciary

duty and inducement of breach of fiduciary duty claims are not

preempted.

The unfair competition claim is based on the Corporate
Defendants having "wrongfully appropriated the fruits of USG's
investments in connection with the manufacture of gypsum
wallboard." 2d Am. Compl. ¶ 269. The "fruits" that are alleged
to have been appropriated are primarily, if not exclusively,
USG's confidential, proprietary, and trade secret information.
That is what USG also alleges has been converted by all
defendants. Id. ¶ 284. Similarly, in the unjust enrichment
count, it is alleged that Corporate Defendants were "unjustly
enriched by a sustained and widespread plan and practice to raid
USG employees, information and know-how." Id. ¶ 301. In its
reply (which should have been limited to issues raised in USG's
summary judgment motion), USG characterizes its claims (including
the breach of fiduciary duty claims) as being based on activities
such as solicitation of employees, corporate raiding, and acting
for the benefit of a competitor. Pl. Reply [235] at 12. USG's
state law claims are primarily based on appropriation of
information. To the extent particular information is a trade
secret, the claim is preempted; to the extent particular
information is not a trade secret, the claim is not preempted.
Hecny, 430 F.3d at 404-05. Whether any of USG's non-trade-secret
information can be characterized as property that has been
converted is not raised by the present motions. At this time, no
specific aspect of these claims will be dismissed based on

preemption.[17]   In narrowing its claims down for trial, however,
USG should carefully consider which claims it will continue to
pursue.

Although not formally raised by defendants, the factual
grounds for dismissing some of the trade secrets claims may also
be a basis for partially dismissing related state law claims.
For example, the reason for dismissing the trade secrets claim
based on the hose shaker is that USG had no trade secret in the
hose shaker because the hose shaker was developed by a different
company.  Similarly, USG likely would not have a proprietary
interest in the hose shaker upon which it could base a
conversion, unfair competition, or unjust enrichment claim.
Since not raised by defendants, this issue is not being ruled
upon.  In preparing the final pretrial order, however, USG should
act in good faith and withdraw any related claims that lack merit
in light of today's rulings regarding particular trade secrets.

## B. Contract Claims

Consistent with § 8(b)(1) of ITSA, defendants concede
that the breach of contract claims against some of the Individual

---

[17]In its reply at 12 (which should have been limited to
issues raised on USG's summary judgment motion), USG asserts for
the first time that ITSA cannot preempt its conversion and unfair
competition claims because those claims are based on New York and
New Jersey law.  That is contrary to the position taken in USG's
answer brief.  See Pl. Memo. in Opposition [225] at 4, 44-48.
Since no claim is presently being dismissed based on preemption,
neither the merits of this contention nor its possible waiver
need be addressed.

- 69 -

Defendants and the tortious interference with contract claims against the Corporate Defendants are not preempted by ITSA. Defendants contend these claims fail because USG cannot show actual damages based on any breach.

USG contends that it has suffered damages resulting from the breach of its former employees' confidentiality agreements. USG, however, points to no evidence supporting this contention. It only cites to allegations contained in the Second Amended Complaint, see Pl. Memo. in Opposition [225] at 48, which is an insufficient factual response to a motion for summary judgment. Behrens v. Pelletier, 516 U.S. 299, 309 (1996); Thurman v. Village of Homewood, 446 F.3d 682, 687 (7th Cir. 2006); Sparing v. Village of Olympia Fields, 266 F.3d 684, 692 (7th Cir. 2001), cert. denied, 536 U.S. 958 (2002).

USG's other argument is that it need not show actual damages. While the case cited in support of that contention is a Seventh Circuit case, the Seventh Circuit was applying Wisconsin law in that case. See Olympia Hotels Corp. v. Johnson Wax Development Corp., 908 F.2d 1363, 1365, 1372 (7th Cir. 1990). Illinois law, which is being applied here, requires a showing of damages to succeed on a breach of contract claim, Walker v. Ridgeview Construction Co., 316 Ill. App. 3d 592, 736 N.E.2d 1184, 1187 (1st Dist. 2000), appeal denied, 193 Ill. 2d 600, 744 N.E.2d 289 (2001); Sharon Leasing, Inc. v. Phil Terese Transportation, Ltd., 299 Ill. App. 3d 348, 701 N.E.2d 1150,

1157-58 (2d Dist. 1998); Feldstein v. Guinan, 148 Ill. App. 3d 610, 499 N.E.2d 535, 537 (1st Dist. 1986); Bergstrom v. Northeast Illinois Regional Commuter R.R. Corp., 2004 WL 2973808 *3 (N.D. Ill. Nov. 30, 2004),[18] or tortious interference with contract

---

[18]In its reply, USG cites a case from this district which was applying Illinois contract law.  See Real Estate Value Co. v. USAir, Inc., 979 F. Supp. 731, 741 (N.D. Ill. 1997).  Although applying Illinois contract law, the support cited for Real Estate's holding that nominal damages can be awarded on a contract claim are two Seventh Circuit cases applying Wisconsin law.  Id. (citing Olympia Hotels, supra; Hydrite Chemical Co. v. Calumet Lubricants Co., 47 F.3d 887, 891 (7th Cir. 1995)).  Real Estate also cites Doe v. United States, 976 F.2d 1071, 1085 (7th Cir. 1992), cert. denied , 510 U.S. 812 (1993) (citing Schoeneweis v. Herrin, 110 Ill. App. 3d 800, 443 N.E.2d 36 (5th Dist.1982)).  Doe, however, involved a claim under the Federal Tort Claims Act, which incorporated Illinois law.  It did not involve a contract claim.  Schoeneweis involved claims for defects in construction of a home, apparently based in part on negligence and in part on breach of contract.  See 443 N.E.2d at 38.  In any event, the statement in Schoeneweis that nominal damages could be awarded is dictum since it was held that the plaintiff proved certain damages.  See id. at 42.  More importantly, the statement in Schoeneweis is not that a plaintiff can be awarded nominal damages when he cannot prove that he suffered damages as a result of a breach of contract, but that a plaintiff can recover nominal damages if he proves he suffered damages, but cannot establish the amount of those damages with reasonable certainty.  See id. (citing Brewer v. Custom Builders Corp., 42 Ill. App. 3d 668, 356 N.E.2d 565, 573 (5th Dist. 1976)).  See also Doe, 976 F.2d at 1075; Orchard Park Plaza, L.L.C. v. Dolgencorp, Inc., 2006 WL 1084298 *3 (N.D. Ill. April 18, 2006) (citing Wilson v. DiCosola, 352 Ill. App. 3d 223, 815 N.E.2d 975, 980 (2d Dist. 2004)); Heller Financial Leasing, Inc. v. Gordon, 2005 WL 2756113 *4 (N.D. Ill. Oct. 19, 2005) (citing Schoeneweis).  A recent decision from this district, applying Illinois law, states that nominal damages can be awarded for breach of contract even when there is no injury.  That, however, is dictum (it was instead found that no breach of contract occurred) and is a misstatement of the previously discussed holding contained in Schoeneweis and other Illinois cases.  See Dominion Nutrition, Inc. v. Cesca, 467 F. Supp. 2d 870, 882 (N.D. Ill. 2006) (Posner, J., sitting by designation) (citing Hentze v. Unverfehrt, 237 Ill. App. 3d 606, 604 N.E.2d

claim, Turner v. Fletcher, 302 Ill. App. 3d 1051, 706 N.E.2d 514, 519 (4th Dist.), appeal denied, 184 Ill. 2d 575, 714 N.E.2d 533 (1999); Sharon Leasing, 701 N.E.2d at 1157-58; Allstar Music, Inc. v. Eckhoff, 257 Ill. App. 3d 961, 629 N.E.2d 816, 821 (4th Dist. 1994); Voelker v. Porsche Cars North America, Inc., 353 F.3d 516, 527 (7th Cir. 2003); Montgomery v. Aetna Plywood, Inc., 231 F.3d 399, 413 (7th Cir. 2000), cert. denied, 532 U.S. 1038 (2001).

Additionally, USG asserts, without any amplification or citation to case law, that it seeks specific performance of the confidentiality provisions of the contracts. At most, that would apply to the breach of contract claims against Individual Defendants, not to the tortious interference claims against the Corporate Defendants. Defendants respond that they do not dispute that the confidentiality obligations under the contract continue to exist. Specific performance is an equitable remedy that may be appropriate where there is no remedy at law. It requires proof that the defendant continues to refuse to perform his or her obligations. Even if grounds for granting specific performance are shown, it is within the court's equitable

536, 540 (5th Dist. 1992) (citing Schoeneweis)). Here, USG has not sufficiently presented evidence establishing that it suffered any damages whatsoever resulting from a breach of contract; it is not merely a matter of USG failing to prove the amount of such damages. Even if Real Estate supports that, under Illinois law, nominal damages can be awarded on contract claims when no damages whatsoever have been proven, the cases cited in the text (including Illinois Appellate Court cases) are to the contrary.

discretion as to whether to grant any relief. <u>Dixon v. City of Monticello</u>, 223 Ill. App. 3d 549, 585 N.E.2d 609, 618 (4th Dist. 1991). The contract claim will not survive based on USG's unsupported assertion regarding specific performance.

The contract and tortious interference with contract claims will be dismissed in their entirety.

## IV. FEDERAL COMPUTER STATUTES

USG brings SCA and CFAA claims (the "computer claims") against the Corporate Defendants and Spear. On November 6, 2002, while still an employee of USG, defendant Spear received an email containing five power point presentations (the "power point email"). For present purposes, it is assumed that the power point email contained confidential, proprietary information of USG. On December 28, 2002, defendant Spear accepted an offer of employment with LNA. On January 2, 2003, while still employed by USG, Spear forwarded the power point email from his USG work account to a personal email account he had with WideOpenWest. On March 18, 2003, at which point Spear was working for LNA, he forwarded the power point email from his WideOpenWest account to an LNA work account. In December 2003 or thereabouts, Spear forwarded the power point email from the LNA account to a personal Yahoo! account. Shortly thereafter, Spear deleted the power point email from both the LNA and Yahoo! accounts.

Initially, defendants moved for summary judgment dismissing all the computer claims. In light of International Airport Centers, L.L.C. v. Citrin, 440 F.3d 418 (7th Cir. 2006), defendants withdrew their arguments regarding Spear accessing the power point emails while still employed at USG. This is stated in a supplement to defendants' motion for summary judgment.[19] In the supplement, it is asserted that defendants still seek dismissal of any computer claim based on accessing the emails from the WideOpenWest, LNA, and Yahoo accounts. It is asserted, without citation to any legal support, that such access did not violate either the SCA or CFAA because the accounts were not USG accounts. The supplement was served after USG had filed its opposition to defendants' motion for summary judgment. Although the merits of the computer claims are not a subject of USG's summary judgment motion, USG responded to the supplement in its reply in support of its summary judgment motion. See Pl. Reply [235] at 11.

In its opening brief, defendants argue that the computer claims fail because Spear "never accessed any USG computer

---

[19]The supplement is dated March 28, 2006 and contains a certificate of service certifying that it was served on USG at the time. The document, however, does not appear on the docket. Forthwith, defendants should electronically file the document. There is nothing contained in the document that would support filing it in camera or under seal.

without authorization." Def. Brief [212] at 34.[20]  In the brief,
there is no express mention of accessing personal accounts or
third party accounts.  See id. at 34-35.  The last line before
concluding that all computer claims should be dismissed is:
"Here, the undisputed facts show that on the occasions that Spear
is alleged to have accessed USG's e-mail server he was an
employee of USG and authorized to do so."  Id.  In defendants'
motion itself, it is asserted: "And on the second two dates, it
is undisputed that Spear never accessed USG's computers at all,
but rather accessed his personal Yahoo! or WideOpenWest email
accounts."  Def. Summ. Jmt. Motion [211] ¶ 30.  However, neither
the opening brief nor reply contains any argument supporting this
assertion.

        In its opposition brief, USG's position regarding
accessing the power point emails through Yahoo! and WideOpenWest
is that defendants have failed to address these allegations.  USG
does not address the assertion in the motion itself that
assessing non-USG computers cannot violate the statutes.  In its
reply, USG does briefly address the merits of the conclusory
contention contained in the supplement, while still noting that
defendants have not adequately argued the issue.  USG does note
that its CFAA claim is not based on Spear's use of WideOpenWest
or Yahoo!, only its SCA claim.  It does contend that the

_____

[20]The computer claims are not addressed in defendants'
reply [230].

- 75 -

WideOpenWest and Yahoo! access are still relevant to proving
Spear's intent regarding the CFAA claim. In any event, since
defendants did not support their assertion regarding WideOpenWest
and Yahoo! access with an argument, this contention is waived for
purposes of ruling on summary judgment. No aspect of the
computer claims will be dismissed.

## V. PERSONAL JURISDICTION

LSA and four Individual Defendants contend both that
personal jurisdiction is lacking and that, on the merits, the
evidence does not support that they are responsible for any of
the claims made against them. To a large extent, the merits
evidence going to whether a particular one of these defendants is
liable also goes to the issue of whether that defendant had
sufficient contacts with Illinois to support personal
jurisdiction. Therefore, the two issues will be considered
together. As to personal jurisdiction, USG is also moving for
summary judgment, contending the undisputed facts conclusively
establish that personal jurisdiction is satisfied. As to
personal jurisdiction, the facts must be considered from the
perspective of each side's motion.

As to patent claims against LSA, Federal Circuit law
applies in determining whether personal jurisdiction is
appropriate. Breckenridge Pharmaceutical, Inc. v. Metabolite
Laboratories, Inc., 444 F.3d 1356, 1361 (Fed. Cir. 2006); Silent

Drive, Inc. v. Strong Industries, Inc., 326 F.3d 1194, 1201 (Fed. Cir. 2003); Irwin Industrial Tool Co. v. Orosz, 2003 WL 22048073 *2 (N.D. Ill. Aug. 29, 2003). Since the other claims are not intimately related to the patent claims, Seventh Circuit law applies to the question of whether there is personal jurisdiction over LSA and certain Individual Defendants for the state law claims and for LSA regarding the computer claims. Breckenridge, 444 F.3d at 1361-62; Silent Drive, 326 F.3d at 1201; Orosz, 2003 WL 22048703 at *2. If LSA is subject to personal jurisdiction on either the patent or computer claims, it would be subject to supplemental personal jurisdiction on the other claims as long as the other claims satisfy the supplemental jurisdiction requirement of 28 U.S.C. § 1367(a). Silent Drive, 326 F.3d at 1206; Robinson Engineering Co. Pension Plan & Trust v. George, 223 F.3d 445, 449-50 (7th Cir. 2000); Orosz, 2003 WL 22048703 at *2.

Even if Federal Circuit law and Seventh Circuit law on personal jurisdiction differs on some points or details, the same general framework applies to all the claims. First, personal jurisdiction in the state in which the district court sits must be appropriate under the applicable statute of the state in which the district court sits. See Silent Drive, 326 F.3d at 1200 (patent claims); Snow v. DirecTV, Inc., 450 F.3d 1314, 1317 (11th Cir. 2006) (SCA claims); FAIP North America, Inc. v. Sistema s.r.l., 2005 WL 3436398 *3 (N.D. Ill. Dec. 14, 2005)

(computer claims); <u>Verizon Online Services, Inc. v. Ralsky</u>, 203
F. Supp. 2d 601, 609 (E.D. Va. 2002) (CFAA claims); <u>Hyatt
International Corp. v. Coco</u>, 302 F.3d 707, 713 (7th Cir. 2002)
(state law claims). In this case, the applicable statute is the
long-arm statute of Illinois, 735 ILCS 5/2-209. Second, personal
jurisdiction must comport with constitutional due process.
<u>Silent Drive</u>, 326 F.3d at 1201; <u>Snow</u>, 450 F.3d at 1317; <u>Hyatt</u>,
302 F.3d at 713. Illinois's long-arm statute, however, reaches
the full limits of the Illinois and United States Constitutions.
735 ILCS 5/2-209(c). Therefore, it need only be considered
whether the due process requirements of the two constitutions are
satisfied. <u>Brown v. SBC Communications, Inc.</u>, 2007 WL 684133
*10 (S.D. Ill. March 1, 2007). Since, as regards personal
jurisdiction, the Illinois courts have not held that the due
process provision of the Illinois Constitution differs from
federal due process guarantees, the two inquiries collapse into
one, with the only consideration being whether exercising
personal jurisdiction would comport with federal due process.
<u>Id.</u> at *11. As to LSA, USG alternatively contends that if its
contacts with Illinois are otherwise insufficient to support
personal jurisdiction here, personal jurisdiction may still be
exercised in Illinois if LSA has insufficient contacts with any
single state, but sufficient contacts with the United States as a
whole to exercise personal jurisdiction in this country. <u>See</u>
Fed. R. Civ. P. 4(k)(2).

As a general rule, a court should not rule on the merits
of a case before determining that it has personal jurisdiction.
Sinochem International Co. v. Malaysia International Shipping
Corp., 127 S. Ct. 1184, 1186 (2007) (dictum); In re Rationis
Enterprises, Inc. of Panama, 261 F.3d 264, 267-68 (2d Cir. 2001);
Republic of Panama v. BCCI Holdings (Luxembourg) S.A., 119 F.3d
935, 940-41 (11th Cir. 1997). However, when the case can be
resolved in a defendant's favor on the merits, it is sometimes
appropriate to go directly to the merits. See Charles Alan
Wright & Arthur R. Miller, Federal Practice & Procedure:
Civil 3d § 1067.6 at 553 & n.7 (2002). This is especially true
when the personal jurisdiction issue is complex or intertwines
with the merits. Id.; Sandpiper Village Condominium Association,
Inc. v. Louisiana-Pacific Corp., 428 F.3d 831, 840 n.12 (9th Cir.
2005), cert. denied, 126 S. Ct. 2970 (2006). Also, the existence
of genuine factual disputes regarding personal jurisdiction does
not preclude resolving on summary judgment the merits of claims
for which there are no genuine factual disputes. Here,
defendants press addressing the merits before considering
personal jurisdiction, which is the approach that has been taken.
The personal jurisdiction issue, at least as to LSA, is factually
complex and intertwined with the merits. Moreover, here personal
jurisdiction is only challenged by some defendants. The merits
issues would still have to be resolved regarding the other
defendants even if some defendants are dismissed for lack of

personal jurisdiction. Additionally, by first addressing the merits of the claims, it is easier to consider the personal jurisdiction issues in light of the facts material to claims.

To the extent that any defendant prevails on personal jurisdiction grounds either on summary judgment or at trial, all claims against that defendant would be dismissed without prejudice. See Lichtenheld v. Juniper Features, Ltd., 1996 WL 685443 *2 (N.D. Ill. Nov. 21, 1996). Any ruling otherwise dismissing a claim on the merits would not apply to a defendant dismissed on personal jurisdiction grounds. The defendant dismissed on personal jurisdiction grounds, though, might be able to invoke collateral estoppel (issue preclusion) based on a judgment entered in favor of a different defendant.

## A. LSA

Defendants do not dispute that LNA does business in Illinois and therefore is subject to personal jurisdiction here. They also do not dispute that LNA is an appropriate entity from which to seek compensation for misconduct done through its employees. LSA's liability, and the ability to bring suit against it in Illinois, turns on the question of whether it had sufficient control over LNA or involvement in LNA's conduct. To some extent, this question turns on the nature of the unincorporated entity known as LSA's Gypsum Division. LSA contends that much of the conduct that USG relies on to hold it

liable is actually conduct of the Gypsum Division, which LSA
contends is distinct from LSA itself.

A parent-subsidiary relationship generally is an
insufficient basis for exercising personal jurisdiction over the
parent based on conduct of the subsidiary. FAIP, 2005 WL 3436398
at *4. However, if the parent itself participates in the
pertinent conduct, personal jurisdiction may be exercised over
the parent. Id. Jurisdiction may also be exercised over the
parent if the subsidiary is acting as an agent of the parent.
Id. Situations where the corporate veil can be pierced are also
a basis for exercising personal jurisdiction over the parent.
Id. Piercing the veil, however, is not a necessity for
exercising personal jurisdiction over the parent. Observing
corporate formalities while exercising a high degree of control
over the subsidiary will suffice. Id. It is also sufficient
that the subsidiary's only purpose is to conduct the business of
the parent. Id. at *5.

Undisputed evidence shows that there is a group known as
the Gypsum Division that exercises substantial control over
various LSA-owned entities that are involved in the gypsum-
related industrial processes. LNA is one of the entities
controlled by the Gypsum Division. The Gypsum Division is not
incorporated. It is run by employees of LSA and employees of LSA
subsidiaries and is involved in transferring employees between
LSA subsidiaries. At the time LSA was named as a defendant in

this case, it directly owned a substantial interest in LNA and
had the right to purchase a majority of its shares. All the
wallboard sold by LNA has LSA-owned trademarks on it. The Gypsum
Division has substantial control over LNA's budget and business
decisions, input into employment decisions, and provides training
and technical guidance. The head of the Gypsum Division is an
employee of LSA. Of the ten executive officers identified as
LNA's management team in March 2005, six currently or formerly
held positions with LSA, one subsequently went straight from LNA
to LSA, and two others worked for a different LSA subsidiary and
were authorized to testify on behalf of LSA in this litigation.
These undisputed facts establish sufficient control by LSA over
LNA to hold that LSA is subject to personal jurisdiction in
Illinois based on LNA doing business in Illinois. LSA's
contention of a lack of personal jurisdiction defense will be
dismissed.

        It is a separate issue as to whether LSA can be held
liable for any of the remaining claims against it based on its
participation in the alleged misconduct. USG does not present
evidence that would support piercing the corporate veil.
Therefore, a finding of liability on the part of LSA would
require evidence supporting that LSA was involved in the
particular misconduct or sufficient evidence that LNA was acting
at LSA's agent. It is held that genuine factual disputes exist
regarding LSA's liability for the patent infringement and state

law claims.  USG, however, points to no sufficient basis for holding LSA liable on the computer claims.  The computer claims against LSA will be dismissed.

## B. Individual Defendants

Individual Defendants Hartford, Huffer, Myslinski, and Jett contend that they are not subject to personal jurisdiction in Illinois.  Alternatively, each of them contends there is insufficient evidence that he engaged in any of the alleged misconduct.

## 1. Personal Jurisdiction

None of these defendants have ever lived in Illinois nor been employed in a position where their place of employment was Illinois.  All are former employees of USG, which is and was headquartered in Illinois.  Each of them had employment contracts with USG that had Illinois choice of law provisions.  Hartford had a few short training assignments in Illinois.  Jett had a one-week training assignment in Illinois.  The claims against Hartford and Jett do not arise from those training assignments. USG instead contends these defendants are subject to personal jurisdiction in Illinois because they appropriated property of USG, which is based in Illinois, and that the alleged harm and tort occurred in Illinois since that is where USG is located. Seventh Circuit case law supports that contention, holding that this is a sufficient basis for personal jurisdiction under § 209(c) of Illinois's long-arm statute.  <u>Janmark, Inc. v. Reidy</u>,

132 F.3d 1200, 1202 (7th Cir. 1997). See also Riddell, Inc. v. Monica, 2003 WL 21799935 *3 (N.D. Ill. July 25, 2003) (trade secrets claim brought by corporation located in Illinois); SpankA Music & Sound Design, Inc. v. Hanke, 2005 WL 300390 *3 (N.D. Ill. Feb. 7, 2005) (same); Allied Van Lines, Inc. v. Gulf Shores Moving & Storage, Inc., 2005 WL 418032 *3 (N.D. Ill. Feb 23, 2005) (conversion of funds of a company located in Illinois) Filipowski v. Rogovin, 2000 WL 983727 *4 (N.D. Ill. July 17, 2000) (conversion of tangible property known to have been originally stolen in Illinois). Defendants contend the Illinois courts have rejected Janmark as being an inaccurate interpretation of Illinois law, citing West Va. Laborers' Pension Trust Fund v. Caspersen, 357 Ill. App. 3d 673, 829 N.E.2d 843, 847-48 (1st Dist. 2005). Caspersen, however, distinguishes Janmark; it does not reject Janmark's holding. Caspersen involved the question of whether disseminating allegedly fraudulent merger materials was a tort committed in Illinois because it adversely affected a shareholder of a corporation who happened to reside in Illinois. That conduct was found to be an insufficient basis for exercising jurisdiction in Illinois because defendants did not intentionally direct their conduct at Illinois. That is unlike the present case where defendants allegedly engaged in intentional conduct aimed to appropriate property of a plaintiff located in Illinois, by misappropriating trade secrets, through conversion, and/or involving a breach of

fiduciary duties owed to plaintiff. Consistent with Janmark and the trades secret and conversion cases cited above, that is a sufficient basis for exercising personal jurisdiction over these four Individual Defendants. Since it is undisputed that USG is headquartered in Illinois and that these defendants were aware of that, USG is entitled to summary judgment dismissing the personal jurisdiction defense of these defendants.

Still to be considered are the merits of the claims against these four Individual Defendants.

## 2. Defendant Hartford

There is evidence that: (a) Hartford had a USG safety manual that he brought from USG; (b) among training bulletins Hartford received at LNA were some USG information bulletins; and (c) Hartford saw ice used as a cleaner while at USG.

As was discussed in § II(I), supra, the use of ice to clean slurry is not a trade secret. Neither is it a confidential procedure, the disclosure of which could be considered a breach of Hartford's fiduciary duty. Nor is there evidence supporting that USG had a proprietary interest in the procedure that could be converted. Any claim against Hartford based on the ice cleaner will be dismissed.

Although the safety manual was among things Hartford left behind when he departed LNA, there is no evidence that Hartford

ever used the safety manual while at LNA. Any type of claim against Hartford based on the safety manual will be dismissed.

Regarding the information bulletins, Hartford only contends no claim can be based on them because he innocently received them from someone else at LNA. Def. Brief [212] at 50. Hartford does not raise an issue regarding the bulletins containing secrets so USG was not required to make such a showing in response to summary judgment. For present purposes, it must be assumed that the bulletins contained secrets. Hartford recognized the bulletins as USG documents that should not have been taken from USG. Even if he was not the one who took them, he can still be liable under ITSA for using documents he knew were improperly obtained. See 765 ILCS 1065/2(b)(2)(B); § II(G), supra.

All claims against Hartford will be dismissed except the trade secret, breach of fiduciary duty, and conversion claims based on the information bulletins in the training materials.

### 3. Defendant Huffer

Defendant Huffer is a former USG employee who went to work at LNA in 2001. Attached to an August 2, 2002 Huffer email is a May 18, 2001 list of possible improvements that he suggests for a wallboard line at LNA's Buchanan plant. See App. 7,

- 86 -

Tab 229.[21] USG contends such recommendations must be based on knowledge gained at USG since that is the only wallboard manufacturer that employed Huffer prior to his going to LNA.

USG particularly points to recommendations regarding foam injection technology and skim coating. See PSF ¶ 762. USG, however, points to no evidence supporting that these particular suggestions, nor anything else in the list, is a USG trade secret or kept confidential by USG or a process in which USG has a proprietary interest. Moreover, the email does not detail the skim coating or injection changes. Evidence of changes actually made at LNA would have to be provided in addition to evidence that such processes were previously used at USG, kept in confidence, and not part of the general knowledge, skill, or experience acquired by Huffer while at USG. Any type of claim against Huffer based on the recommendation list will be dismissed.

USG also contends Huffer provided Red Valve information to LNA. As is discussed in § II(E), supra, there is no sufficient evidence that LNA used USG's particular Red Valve procedure. Any type of claim against Huffer based on the Red Valve will be dismissed.

_____

[21]A shorter version of the May 18, 2001 list was also attached to emails sent by other LNA employees in May 2001 and September 2001. See App. 7, Tab 307.

Separate from the attached May 2001 list, the body of
Huffer's August 2002 email suggests using a wallboard additive
known as MCM that was being used at USG. While Huffer states how
much additive to use and identifies it by its initials,[22] USG
points to no evidence that the additive was ever used by LNA.
There is also no evidence that Huffer disclosed (or even knew)
the components of MCM.

All the claims against Huffer will be dismissed.

## 4. Defendants Jett and Myslinski

Jett worked in various positions at USG's Baltimore plant
from 1995 until January 2002 and then worked at LNA's Buchanan
plant from January 2002 to February 2003. Myslinski worked at
USG's Baltimore plant from 1989 until 1992, then worked at other
gypsum manufacturers, and, except for eight months in 1999, has
worked for LNA since April 1997. On October 11, 2001, Myslinski
interviewed Jett for a position at LNA. That same day, Myslinski
distributed an email containing information about USG's Baltimore
plant. USG contends Myslinski improperly obtained this
information from Jett and that both are liable for claims based
on this information. It is also contended that Myslinski is
separately liable for use of some other USG information.

---

[22]An email sent from Downs to Myslinski and two others at
LNA states that MCM stands for "magical chemical mixture."
App. 7, Tab 240.

USG points to only two other pieces of information that are distinct from Myslinski's relationship with Jett. One is the slotted forming plate information. As is discussed in § II(F), supra, that information does not constitute a trade secret. It is commonly known in the industry and also would not support a claim based on breach of fiduciary duty or conversion. USG also points to evidence that Myslinski requested information about MCM from defendant Downs. The evidence of this is a email from Downs (App. 7, Tab 240) in which he states that USG kept secret what MCM actually was, though Downs believed it was actually a commonly known ingredient. There is no evidence that Downs was privy to this USG information. Instead, Downs indicates in the email that he intended to conduct tests to confirm his suspicion. There is no evidence that he conducted these tests or that LNA ever used MCM. Even if it did, there would be no viable claim against LNA, Myslinski, or Downs based on his independent discovery of a wallboard additive. No sufficient basis is shown for pursuing a claim against Myslinski based any information distinct from the Baltimore plant information.

Myslinski's email (App. 3, Tab 14) about the Baltimore plant contained information about the plant's natural rock costs, synthetic rock costs, and improvements to its unloading system. The email is very brief, consisting of three paragraphs containing two or three sentences each. The stated cost for

natural rock was inaccurate. The stated cost for synthetic rock was incomplete in that it listed one price while the price was variable. The statement about improving the unloading system is simply that construction had begun and the name of the line manager. There is no description of the improvements.

As to the information in the email, Myslinski and Jett testify that Jett did not provide it. Myslinski testifies that he often gets information about competitors' costs from the third parties who sell both to LNA and the competitors. He states that the information about unloading came from the Huffer list discussed in § V(B)(3), supra. USG contends that Jett can be inferred to be the source of all the information because the email was sent on the same day Myslinski interviewed Jett. That is a reasonable inference that must be taken on defendants' motion for summary judgment.[23]

However, there can be no injury based on inaccurate cost information or the fact that USG had begun some construction at its plant. All the claims against Myslinski and Jett will be dismissed.

---

[23]Defendants' citation to a discrimination case (see Stagman v. Ryan, 176 F.3d 986, 1000-01 (7th Cir.), cert. denied , 528 U.S. 986 (1999)) involving inferences drawn from the timing of a discharge is not on point.

## VI. CONCLUSION

Today's ruling narrows this case a bit, but still leaves much to be resolved. In light of today's ruling, the parties should promptly meet to discuss the possibility of settlement. Even if the case cannot be settled, the parties may be able to narrow the issues remaining for trial, either by dropping some claims, defenses, or contentions or by reaching stipulations as to certain facts. In order to provide the parties with an opportunity to resolve some or all matters, a longer time than usual will be provided to prepare the final pretrial order.

The pretrial order shall be in full compliance with Local Rule 16.1 and Local Rule Form 16.1.1, including trial briefs, proposed voir dire questions (if there will be a jury), motions in limine with supporting briefs,[24] and proposed jury instructions and/or findings of fact and conclusions of law. In the pretrial order, the parties must be clear regarding the burdens of proof imposed on each party and the issues remaining in the case. They also must make clear which issues, if any, are for a jury and which issues, if any, are for the judge to decide. In accordance with the issues remaining for a jury and/or the judge, appropriate jury instructions and/or proposed findings of fact and conclusions of law must be submitted.

---

[24]At the time the pretrial order is submitted, a date will be set for responding to motions in limine, if any, usually two weeks.

IT IS THEREFORE ORDERED that:

(a) Defendants' motion for summary judgment [211] is granted in part and denied in part.

(b) Plaintiff's cross motion for summary judgment [218] is granted in part and denied in part.

(c) Plaintiff's claims that claims 36 and 37 of the '635 patent are literally infringed are dismissed.

(d) Defendants' affirmative defense and counterclaim based on USG's failure to disclose the Sweetwater process are dismissed.

(e) Plaintiff's trade secret claims are dismissed except to the extent they are based on (i) cockle reduction technology, (ii) board formulation sheets, (iii) power points, (iv) the 2000 document, (v) certain Operating Bulletins listed on page 9 of USG's Second Revised List of Trade Secrets, (vi) the Gypsum Basics document, (vii) certain running speed documents, (viii) certain cost documents, and (ix) USG's financial analysis reporting package.

(f) Plaintiff's contract and tortious interference with contract claims are dismissed.

(g) Defendants LaFarge, S.A.'s, Hartford's, Huffer's, Myslinski's, and Jett's defenses of lack of personal jurisdiction are dismissed.

(h) Plaintiff's claims against LaFarge, S.A. based on the Stored Communications Act and the Computer Fraud and Abuse Act are dismissed.

(i) Plaintiff's claims against defendant Hartford are dismissed except trade secret, conversion, and breach of fiduciary duty claims based on the information bulletins in training materials.

(j) All claims against defendants Huffer, Myslinski, and Jett are dismissed and those defendants are dismissed from this action.

(k) In open court on July 11, 2007 at 11:00 a.m., the parties shall submit an original and one copy of a final pretrial order in full compliance with Local Rule 16.1 and Local Rule Form 16.1.1, including trial briefs, proposed voir dire questions, motions in limine with supporting briefs, proposed jury instructions, and proposed findings of fact and conclusions of law.

(l) A status hearing will be held on April 14, 2007 at 11:00 a.m. to report on settlement progress and to consider procedural matters.

                              ENTER:

                              William T. Hort

                              UNITED STATES DISTRICT JUDGE

DATED: APRIL $3$ , 2007