UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES GYPSUM COMPANY,** ) | |
| ) | |
| **Plaintiff** ) | |
| ) | |
| v. ) | No. 03 C 6027 |
| ) | |
| **LAFARGE NORTH AMERICA INC.,** ) | Judge Rebecca R. Pallmeyer |
| **LAFARGE S.A., DAVID DOWNS, JOHN D.** ) | |
| **YOCKEY, ED GREEN, WILLIAM** ) | |
| **HARTFORD, WALTER WELDON,** ) | |
| **KURT F. KURZSHAK, and SIDNEY** ) | |
| **SPEAR,** ) | |
| ) | |
| **Defendants.** ) | |

**MEMORANDUM OPINION AND ORDER**

In this lawsuit, pending since 2003, Plaintiff United States Gypsum Company ("USG") claims that Defendants Lafarge North America, Inc. ("Lafarge"), Lafarge's parent company, and several Lafarge employees, have infringed USG's patents and stolen confidential information relating to wallboard manufacture. Before the court are motions to bar the testimony of the parties' expert witnesses pursuant to Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

**DISCUSSION**

Defendants have moved *in limine* (No. 13) [562] to exclude the testimony of Plaintiff's proffered computer forensics expert Carl Florez. The court simultaneously considers Plaintiff's motion *in limine* (No. 4) [575] to preclude the testimony of Defendants' proffered computer forensics expert Andrew Reisman. Florez is expected to testify to his opinions on the adequacy of data protections measures at USG and the manner and extent to which USG documents were obtained by Lafarge. Reisman is expected to testify to his opinions on the adequacy and shortcomings of Florez's computer forensics investigation and report. For the reasons explained below, both motions are granted in part and denied in part. The factual background has been presented earlier,

*see United States Gypsum Co. v. Lafarge North America, Inc.*, 508 F. Supp. 2d 601 (N.D. Ill. 2007), and the standards governing the pending motions were presented in a companion ruling of today's date. Those facts, and the legal standards, will not be repeated here, but the court assumes familiarity with those previous orders.

**I.      Expert Qualifications**

Under Rule 702, a witness can be qualified as an expert by "knowledge, skill, experience, training, or education . . . ." FED. R. EVID. 702. "Accordingly, [courts] consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

**A.      Carl Florez's Qualifications**

Carl Florez's technical expertise, as a general matter, is not in dispute. Defendant concedes that "Carl Florez knows his way around computers . . . . He can surely testify about technical matters that are beyond the ordinary experience of most jurors . . . ." (Def. [562] Mot. at 2.) Florez has been the Director of Impact Forensics, a computer forensics examiner with its own forensics laboratory, since 2006. (Florez 06/18/07 Expert Report at 1-2.) Previously, he was Director of Electronic Discovery at that company. (*Id.*) He has also been the president of Computer Evidence Specialists, another company, since 2002. (*Id.*) In his current position, he provides consulting services in computer forensics, electronic discovery, data recovery, expert witness testimony and litigation support for law firms and corporate clients. (*Id.*)

Prior to entering private practice in 2002, Florez spent twenty years with the Federal Bureau of Investigation, retiring as the Assistant Special Agent in Charge of the FBI's Seattle office. (*Id.* at 2.) While there, Florez oversaw several FBI laboratories dedicated to the investigation and examination of electronic media and illegal internet activity. (*Id.*) He had executive responsibility for the creation and management of the National Drug Intelligence Center. (*Id.*) He is an FBI-

certified computer forensics examiner and a field instructor on computer forensics. (*Id.*) He has previously taught courses on computer forensics, personally conducted more than 100 computer forensic investigations, testified as a computer forensic expert in both state and federal courts, and worked on trade secret matters for Fortune 500 companies like Motorola and McDonalds. (*Id.*) He holds a graduate degree in criminal justice from Michigan State University. (*Id.* at 3.) Florez's knowledge, experience, and training provide ample support for the court's determination that he is a qualified expert in the areas of computer forensics and investigation.

### B. Andrew Reisman's Qualifications

Defendant's expert, Andrew Reisman, is also a qualified expert in the field of computer forensics. Reisman is the President and Lead Forensic Examiner of Elijah Technologies, a company he founded in 2003, which specializes in computer forensic investigations, electronic discovery, and litigation support. (Reisman 08/24/07 Expert Report at 2.) In that position, he has had primary responsibility for more than 100 forensic engagements. (*Id.*) Prior to 2003, Reisman was a practicing attorney specializing in litigation and technology law at the firm of Foley & Lardner LLP in Chicago. (*Id.*) He is a certified fraud examiner and a certified EnCase computer forensics examiner.[1] (*Id.*) He has undergone formal training in computer forensics techniques and software. (*Id.*) He has been on the Board of Directors of the International Information Systems Forensics Association. (*Id.*) He has delivered lectures and published articles on topics in computer forensics and electronic discovery, including a primer on computer forensics for the Illinois Institute for Continuing Legal Education. (*Id.* at 2-3.) Reisman is a licensed private investigator in Michigan and Texas and a member of the Illinois bar. (*Id.* at 2.) He has previously testified as a computer forensics expert in state and federal court. (*Id.* at 3.) The court concludes that Reisman is a

---

[1] According to Wikipedia, EnCase is a series of proprietary forensic software products produced by Guidance Software. It is used by law enforcement agencies and businesses for purposes of civil and criminal investigation. http://en.wikipedia.org/wiki/EnCase, last visited Oct. 26, 2009.

competent expert in computer forensics.

## II. The *Daubert* Standard: Reliability and Assisting the Jury

The admissibility of expert testimony depends on more than just whether the potential witness qualifies as an expert. The court must also determine that the proffered expert opinions are more than mere speculation or conjecture, but have at their core some reliable basis.[2] In addition to reliability, the court must decide whether expert testimony is relevant by determining "whether evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue." *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996) (internal citations and quotations omitted); *see also Daubert*, 509 U.S. at 591. The court turns to the question of whether the opinions offered by Florez and Reitman are reliable and will assist the trier of fact.

### A. Florez's Opinions

#### 1. Reasonable Steps to Protect Information

In his expert reports, Carl Florez offers a list of "reasonable" measures a company might take to protect its confidential information. (Florez 06/18/07 Expert Report at 4-10.) Florez then proceeds to review the measures taken by USG, ultimately concluding that "USG's efforts to protect the secrecy of its proprietary and confidential information, including the information that is electronically stored, are more than reasonable, and are among the most thorough I have encountered in my experience." (*Id.* at 10.) Defendants contend that Florez is not qualified to render an opinion regarding the steps USG took to protect its confidential information. According

---

[2] *Daubert* sets forth a non-exclusive checklist for trial courts to use in assessing the reliability of expert testimony: (1) whether the expert's technique or theory can be or has been tested–that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.

to Defendants, "[Flores] may be conversant in computer forensics and an expert in investigating certain crimes, but he has no stated or apparent expertise in the steps necessary to protect the secrecy of information." (Def. [562] Mot. 2-4.) As a result, Defendants contend, Florez's opinions on these matters are unreliable and will not assist the trier of fact.

"Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990). The court is satisfied that Florez's testimony passes this test. Defendants concede that Florez is an expert in investigating electronic breaches of confidential information. In the context of that experience, Florez has certainly gained expertise and familiarity with how breaches occur, including the measures and countermeasures used to protect information and to overcome protections. Efforts to protect information and efforts to access confidential information evolve on parallel tracks, such that a person familiar with the challenges of accessing protected information will also be familiar with steps necessary to protect it. Nor is this conclusion unique to data protection. For example, an expert in investigating counterfeit currency would almost certainly have some expertise on how to prevent counterfeiting, and his expertise would be shaped by his familiarity with the activities and capabilities of counterfeiters. *See, e.g., Estate of Wicker v. United States,* 43 Fed. Cl. 172, 184 (Fed. Cl. 1999) (noting that those responsible for preventing counterfeiting "are charged with knowing the possible threats to documents and they incorporate these anti-counterfeiting features into documents."). Applying the same logic, Florez's unique familiarity with computer crime provides him with an understanding of computer security measures. The court concludes that Florez is generally qualified to opine on matters relating to effective data and information protection measures.

Defendants nevertheless urges that Florez may not opine on the reasonableness of USG's protection measures because his opinion rests on an unreliable method. Again, the court

disagrees. Florez's failure to undertake a specific experimental analysis in reaching his opinion does not, by itself, require the court to exclude his testimony. Indicators of reliability depend on the "particular circumstances of the particular case at issue." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). "Among the factors to consider, the expert witness's experience in a particular field is often quite relevant in determining the reliability of her opinion." *United States v. Young*, 316 F.3d 649, 657 (7th Cir. 2002). Determining whether a particular activity is reasonable in light of other facts is often a function of experience.[3] Defendants concede that Florez has substantial experience in investigating how breaches of confidential information occur. The court believes that experience provides a reliable basis for determination of what precautions are reasonable and effective to prevent breaches.

Florez sets out and expounds on five "generally accepted measures" for protecting electronic information: (1) establishing and communicating protection polices; (2) need-to-know distribution of confidential information; (3) marking information as "confidential" or "proprietary"; (4) maintaining confidentiality agreements; and (5) controlling access to information with physical or electronic systems. (Florez 06/18/07 Expert Report at 4-5.) The measures Florez identifies appear reasonable. In the context of forming his opinion, Florez consulted authoritative sources and publications in the field.[4] He also compared USG's policies with those at several other organizations he was familiar with, including the FBI. (Florez Dep. 85-89.) Defendants suggest that these comparisons are inadequate because none of these organizations "is in the manufacturing

---

[3] As the great proponent of the reasonableness standard, Oliver Wendell Holmes famously wrote, "[t]he life of the law has not been logic; it has been experience." THE COMMON LAW, 1 (1880).

[4] Defendants make much of the fact that Florez could not remember exactly what authoritative sources he looked at in his deposition, but Florez makes clear that he consulted industry sources. What asked if he consulted sources for this case, Florez responded: "I believe I did . . . . One of them is the Information Security – I forget the acronym, Association." (Florez Dep. 91:19-20.) The Information Systems Security Association (ISSA) regularly publishes trade publications for information and data security experts.

business or construction industry." (Def. [562] Mot. at 6.) A discussion of confidentiality measures in the manufacturing setting might have been useful, but Florez's failure to offer such an analysis is not fatal; the need for secrecy, confidentiality, and security can be no greater in the wallboard manufacturing business than it is at the Federal Bureau of Investigation. The court finds the method and application of experience Florez employs are sufficiently reliable to permit his testimony.

The court also finds that Florez's testimony will assist the jury. Florez is offering more than bottom-line conclusions. His opinions emerge as a result of his experience and knowledge in the field, and they are relevant to facts in issue. In order for information to constitute a trade secret under Illinois law, (1) the information must be "sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure;" and (2) the information must be the "subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d); *Mangren Research and Development Corp. v. National Chemical Co.*, 87 F.3d 937, 942 (7th Cir. 1996). Florez's testimony bears directly on the second element, and, contrary to Defendants' insistence, the topic is also sufficiently technical to warrant expert testimony. The potential protections in this case range from the rudimentary, such as marking documents "Confidential," to the exceedingly complex. Florez's reports note that USG apparently employed a tiered level of electronic password control access as well as secured "electronic storage vaults" for retaining electronic documents. (Florez 06/18/07 Expert Report at 9.) While basic familiarity with computer passwords and the like is no doubt becoming more common in this information age, the court finds that the level of technological sophistication claimed by USG is likely outside the typical experience of a lay jury. To that end, the court finds Florez's testimony will assist the jury in understanding the evidence and determining facts in issue.

    **2.**    **"Misappropriation" of Trade Secrets**

Based on his forensics investigation, Florez concludes that various Defendants "misappropriated" information from USG. Defendants object to Florez's use of the term "misappropriate" and urge that the word suggests Florez is drawing legal rather than factual conclusions. In support, Defendants cite *Good Shepherd Manor Foundation, Inc. v. City of Momence,* in which "proffered testimony [that] was largely on purely legal matters and made up solely of legal conclusions" was properly excluded. 323 F.3d 557, 564 (7th Cir. 2003).

The court is not troubled by Florez's use of the word "misappropriate." Expert testimony is not ordinarily offered on determinative legal conclusions, but Florez, admittedly not a legal expert, does not purport to offer testimony on purely legal matters. Instead, his conclusions relate to a central contested fact: whether Defendants wrongfully obtained information from Plaintiff's private files. Misappropriation is not an exclusively legal concept; it is a common term in everyday usage. See MERRIAM WEBSTER'S COLLEGIATE DICTIONARY, 743 (10th ed.1997) ( "to appropriate wrongly (as by theft or embezzlement)"). The court will therefore admit Florez's opinion testimony, as it bears on factual rather than legal conclusions. To avoid confusion, however, and in recognition that "misappropriate" may well be a loaded term, the court will direct Plaintiff's witnesses to use other common words to describe Defendant's alleged activities and to minimize the use of the word "misappropriate" and other references that express a conclusion that falls within the jury's purview.

Defendants further argue for the blanket exclusion of Florez's testimony on the trade secret issue because it is "a regurgitation of facts–facts that ought to be presented through competent witnesses . . . ." A review of Florez's report shows, however, that he relies on facts to give proper context to his computer forensics investigation and resulting findings. The court concludes that Florez's method is reliable and that his testimony will assist the trier of fact in understanding complicated technical evidence. That Florez mentions other facts in evidence in his reports—facts that a competent investigator would no doubt regularly rely on for context in the field—is not a basis to exclude his testimony.

### 3. Intent of Defendants

Defendants contend that Florez inappropriately opines on the mental states of various Defendants when recounting the findings of his investigation. Florez's reports make a few oblique references to actors' states of mind, primarily in response to reports and testimony from Defendants' computer forensics expert Andrew Reisman. For example, in one report Florez writes, "[t]he fact that Spear twice chose to forward the presentations en route to his Lafarge email account adds weight to the conclusion that he did so intentionally." (Florez 10/01/07 Report at 6.) There is nothing before the court to suggest that Florez is particularly qualified to understand the mental attitudes of others. Even assuming he were, he is able to render an opinion on intent only by drawing inferences from the evidence. Such opinions merely substitute the inferences of the expert for those the jury can draw on its own. "'[T]estimony that does little more than tell the jury what result to reach' is unhelpful and thus inadmissible, and testimony regarding intent–essentially an inference from other facts–'is even less likely to be unhelpful to the trier of fact.'" *Dahlin v. Evangelical Child and Family Agency,* No. 01-1182, 2002 WL 31834881, at *3 (N.D. Ill. Dec. 18, 2002), quoting *Woods v. Lecureux*, 110 F.3d 1215 (6th Cir. 1997). The court finds Florez's opinions on Defendants' intent would not assist the jury. Defendants' motion is granted in part. Florez may recount the findings of his investigation and underlying facts from which the jury can infer intent, but he will not be permitted to opine on the Defendants' intent or mental attitudes of Defendants.

### 4. Spoliation of Documents

In his reports, Florez opines that various Defendants committed intentional acts of spoliation to cover up the misappropriation of USG documents. (Flores 01/29/08 Expert Report at 24-26.) The court has previously dealt with the spoliation issue, ruling on May 26, 2009, that USG, its attorneys, and witnesses are barred "from offering evidence of any alleged spoliation of evidence by any of the Defendants . . . and precluding all comment or testimony on such matters in the

presence of the jury, either directly or indirectly, at any stage of trial from jury selection to verdict." (Motion, D.E. 339 at 1;Order, D.E. 477 at 2.) The court subsequently granted in part and denied in part Plaintiff's motion for clarification, stating: "The parties will stipulate that, because certain original disks are missing or damaged, information that could be obtained from those original disks is unavailable. Plaintiff will not be permitted to infer that disks were intentionally destroyed or lost unless there is non-speculative admissible evidence that would support such an inference." (Minute Order, D.E. 665 at 2.)[5]

Plaintiff now seeks to use Florez's testimony to explain "what steps were taken resulting in deletion of the documents, how partial information was recovered, and what information is irretrievably lost." (Pl.'s [562] Resp. at 11.) Plaintiff endeavors to demonstrate to the jury "how defendants' cover up of the theft of USG's strategy documents prejudiced USG." (*Id.* at 13.) Plaintiff implicitly concedes that the main purpose of Florez's testimony is to create the inference that Defendants intentionally destroyed evidence in an attempt to cover up alleged wrongdoing. Plaintiff presents no new non-speculative evidence to support this inference, however. In compiling his reports, Florez reviewed the facts that were before the court when it issued its orders of May 26, 2009 and August 6, 2009. Florez's technical account of how information was damaged, lost, or destroyed cannot shed light on the issue of intent without straying into improper speculation. Florez's opinions on spoliation of documents, found on pages 24-26 of his January 29, 2008 expert report, will be barred.

### B. Reisman's Opinions

---

[5] The court's rulings pre-dated the parties' recent discovery of troubling circumstances involving a compact disk containing a large number of USG documents, found in the possession of a Lafarge employee and secreted since 2005. Pending further discovery on this issue, the court expresses no views on how, if at all, this discovery might support revisiting the spoliation ruling. The conclusions expressed in the instant opinion are based on the record created by Mr. Florez's declaration and by the parties' briefs, all filed well before the circumstances involving this disk emerged.

### 1. Validity of Florez's Findings

Defendants' computer expert Andrew Reisman conducted no independent investigation or data analysis. Instead, he reviewed Florez's reports and consulted the same data that Florez relied on in reaching his opinions. Plaintiff intimates that Reisman was obligated to undertake a broader investigation because he "had unfettered access to the entire Lafarge computer network" and concludes that his failure to do so constitutes cherry-picking data in a way that fatally undermines the reliability of his conclusions. (Pl.'s [575] Mot. at 1.) Defendants respond that Reisman will testify, based on his own experience, to "what forensic analysts do, what information they look at, what conclusions they can reach, and what conclusions they cannot reach based on forensic evidence." (Def.'s [575] Resp. at 2). Reisman opines primarily on the validity of Florez's methods and conclusions, contending that the evidence Florez reviewed fails to establish his subsequent findings. To the extent that Reisman's opinions are limited to pointing out the methodological shortcomings he perceives in Florez's work, the court finds Reisman's testimony is reliable and will assist the trier of fact. Reisman has considerable experience as a computer forensics investigator and his report presents legitimate differences of opinion with Florez. To opine on what he views as intrinsic weaknesses in Florez's reports, Reisman is not required to undertake an independent investigation. Reviewing the allegedly flawed reports is enough. Reisman's methodological criticisms are sufficiently based on his relevant experience to be reliable, and because computer forensics is a highly complicated area, the jury will benefit from having access to criticism from another expert in the field. The contrasting view Reisman offers will likely highlight areas of disagreement and better equip the jury to make informed evaluations of the evidence and Florez's expert testimony. For those reasons, the court will permit Reisman to testify to the shortcomings he perceives in Florez's analysis and findings.

### 2. Use and Dissemination of USG Information

Defendants contend that Reisman "has never expressed an opinion, and was never asked

to render an opinion" on use or dissemination of USG information at Lafarge. (Def.'s [575] Resp. at 3.) The court is less emphatic; it appears that Reisman does offer his own independent opinions in the guise of criticizing Florez. Thus, in his reports, Reisman signals his opinions concerning dissemination with phrases like, "[r]ather, a more likely explanation of events is that . . . " or by suggesting that some bit of evidence is more consistent with the testimony of Defendants' witnesses than with USG's interpretation. (Reisman 8/24/07 Expert Report at 4, 5, 8.) Reisman conducted no independent review of the evidence and articulates no independent methodology or basis by which he arrives at these speculative conclusions. Accordingly, the court doubts their reliability and ability to assist the jury. Reisman will be barred from offering any speculative testimony on the use or dissemination of USG information at Lafarge. His testimony will be limited to methodological criticisms of Florez's reports and testimony.

### 3. Intent of Defendants

Reisman asserts that Defendant Sidney Spear's conduct in forwarding USG board presentations to his Lafarge e-mail address was inadvertent. (Reisman 8/24/07 Expert Report at 3-4.) To support that conclusion, Reisman lists several e-mails Spear sent from his personal account to his work account and relies on Spear's testimony that he intended only to migrate data to his work account. (*Id.*) Spear will be available at trial to testify regarding his actions and intentions. Reisman's testimony on the topic adds nothing that will assist the trier of fact. As explained earlier with respect to Florez's proffered testimony, a computer forensics expert is not particularly qualified to draw conclusions as to mental state. Even if Reisman were, his opinion rests solely on inferences derived from other facts in evidence, namely Spear's testimony. Any inference of intent or willfulness will be made by the trier of fact, and neither party's expert will be permitted to attempt to supplant the jury's proper determination with his own unsupported speculation. Reisman may attest to the underlying facts (*i.e.*, that seven e-mails were forwarded from one account to another in less than two minutes), but he will not be permitted to speculate as to whether the transfer of

USG information was intentional or inadvertent.

### 4. Destruction and Spoliation of Documents

Many of Reisman's opinions, including most or all of Reisman's July 9, 2009 Report, attempt to contradict conclusions Florez draws with regard to destruction and spoliation of documents by Defendants in the context of trial preparation. As the court has excluded Florez's speculative testimony on this topic, any contrary opinion offered by Reisman is no longer relevant and would fail to assist the trier of fact. Reisman may not opine on issues of spoliation or destruction of documents.

### **CONCLUSION**

Defendant's substituted motion *in limine* (No. 13)[562] to exclude the testimony of Plaintiff's proffered expert Carl Florez is granted in part and denied in part. Florez may testify as an expert in computer forensics on his investigation and findings in this case. He may opine on the reasonableness of the steps undertaken by USG to safeguard its private information. Florez may opine on whether Defendants wrongfully obtained Plaintiff's trade secrets and proprietary information. The court directs Florez to refrain from using the loaded term "misappropriate," however, and bars his testimony on issues of Defendants' intent or mental state. Nor may Florez opine on the spoliation or destruction of documents in advance of trial.

Plaintiff's motion *in limine* (No. 4) [575] to preclude the testimony of Defendants' proffered computer forensics expert Andrew Reisman is granted in part and denied in part. Reisman may opine on methodological shortcomings he perceives in Florez's analysis and findings, but he is barred from speculating on issues of use or dissemination of USG information at Lafarge. He may not opine on the intent or mental states of Defendants, nor will he opine on spoliation or destruction of documents.

ENTER:

*[signature]*

Dated: October 27, 2009                    _____
                                                  REBECCA R. PALLMEYER
                                                  United States District Judge

(Final-Florez-Reisman)