UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES GYPSUM COMPANY, | ) |
| Plaintiff | ) |
| v. | ) No. 03 C 6027 |
| LAFARGE NORTH AMERICA INC., LAFARGE S.A., DAVID DOWNS, JOHN D. YOCKEY, ED GREEN, WILLIAM HARTFORD, WALTER WELDON, KURT F. KURZSHAK, and SIDNEY SPEAR, | ) Judge Rebecca R. Pallmeyer |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

In this lawsuit, pending since 2003, Plaintiff United States Gypsum Company ("USG") claims that Defendants Lafarge North America, Inc. ("Lafarge"), Lafarge's parent company, and several Lafarge employees, have infringed USG's patents and stolen confidential information relating to wallboard manufacture. Before the court are motions to bar the testimony of the parties' expert witnesses pursuant to Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

## DISCUSSION

Plaintiff has moved *in limine* (No. 3)[598] to exclude the testimony of Defendants' proffered damages expert, Mark Peterson. The court simultaneously considers Defendants' substituted motion *in limine* (No. 7) [566] to preclude the testimony of Plaintiff's proffered damages expert Julie Davis. For the reasons set forth here, Plaintiff's motion [598] is denied, and Defendants' motion [566] is granted in part and denied in part. The factual background has been presented earlier, *see United States Gypsum Co. v. Lafarge North America, Inc.*, 508 F. Supp.2d 601 (N.D. Ill. 2007), and the standards governing the pending motions were presented in a companion ruling of today's date. Those facts, and the legal standards, will not be repeated here, but the court assumes familiarity

with those previous orders.

**I.     Expert Qualifications**

Under Rule 702, a witness can be qualified as an expert by "knowledge, skill, experience, training, or education . . . ." FED. R. EVID. 702. "Accordingly, [courts] consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). The parties here do not contest the qualifications of either prospective damages expert as a general matter. Rather, each party suggests that the other's proffered expert is ill-suited or unqualified to reliably render some specific facet of his or her expert opinion. The court will address these arguments in the next section, but first merely summarizes the proposed experts' general qualifications.

**A.     Julie Davis's Qualifications**

Julie Davis is a qualified expert in computation and assessment of damages in intellectual property cases. She has been providing audit and financial consulting services for nearly thirty years. (Davis 06/18/007 Expert Report at 1.) Ms. Davis graduated *summa cum laude* from Kansas State University with a Bachelor of Science degree in Business Administration and Accounting in 1978. (*Id.*) She is a Certified Public Accountant, earning the Gold Key for the highest score on the CPA exam in Kansas in 1978. (*Id.*) She has previously testified in numerous intellectual property cases and has conducted professional studies evaluating lost sales, lost profits, incremental profits, manufacturing and marketing capacities, fixed and variable costs, product line profitability, price erosion, reasonable royalty, unjust enrichment, and prejudgment interest. (*Id.*) She has co-authored a book on best practices in managing intellectual property and several other publications (*Id.*) She is a member of the American Institute of Certified Public Accountants, the American Bar Association, and the Licensing Executives Society. (*Id.*)

**B.     Mark Peterson's Qualifications**

The court is similarly satisfied that Mark Peterson is qualified to give expert testimony concerning the computation and assessment of damages in intellectual property cases. For over 15 years, Peterson has been the chief executive officer of Robinwood Consulting, a firm specializing in dispute analysis and litigation support. (Peterson Dep. 6:6-15; Peterson 8/24/07 Expert Report at 3.) Prior to founding Robinwood Consulting in 1994, Peterson was Vice-President of Peterson Consulting Limited. In both positions, Peterson consulted on valuation of intellectual property. (*Id.*) He has previously testified in approximately 15 trials as an expert on lost profits, reasonable royalties, price erosion, convoyed sales,[1] market share and other economic considerations affecting intellectual property valuation. (Peterson 8/24/07 Expert Report at 3.) Peterson was also formerly an auditor with the Chicago Board of Trade's Office of Investigations and Audits. (Peterson Dep. 6-7.) He is a Certified Public Accountant in Illinois. (*Id.*) He holds degrees in accounting and economics from Ohio University. (*Id.*) He helped create a training program and has conducted educational seminars on intellectual property for the Licensing Executive Society, an organization in which he has served as Trustee, Treasurer, and Executive Committee Member. (*Id.* at 8; Peterson 8/24/07 Expert Report at 3.)

## II. The *Daubert* Standard: Reliability and Relevancy

The admissibility of expert testimony depends on more than just whether the potential witness qualifies as an expert. The court must also determine that the proffered expert opinions are more than mere speculation or conjecture, but have at their core some reliable basis.[2] In

---

[1] A "convoyed sale" is a sale in which patented and unpatented products are sold together. *DePuy Spine, Inc., v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1333 (Fed. Cir. 2009.)

[2] *Daubert* sets forth a non-exclusive checklist for trial courts to use in assessing the reliability of expert testimony: (1) whether the expert's technique or theory can be or has been tested–that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) (continued...)

addition to reliability, the court must decide whether expert testimony is relevant by determining "whether evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue." *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996)(internal citations and quotations omitted); *see also Daubert*, 509 U.S. at 591.  The court turns to the question of whether the opinions offered by Peterson and Davis are reliable and will assist the trier of fact.

### A. Julie Davis's Opinions

#### 1. Unjust Enrichment and Lafarge's Viability

Plaintiff retained Julie Davis to opine on the extent of Plaintiff's damages, assuming Plaintiff prevailed on its various claims.  Davis's assessment presents several alternative damage calculations based on different assumptions and legal standards of recovery, ranging from lost profits to reasonable royalties to unjust enrichment.  Initially, Davis posits a scenario in which "Lafarge would have been unable to sell any of its wallboard without the use of USG's confidential, proprietary and trade secret information." (Davis 06/18/07 Expert Report at 28.)  In scenario #2, Davis assumes Lafarge would only have been able to sell wallboard "based on production levels experienced at its [low-speed] Buchanan and Wilmington plants prior to [the] use of USG" information. (*Id.* at 19.)  In scenario #3, Davis assumes that Lafarge would have been forced to close its [high-speed] Silver Grove and Palatka plants, but would have continued producing wallboard at its low-speed plants at pre-infringement capacity. (Davis 06/24/09 Expert Report at 8.)

Defendants take issue not with Davis's subsequent calculations, but with her initial assumptions.  Defendants urge that Davis's assumptions regarding Lafarge's hypothetical commercial viability and the scope of its reliance on USG information are inconsistent with the

---

[2](...continued)
the known potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.

4

evidence, unreliable, and outside the scope of her financial expertise. As the court reads Davis's reports, however, she does not seek to opine that the assumptions underlying her analysis are true in fact.³ Davis is an expert on damages, not liability, and she seeks to opine only on what the damages should be *if* the jury separately finds the facts she assumes to be true. As Davis notes in her report, her assumptions are "[b]ased upon the facts I understand will be established at trial . . . ." (*Id.* at 6.) Plaintiff bears the burden of establishing the factual predicate necessary for admission of Davis's conditional opinions on damages, and the jury will decide whether to accept or reject that factual predicate. "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact . . . ." *Smith*, 215 F.3d at 718. This objection is, accordingly, overruled without prejudice to renewal, should Plaintiff's proffered evidence be insufficient to support the findings that are necessary predicates for her opinions.

Defendants further contend that Davis's opinion is unreliable because she "failed to scrutinize and test the proposition that whatever technical problems Lafarge faced were remedied by virtue of the use of USG information." (Def. Mot [566] at 14). This, too, however, is a factual issue to be proved by the Plaintiff and determined by the jury–that is, the extent, if any, to which the viability of Lafarge's operations depended on USG information will be determined by the trier of fact. Though the court has excluded Peter Morton's speculative testimony on Lafarge's product quality and economic viability, there remains admissible evidence (primarily in the form of Lafarge's business records and admissions) from which the trier of fact could find that Lafarge's operations were at imminent risk of failure had Lafarge not undertaken a large-scale appropriation of USG information

---

³ The court has ruled that Peter Morton's testimony, opining that Lafarge was on the verge of exiting the American wallboard manufacturing market due to quality problems, is inadmissible. Morton's testimony on that issue constituted speculation that failed to assist the jury. Davis's testimony on the scope of damages issue is, however, distinct from Morton's fact opinions. It does not seek to establish the facts Davis assumes, but instead suggests a metric for damages, should the jury find certain facts to be true.

and technology. If the jury ultimately makes that determination, Davis is qualified to present her calculations of the damages Plaintiff suffered as a result.

In concluding that her opinions are sufficiently reliable, the court notes that Davis reasonably employed the analytical tools of her trade in assessing damages. She provided a detailed analysis of Lafarge's market share as compared with that of USG. (*Id.* at 2-3.) She presented all of the formulas and schedules on which she relied in making her calculations. (*Id.* at 9-17.) Her technique can be challenged in an objective sense; indeed, Defendant's expert, Mr. Peterson, does so do by relying on the very schedules Davis provides. (Peterson 07/08/09 Expert Report at 11-12.) The court is satisfied that Davis's methods reflect the same intellectual rigor that characterizes accounting practices in the field and satisfied, further, that her analysis and projections of prospective economic damages suffered by Plaintiff will assist the trier of fact. Assuming that Plaintiff establishes the requisite factual predicates during its liability case, Davis's testimony concerning resulting damages is admissible.

### 2.  **Lost Profits and the *Panduit* Factors**

To recover for lost profit damages, the patentee must show a reasonable probability that, but for the infringement, it would have made the sales that were made by the infringer. *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1371 (Fed. Cir. 2006). To do this, the patentee may rely on the *Panduit* test, which requires the patentee to establish: (1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capacity; and (4) the amount of profit it would have made. *Id.* at 1371-72; *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978). Defendants argue that Davis's opinion on lost profits should be excluded because USG will be unable to establish two factors at trial: that there was sufficient demand for the patented product and that there were no acceptable non-infringing alternatives to the accused process.

As a preliminary matter, the court notes that satisfying the *Panduit* test is only one of the

ways a plaintiff may seek to prove it is entitled to recovery of lost profits. "[C]ourts have given patentees significant latitude to prove and recover lost profits for a wide variety of foreseeable economic effects of the infringement." *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341 (Fed. Cir. 1999). In any event, Defendants have not satisfied the court that Plaintiff will be unable to meet the *Panduit* test as a matter of law. In challenging Plaintiff's case for lost profits, Defendants note a distinction between the patented *process* at issue in this case and the patented *product* identified in the first *Panduit* factor. Defendants claim USG cannot establish demand for wallboard specifically resulting from USG's patented process as opposed to other manufacturing processes. However valid this argument is in the abstract, it is not persuasive here; Plaintiffs are expected to present evidence demonstrating that the patented process allowed their plants to operate at higher speeds and efficiencies, reducing costs and creating better wallboard. A jury could find that a manufacturer who had the exclusive ability to produce better wallboard faster than its competitors would also have had a reasonable probability of capturing greater market share and higher profits. And courts have recognized that the holder of a process patent is entitled to recover lost profits, on an appropriate factual record. *See, e.g.*, *Northlake Marketing & Supply, Inc. v. Glaverbel, S.A.*, 72 F. Supp. 2d 893 (N.D. Ill 1999). Whether the patented process does in fact result in better efficiency and whether its exclusive use would have given Plaintiff a competitive advantage are questions of fact to be left to the jury.

Likewise, the existence and availability of non-infringing substitutes for USG's patented process are factual issues that are hotly disputed. Technical experts Robert Bruce and Peter Morton are expected to offer substantial testimony on this very issue. Plaintiff's expert Mr. Morton is expected to opine that neither the hard edge mixer process nor the triple mixer process, the two potential non-infringing alternatives Ms. Davis could identify, were capable of producing wallboard comparable to the patented process at the time of Lafarge's alleged infringement. An inability to provide the same "benefits or advantages of the patented invention" is sufficient to support a finding


that substitutes were not acceptable. *Northlake Marketing & Supply Inc.*, 72 F. Supp. 2d at 910. "Moreover, *Panduit* teaches that the argument of 'acceptable substitutes' must be viewed of limited influence where the infringer knowingly made and sold the patented product for years while ignoring the claimed 'substitute.'" *Id.* at 910-11.[4]

Mr. Morton may, of course, be incorrect. The alternative mixing processes may well be acceptable substitutes. But that is a question of fact for the jury. Plaintiff is entitled to present evidence that in the absence of infringement, USG would have filled market demand for wallboard that was otherwise filled by Lafarge. If Plaintiff can make such a showing, Davis's opinion is reliable and would assist the jury in making a determination concerning the proper amount of lost profit damages.

### 3. Federal Statutory Claims

The court next turns to Davis's opinion on damages for Plaintiff's federal statutory claims. First, Plaintiff claims that Defendants violated the Computer Fraud and Abuse Act ("CFAA" or "the Act") when Defendant Sidney Spear e-mailed copies of five USG board of director's presentations to a Lafarge e-mail account. Spear had been a USG employee before subsequently going to work for Lafarge. Plaintiff alleges that, before Spear left USG, he e-mailed USG board presentations and other sensitive documents to his personal non-USG e-mail account. (Compl. ¶ 205.) From the personal account, Plaintiff alleges, Spear forwarded the e-mails on to his new employer, Lafarge. (*Id.*)

The CFAA prohibits individuals from illicitly accessing secure computer systems and damaging the data on the computer. 18 U.S.C. § 1030. The Act provides a private right of action

---

[4] In fact, evidence of acceptable substitutes does not necessarily foreclose recovery of lost profits. If the record is sufficient to show that the infringed product was in significant demand and otherwise supports the conclusion that a plaintiff had a reasonable probability of making sales but for the infringement, the plaintiff may still recover some measure of lost profits. *Minco, Inc. v. Cumbustion Engineering, Inc.*, 95 F.3d 1109, 1119 (Fed. Cir. 1996).

8

for any "person who suffers damage or loss" as a result of a violation of the Act. 18 U.S.C. § 1030(g). Thus, to recoup compensatory damages, a plaintiff must show *either* damage or loss. *SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 720 (N.D. Ill. 2009). The CFAA defines "damage" as any "impairment to the integrity or availability of data, a program, a system or information." 18 U.S.C. § 1030 (e)(8). It defines "loss" to mean either "any reasonable cost to the victim, such as responding to the offense or otherwise restoring lost material" or "lost revenue or other damages incurred as a result of interruption of service." *SKF USA, Inc.*, 636 F. Supp.2d at 721. These losses must be related to the computer systems involved. *Id.*

Davis concedes that she did not consider the kind of "loss" contemplated by the Act (Davis Dep. at 219-220), and Plaintiff appears to concede that it has not attempted to plead such loss. (Pl.'s [566] Resp. at 14.) Davis nevertheless asserts that Plaintiff suffered damage because of the intrinsic value of the proprietary information leaked to Lafarge. This is not the correct legal standard for determining damage under the Act. "Under the CFAA, an employee causes 'damage' when she destroys company data." *Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands International Inc.*, 616 F. Supp.2d 805, 810 (N.D. Ill. 2009). "By contrast, merely downloading and e-mailing confidential information is insufficient to show damages . . . ." *Id., see also Garelli Wong & Assocs. v. Nichols,* 551 F. Supp. 2d 704, 707 (N.D. Ill. 2008).

As far as the court is aware, Plaintiff does not contend that Spear destroyed USG data. Rather, it alleges he disclosed USG data improperly. This does not constitute damage under the CFAA. In the very similar case of *Motorola, Inc. v. Lemko Corp.*, Motorola alleged that a group of its employees secretly accepted employment with a competitor and e-mailed substantial amounts of Motorola's confidential business information to the competitor. 609 F. Supp. 2d 760, 763 (N.D. Ill. 2009). Judge Kennelly observed:

> The only harm Motorola has alleged is the disclosure to a competitor of its trade secrets and other confidential information. The CFAA's definition of damage does not cover such harm; rather, damage under the statute is limited to impairment of the

9

> integrity or availability of data and information. The plain language of the statutory
> definitions refers to situations in which data is lost or impaired because it was erased
> or because (for example) a defendant smashed a hard drive with a hammer.

*Id.* at 769. Though Plaintiff prevails upon the court to adopt a more capacious interpretation of "damage" which could encompass harm from the mere disclosure of information, the court agrees with its colleagues that the CFAA is not intended to expansively apply to all cases where a trade secret has been misappropriated by use of a computer. *See, e.g., Garelli Wong & Assocs.,* 551 F. Supp. 2d at 710 (Kocoras, J.).

Plaintiff relies on *Creative Computing v. Getloaded.com LLC,* 386 F.3d 930 (9th Cir. 2004), but that case is distinguishable. In *Creative Computing*, the owners of a website hacked into the website of a competitor and disrupted service. *Id.* at 932. The competitor sued, and was awarded damages for loss of business and goodwill resulting from the disruption. Unlike the plaintiff in that case, USG's business is not reliant on the proper functioning of the computer system that Spear allegedly accessed. Nor is the court aware of any evidence that USG's computer systems or business generally suffered a disruption as a result of Spear's activities.

In formulating her damages opinion, Davis did not consider whether USG suffered damage to its systems or data. Instead, she appears simply to have assumed that the mere disclosure of information contained in the board presentations caused compensable harm. That assumption is not appropriate in this context, and Davis therefore applied a legally incorrect standard for determining damages under the CFAA. She has not articulated a sufficient basis for the conclusion that Plaintiff suffered any damage compensable under the Act, and the court therefore concludes her opinion on the topic must be excluded. With respect to its CFAA claim, Plaintiff will be limited to presenting evidence of actual damage or loss, meaning data that has been lost or impaired.

Defendants further challenge Davis's opinion on damages for Plaintiff's claims under the Stored Communication Act. 18 U.S.C. §2701 *et seq*. That opinion, Defendants urge, is unreliable because Davis adopted the opinion of Plaintiff's previous expert, Dr. Bernard Friedlander, and failed

to undertake any independent analysis.  In fact, however, Davis testified in her deposition that she independently reproduced Friedlander's analysis, (Davis Dep., at 106-07), and a review of her reports and testimony satisfies the court that Davis did engage in an adequate independent review when she forming her opinions on this claim.  Defendant does not object to the substance of the analysis, which is reasonable.  The court will permit Davis to opine on the Stored Communication Act claim.

Additionally, the parties agree Ms. Davis should deduct $759,998, the amount of Mr. Spear's salary, from her damage assessment as the court has previously ordered that salaries of the individual defendants are not to be considered at trial.  (Order, D.E. 446.)[5]

Defendant's motion is therefore granted in part.  Having applied the incorrect legal standard in formulating damages under the CFAA, Davis will not be permitted to testify on that topic.  She will be permitted to opine on damages under the other federal claims presented by Plaintiff.

### 4. Quality Issues at Lafarge

In its ruling on Defendant's motion *in limine* [561] to partially preclude the expert testimony of Peter Morton on the topic of wallboard quality at Lafarge, the court concluded that Morton's testimony appeared to be "essentially based on anecdotal data with little or no governing method of analysis." The court further held that the consumer complaints and memoranda that Morton relied on would be readily accessible to a jury, so Morton's testimony did nothing to assist the trier of fact.  Based on the very same evidence (and adoption of a large portion of Morton's excluded opinion), Davis makes substantially similar statements in the "Additional Background Information" portion of her report.  (Davis 06/18/07 Expert Report at 8-12.)  Davis's testimony on quality suffers from the same defects as Morton's, and it will be excluded for the same reasons.  Nor is Davis qualified in any way to opine on wallboard quality.  Davis's expertise is in accounting and damage assessment,

---

[5] Davis's unjust enrichment opinions regarding the salaries of individual defendants will be excluded for the same reason, as contrary to the court's prior ruling.

not technical judgments of wallboard construction.

The court therefore grants Defendant's motion in part. Davis will not be permitted to testify in a manner that summarizes the evidence on wallboard quality at Lafarge. She will, however, be permitted to rely on any facts Plaintiff establishes during the liability phase in the context of her damages assessment. She will also be permitted to draw on accounting and financial information and plant performance plans to support her conclusions that certain Lafarge plants were "high-cost/low volume," or subject to shut downs or inefficient operation. (*Id.*) Davis is qualified to discern the meaning of financial and accounting evidence. Her opinions on those matters are reliable and likely to assist the trier of fact.

**B.      Mark Peterson's Opinions**

**1.      The Value of Technical Capabilities**

Plaintiff USG essentially concedes that Peterson is qualified to opine on damages, and raises no objection that damage testimony would be unreliable or would fail to assist the trier of fact. (Pl's [598] Mot. at 5.) Plaintiff does, however, challenge certain of Peterson's opinions as beyond the scope of his expertise. "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990). Experts are limited in their testimony, therefore, to those topics within their area of expertise. *See Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 724 (7th Cir. 1999).

Peterson admits that he has no technical or engineering expertise in wallboard manufacture. (Peterson Dep. 11-13.) Plaintiff argues that he is therefore precluded from opining on Lafarge's prolonged market viability or its ability to adapt and improve operations in the absence of stolen USG information. The court does not share Plaintiff's belief that Peterson's report exceeds the scope of his accounting and economic expertise. The opinions he expresses in that report, concerning Lafarge's viability and hypothetical ability to adopt non-infringing processes, appear to rest on well-

trod and reliable financial analysis and economic theory, not speculations requiring technical expertise.

Peterson opines that it is unlikely Lafarge would have shut down its high-speed plants in the absence of USG technology. (Peterson 7/08/09 Expert Report at 11.) He bases this opinion on several methods of analysis, all of which appear reliable and within the realm of reasonable accounting and economic analysis. First, he analyzes market-driven behavior of similarly situated wallboard manufacturers and notes that they rarely shut down operations, and in fact tend to expand, even under unfavorable short-term market conditions. (*Id.*) Next, Peterson applies standard cost accounting and economic theory, and concludes that "as long as a plant is covering its variable costs and making significant contributions to covering the fixed costs of operations the plant should continue operating." (*Id.*) Applying this basic principle to the data compiled by Ms. Davis, Peterson concludes Lafarge's high-speed plants were covering costs sufficiently and were not at imminent risk of shutdown for financial reasons. This is wholly a financial analysis, well within Peterson's expertise. The court finds the methods relied on by Peterson in this area to be reliable, as he employs a methodology that reflects the level of intellectual rigor typically employed by accountants and economists in the field.[6]

With regard to assessing the value of USG technology at Lafarge, Peterson refers to what he calls standard learning curve theory. (*Id.* at 3.) Learning curve theory essentially posits that individuals who perform repetitive tasks exhibit an improvement in performance as the task is repeated a number of times. Learning curves were first described by T.P. Wright in a 1936 study

---

[6] To the extent Peterson also relies on information such as board weight and supply and demand factors in rendering his damages opinion, his analysis simply compares reliable data gathered by others. For any technical matters Peterson touches on his report, such as the existence of non-infringing substitutes, Peterson relies on the admissible testimony of Robert Bruce, Defendants' technical expert. This is the type of information regularly relied on by accountants and Peterson's opinions require no special technical expertise. Notably, Plaintiff's damages expert relies on substantially the same information and similarly adopts the technical opinions of Plaintiff's technical expert Peter Morton.

of the time required to manufacture airplane parts. *T.P. Wright et al., Factors Effecting the Cost of Airplanes,* JOURNAL OF AERONAUTICAL SCIENCES (Feb. 1936). Wright's research yielded three basic conclusions: (1) The time required to perform a task decreases as the task is repeated; (2) The amount of improvement decreases as more units are produced; and (3) The rate of improvement has sufficient consistency to allow its use as a prediction tool. *Id.* These basic principles are widely accepted in existing accounting literature.[7] As an accounting expert, Peterson is qualified to discuss the application of learning curve theory to damage calculations in this case.

Peterson applies learning curve theory to support his conclusion that Lafarge's continued viability was considerably less dependent on stolen USG technology than Plaintiff's expert, Ms. Davis, supposes. In Peterson's opinion, the problematic startups at Lafarge's high-speed plants would have been organically remedied as Lafarge became more efficient over the course of operation. Plaintiff asserts that any such analysis or projection requires technical understandings of wallboard manufacture that Mr. Peterson lacks, but the court disagrees. Like Plaintiff's own damages expert, Peterson is working from a set of assumptions and factual underpinnings, some of which must be determined by the trier of fact. The scope of Lafarge's reliance on USG technology is one of the facts that the parties dispute and that must be proved at trial. *Smith*, 215 F.3d at 718. Notably, Peterson is not the first person to apply learning curve theory to the wallboard industry. Peterson's report draws heavily on an article by Robert Blancett, written while Blancett was a director of research at USG, which describes how learning curve theory applies to the wallboard industry.[8] Peterson quotes Blancett's article at length to support his projections.

Peterson's use of learning curve theory here is not unreliable speculation. Peterson simply

---

[7] See e.g. S.S. Liao, *The Learning Curve: Wright's Model vs. Crawford's Model*, ISSUES IN ACCOUNTING EDUCATION, 302-315 (Fall 1988); W.J. Morse, *Reporting Production Costs that Follow the Learning Curve Phenomenon*, THE ACCOUNTING REVIEW, 761-773 (Oct. 1972).

[8] Robert S. Blancett, *Learning From Productivity Curves*, RESEARCH TECHNOLOGY MANAGEMENT (2002)

applies a widely-accepted principle of analysis to a context where it has been applied before. The court finds that Peterson is qualified and that his opinion is reliable and likely to assist the jury. Plaintiff's motion [598] is denied.

### III. The Need for Bifurcation

In the course of reviewing these motions, the court notes several instances in which damages evidence will be admissible only if certain factual predicates are established. As noted, both Defendants' and Plaintiff's experts rely on certain factual assumptions in rendering their opinions on prospective damages. These include the scope of the alleged infringement, the availability of non-infringing substitutes, Defendant Lafarge's reliance on USG information, and Lafarge's economic viability in the absence of that reliance. All of these issues will be properly decided by the trier of fact in determining the existence and scope of liability. It may therefore be appropriate to bifurcate the liability and damages stages of this trial as a matter of judicial economy and to avoid the potential for prejudice. The court has considerable discretion to order the bifurcation of a trial, and may do so to serve the interests of judicial economy or to prevent prejudice to either party, so long as it does not prejudice a non-moving party and does not violate the Seventh Amendment. *Krocka v. City of Chicago*, 203 F.3d 507, 516 (7th Cir. 2000); FED.R.CIV.P.42(b).

Plaintiff seeks a substantial award in this case. Its various damage estimates reach the hundreds of millions, if not billions, of dollars—estimates that are, as Defendants put it, "dizzying." (Def. Mot. [566] at 2.) Combining the evidence of substantial damages with evidence on the already-complicated liability issues might well result in undue confusion and delay at trial. The court invites the parties promptly to weigh in on the court's proposal that the liability and damages evidence be bifurcated, and to offer suggestions regarding appropriate scheduling of a bifurcated trial.

### **CONCLUSION**

Plaintiff's motion [598] to exclude the testimony of damages expert Mark Peterson is denied. Defendants' motion [566] to preclude the testimony of damages expert Julie Davis is granted in part

and denied in part. Davis will be permitted to opine on the various damages scenarios she calculated, assuming Plaintiff establishes the necessary factual predicates for each calculation at trial. Davis will not be permitted to testify on Plaintiff's damages or recovery under the Computer Fraud and Abuse Act. Davis will not be permitted to testify in a manner that summarizes the evidence on wallboard quality at Lafarge. The parties' damages experts will be directed to limit their hypothetical theories of recovery to the facts actually determined by the jury. The court further invites comment on the possibility of bifurcation of the liability and damages stages at trial.

ENTER:

Dated: October 27, 2009

_____
REBECCA R. PALLMEYER
United States District Judge

(Final-Peterson-Davis)