**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES GYPSUM COMPANY,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **No. 03 C 6027** |
| | ) | |
| **LAFARGE NORTH AMERICA INC.,** | ) | **Judge Rebecca R. Pallmeyer** |
| **LAFARGE S.A., DAVID DOWNS, JOHN D.** | ) | |
| **YOCKEY, ED GREEN, WILLIAM** | ) | |
| **HARTFORD, WALTER WELDON,** | ) | |
| **KURT F. KURZSHAK, and SIDNEY** | ) | |
| **SPEAR,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

In 2003, Plaintiff United States Gypsum Company ("USG"), a manufacturer of gypsum wallboard, filed suit against Lafarge North America, Inc. ("Lafarge"), a competing wallboard manufacturer. USG also filed suit against Lafarge's French parent company, Lafarge S.A., and several individual defendants, all former employees of USG who subsequently went to work for Lafarge. USG alleges a battery of patent infringement and state law claims against Lafarge, including violation of the Illinois Trade Secrets Act. 765 ILCS 1065/8-9. The court has discussed the facts at length elsewhere, *see United States Gypsum Co. v. Lafarge North America, Inc.*, 508 F. Supp. 2d 601 (N.D.Ill. 2007), and the court assumes familiarity with that opinion.

The parties have identified a number of expert witnesses including, as relevant here, experts on the technical aspects of wallboard manufacture. Defendants now move to exclude the testimony of Plaintiff's expert Peter Morton, who has been designated as an expert both for Plaintiff's state law claims and Plaintiff's patent claims. In addition to Defendant's motion to bar Morton's testimony, the court simultaneously considers Plaintiff's motion to exclude the testimony of Defendants' technical expert Robert Bruce. Defendants challenge the admissibility of Morton's opinions on Lafarge's wallboard quality and on the likelihood that, absent improper access to USG's

technology, Lafarge would have exited the wallboard industry in 2001. Plaintiff identifies two specific techniques that it claims are USG trade secrets, cockle reduction and board formulation, and asks that the court exclude Bruce's opinion that these techniques are not, in fact, trade secrets exclusive to USG. Plaintiff also moves to exclude Bruce's opinions to the extent they are based solely on his uncorroborated "general knowledge." For the reasons set forth below, Defendants' motion to bar Morton's testimony on Plaintiff's state law claims [561] is granted in part and denied in part; Defendants' motion to bar Morton's testimony concerning patent claims [564] is denied; and Plaintiff's motion to bar Bruce's opinions [594] is denied.

## **DISCUSSION**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Under the standards set out in *Daubert,* the court is required to function as a "gatekeeper" with respect to the screening of expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). Rule 702 imposes "a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant but reliable." *Id.* The purpose of this requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Id.* at 152.

Determining whether this test is met requires a three-step analysis: (i) the witness must be qualified as an expert by knowledge, skill, experience, training, or education; (ii) the expert's reasoning or methodology underlying the testimony must be reliable; and (iii) the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). With the purposes of Rule 702 in mind, the court now applies the *Daubert* framework in assessing the expert testimony of Peter Morton and Robert

2

Bruce.

## I.    Expert Qualifications

Under Rule 702, a witness can be qualified as an expert by "knowledge, skill, experience, training, or education . . . ." FED. R. EVID. 702. "Accordingly, [courts] consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). As explained below, the court finds both Morton and Bruce are qualified to offer opinions on technical matters in wallboard manufacturing.

### A.    Peter Morton's Qualifications

The court is satisfied that Plaintiff's proposed expert, Peter Morton, is qualified as an expert in the manufacturing processes of wallboard, the general industry standards in wallboard manufacturing, and market conditions affecting the wallboard industry. Morton holds advanced degrees in chemical engineering from the University of Leeds in the United Kingdom and has almost two decades of professional experience in the wallboard business, in both gypsum and calcium silicate-based manufacture. (Morton 10/01/07 Expert Report at 2; Morton 10/01/07 Expert Report, Ex. A.) From 1984 to 1997, Morton worked for British Plasterboard ("BPB"), a UK-based manufacturer of gypsum wallboard. Morton held several positions at BPB, including Company Production Manager for British Gypsum, responsible for British Gypsum's entire UK manufacturing operation. (*Id.*) As part of his responsibilities, Morton was in charge of implementing operational best-practices and conducting due diligence on behalf of BPB. In so doing, Morton acquired substantial expertise in the design and operation of wallboard manufacturing plants. (*Id.*) He also oversaw the design, construction, and launch of two wholly new gypsum manufacturing plants, one in Germany and another in Austria. (Morton 10/01/07 Expert Report at 2.) While at BPB and afterward, Morton participated in the building of 15 plants, manufacturing gypsum wall board and other materials, around the world. (Morton Dep. 14-17.) He has been responsible for recruitment,

training, engineering, and bringing plants to their designed capacity. (*Id.* at 14.) In connection with his duties, he has visited more than 70 gypsum board manufacturing plants worldwide, including 30 in the United States, some of which are now operated by Defendant Lafarge. (Morton 10/01/07 Expert Report at 3.) From 2001 to 2003, Morton was on the Board of Directors of the European subsidiary of GypTech, a major international supplier of wallboard manufacturing equipment. (Morton 10/01/07 Expert Report, Ex. A.)

Having substantial professional experience with both United States and European wallboard manufacture and substantial experience in the design, construction, and operation of wallboard facilities, Morton is qualified to discuss common industry practices and technologies with which he has become familiar. This includes knowledge of the importance of "know-how" to the manufacturing process. It also includes analysis of the type of measures wallboard manufacturers might take to safeguard their know-how from dissemination to competitors. Morton is also qualified to contrast the general state of wallboard production in the United States with production in Europe, including differences in rates of production and technical complications incurred by higher-speed production.

### B.    Robert Bruce's Qualifications

Defendant's expert Robert Bruce is also qualified as an expert in gypsum wall board technology and manufacture. Bruce holds an honors associate degree in applied chemistry from the Royal College of Science and Technology in Glasgow, Scotland. (Bruce 08/21/07 Expert Report at 1.) He also holds an honors baccalaureate degree in applied chemistry and a doctorate in organometallic chemistry from Glasgow University. (*Id.*) Bruce has over forty years of experience working in the gypsum wallboard industry. (*Id.*) From 1967 to 1990, he worked for Domtar, Inc., a Canadian gypsum wallboard manufacturer. (*Id.* at 1-2.) Bruce held several positions with Domtar, ultimately serving as director of research, development, and quality. With Domtar, he designed gypsum wallboard manufacturing systems, developed new calcining processes, oversaw

4

plant operations, carried out research and development, and conducted company-wide strategic planning studies. (*Id.*) Since 1990, Bruce has operated his own private consulting firm, consulting with many of the industry's most prominent gypsum and chemical wallboard manufacturers. (*Id.* at 2.) Bruce has consulted on plant start-up, the manufacturing process, wallboard quality, strategic planning, and research and development. (*Id.*) Over the course of his career, Bruce has visited and inspected more than 100 gypsum wallboard manufacturing plants worldwide. Previously as a consultant, and now in preparation for trial, Bruce has visited plants operated by Defendant Lafarge. (*Id.* at 3.) He has also visited three plants operated by Plaintiff USG. (*Id.*) Bruce is the author of a technical paper relating to gypsum wallboard manufacture and the holder of two U.S. patents on wallboard-related technologies. (*Id.* at 2.)

The court finds that Bruce has accumulated substantial academic training and professional experience that qualifies him as an expert on the technical aspects of wallboard manufacture. This includes a familiarity with industry-wide standards in the methods and processes of wallboard manufacture. Bruce is qualified to opine on common technical practices and knowledge in the wallboard industry.

## II.    Reliability of Testimony

The court must next determine whether the proposed expert testimony is reliable—that is, whether it is based on a reliable methodology. "It is axiomatic that proffered expert testimony must be derived by the 'scientific method[.]'" *Clark v. Tanaka Corp.*, 192 F.3d 750, 756 (7th Cir. 1999) (internal citations omitted). The requirement that expert testimony be based on rigorous and reliable methods applies even when the testimony is not of a scientific nature. "It seems exactly backward that experts who purport to rely on general engineering principles and practical experience might escape screening by the district court simply by stating that their conclusions were not reached by any particular method or technique." *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991 (5th Cir. 1997). In short, the court must determine that the proffered expert opinions are more

than mere speculation or conjecture, but have at their core some reliable basis.[1]  The court considers the specific opinions offered by Mr. Morton and Mr. Bruce with this standard in mind.

### A.    Morton's Opinions

#### 1.    Lafarge Quality

Defendants challenge the reliability of Morton's conclusions on several fronts.  First, Defendants claim that Morton is incapable of forming a reliable opinion as to the quality of Lafarge-manufactured wallboard during the period in question because Morton fails to rely on the empirical data metrics that he himself acknowledges are the industry standard.  As Morton recognizes, the traditional metrics for measuring the quality and efficiency of wallboard production are: (1) good "board percentage," or the percentage of board produced that meets internal quality control requirements and can be shipped to the consumer; (2) the monetary value of wallboard rejected and returned by consumers; and (3) the number of consumer complaints per a certain quantity of wallboard shipped (typically, 1000 feet).  (Morton Dep. 878:8-22.)  Defendants contend that their own experts, Robert Bruce and Mark Peterson, have applied these very metrics in their analysis and that their analysis unambiguously defeats Morton's conclusion that Lafarge was producing wallboard below market quality prior to the alleged appropriation of USG technology.

Defendants insist that Morton has completely ignored the conventional quantitative metrics for judging wallboard quality and production efficiency, but the court disagrees.  Morton's reports make clear that he reviewed the same evidence that Defendants' experts did and, indeed, reviewed

---

[1]        Daubert sets forth a non-exclusive checklist for trial courts to use in assessing the reliability of expert testimony: (1) whether the expert's technique or theory can be or has been tested–that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.  The Court in *Kumho* held that these factors might also be applicable in assessing the reliability of non-scientific testimony, depending upon the "particular circumstances of the particular case at issue."  526 U.S. at 150.

Defendants' final expert reports.  (Morton 07/15/09 Expert Report at 14.)  Morton's reports are framed as a response to Defendants' experts, and his methods attempt to find fault with Defendants' experts' conclusions.  To that end, Morton makes two claims: (1) that the good board percentage on which Defendants' experts rely is suspect because it is based on Lafarge's own internal quality control standards, which were lower than the market standards generally, and (2) that Defendants' assessment of the numbers of returned boards and consumer complaints is distorted by market conditions; specifically, Morton points out that during the relevant time period, the demand for wallboard outstripped supply, meaning that customers were willing to settle for lower quality board.[2]  To the extent these criticisms are based on Morton's generalized observations and experience in the wallboard industry at the time (*i.e.*, that internal quality control standards varied and that demand for wallboard was very high at the time in question), the court concludes Morton may fairly offer testimony that presents these criticisms of Defendants' experts' conclusions.

That Morton will be permitted to challenge the conclusions drawn by Defendants' experts does not, however, establish the foundation for Morton to present his own alternative conclusions as to overall quality at Lafarge.  Morton concedes his opinion on this issue is based upon a primarily "qualitative" examination of existing documents, in that he undertook no independent quantitative experiments, models, or studies to objectively determine the quality of the wallboard Lafarge was producing at the time in question.[3]  Instead, Morton bases his opinions on a review of several

---

[2]     The court has some trouble understanding this second argument.  Presumably the important comparison in determining the relative quality of Lafarge's wallboard is as compared against its market competitors at the time, including USG.  If the high demand for wallboard applied to the entire industry and no manufacturer made 100 percent defect-free wallboard, the court presumes that data from all wallboard makers would reflect the impact of increased demand to the extent that some of its defective wallboard would be sold.  It is unclear why Lafarge would be disproportionately affected by this trend.

[3]     Morton apparently subsequently undertook a rough quantitative review of Lafarge's
(continued...)

consumer complaints and internal Lafarge communications (primarily from marketing and sales departments) that, in his view, reflect a continuing concern about poor and deteriorating quality. (Morton 10/1/07 Expert Report at 17-18.)  There is no indication in Morton's reports or testimony that the complaints or communications he considers are a representative sampling of consumer response or internal opinion as to Lafarge's wallboard quality, however.  Nor does Morton clearly articulate his method for evaluating the meaning, weight, or accuracy of these source materials. Consumer complaints are, of course, hearsay.  Morton's consideration of these matters creates the obvious risk that certain data will be selectively used or given disproportionate weight.  As the court reads Morton's conclusions about the quality of Lafarge's wallboard, it appears they are essentially based on anecdotal data with little or no governing method of analysis.  This is an unreliable basis for Morton to opine on wallboard quality.  At best, the documents reviewed and relied on by Morton demonstrate the limited subjective views of individual consumers or Lafarge agents about the quality of Lafarge's product; they do little to illustrate the actual objective quality of the wallboard, the purpose for which Morton purports to rely on them.

Plaintiff contends  that Defendants object to Morton's testimony merely because they "do not like his conclusions." (Def. [561] Resp. at 5.)  "But conclusions and methodology are not entirely distinct from one another."  *General Electric Company v. Joiner*, 522 U.S. 136, 146 (1997).  "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Id.*  The court concludes as much here.  Morton will be permitted to offer his opinion concerning the flaws in Defendants' experts' assessment of Lafarge's wallboard quality, but he will

---

[3](...continued)
reports by applying a rating system used by USG to review the quality of its own boards.  Had Morton's ultimate report contained a rigorous application of this system, this ruling may have had a different outcome.  Even in the context of this limited objective review, however, Morton conceded: "I mean, I am not pretending that this was a full scientific well-researched study.  I just concluded that a lot of the board Lafarge shipped should not have been shipped." (Morton Dep. 87:20-23.)

not be permitted to opine on the objective quality of the wallboard himself, to the extent that his opinion is based solely on a review of individual customer complaints or memoranda from Lafarge's sales department. A valid opinion on wallboard quality would depend on a systematic and empirical approach to the question. Had Morton reached his conclusions based on a systematic evaluation of wallboard quality, the court may well have found his opinions on that basis reliable and beneficial to the trier of fact. The court is unable to conclude that any such systematic evaluation has ever taken place here.[4]

Morton's subjective and anecdotal evidence form an unreliable basis from which to draw conclusions about objective quality. His findings reflect a methodology that fails to employ the same level of intellectual rigor that appears to be the standard for expert evaluation of wallboard quality in the field. Further, to the extent that Morton's report merely quotes from customer complaints or other documents that would (if admissible at all) be readily accessible to any lay member of the jury, the court finds such regurgitation would not assist the trier of fact.

## 2. Lafarge Shut Down

Morton's report further states, "I have found no evidence that Lafarge has had the will to make [the necessary technological] progression if left to its own devices . . . . Lafarge has not demonstrated the motivation to expend the investment in time and capital to conduct such research and development." (Morton 7/15/09 Expert Report at 27.) In the context of Lafarge's alleged quality problems, Morton speculates that Lafarge's inability to develop its own remedial technology would have ultimately resulted in Lafarge's exit from the wallboard business (absent a widespread theft

---

[4] Instead, Morton essentially adopts the unempirical assertions of others. For example, the Lafarge admission, frequently repeated by Morton, that Lafarge was "bleeding because of quality issues" was made in a memorandum that announced a company intention to implement a quality control system. (J. Montgomery Memo, Re: Quality Assurance Measures, LFG 026093.) The "bleeding" comment itself was not based on any objective measure of wallboard quality. In any event, the court finds it hard to believe that a lay jury would need expert assistance to understand the meaning of the phrase: "[W]e are 'bleeding' because of our quality issues. . . ."

of USG's technology). Defendants object to Morton's contention that Lafarge would have been forced to "exit the business" as speculative and unreliable.

The court sustains this objection. Morton offers no further independent analysis to support his claim that Lafarge was at risk of going out of business, such as flagging sales or unreasonable losses. Instead, in forming his opinion, Morton merely refers to comments made in the internal Lafarge documents that Plaintiff seeks to introduce, and offers his own speculative assessment of Lafarge's product quality. Morton's experience in the wallboard business does not give him license to speculate as to Lafarge's hypothetical actions based on such scanty evidence. Absent any independent analysis or support, financial or otherwise, for the claim that Lafarge was at risk of a forced exit from the wallboard business, the court finds Morton's opinion on this matter unreliable. Further, a review of the Lafarge documents on which Morton relies convinces the court that Morton's restatement of their contents adds nothing that will assist the jury. The court finds Morton's opinion on this matter constitutes little more than unreliable speculation or regurgitation of facts that the jury could readily understand on its own. Morton's testimony on this matter will be excluded.

### 3. Trade Secrets

Defendants contend that Morton's opinions on what constitutes a trade secret in the wallboard business are unreliable. In Defendants' words, Morton has drunk "the USG Kool-Aid that 'everything is a trade secret'." (Def. Mot. at 14.) Morton's conclusions, Defendants argue, are thus "inherently unreliable." (*Id.*) The court disagrees. Whether something is a trade secret depends to a large extent on what knowledge is generally available in the industry and whether a new application would not be obvious to someone entering the business. *Computer Care v. Service Systems Enterprises, Inc.*, 982 F.2d 1063, 1073 (7th Cir. 1992). On the first point—what information was generally available in the wallboard industry—the opinion of a person who spent decades as a senior manager in that industry is sufficiently expert and reliable. That Morton's

10

opinions may corroborate the legal positions of Plaintiff does not make them *per se* unreliable. Defendants cite no precedent to support their claims of inherent unreliability. Reliability is a function of methodology, not of outcomes, and Defendants articulate no objection to the application of experience or process by which Morton arrives at his broad understanding of what constitutes a trade secret. Moreover, Defendants are free to expose the flaws they perceive in Morton's reasoning by way of cross-examination. Morton may testify as to his opinion on what regularly constitutes a trade secret in the wallboard business. This ruling does not, however, permit Plaintiff to revisit conclusions reached by Judge Hart, who ruled on certain motions earlier and concluded that certain USG methods do not, due to obviousness or other factors, constitute trade secrets. *United States Gypsum Co.*, 508 F. Supp. 2d at 625-637. To the extent Morton's opinions contradict any of the court's prior rulings, they are barred.

### 4.    Uniform Dispersal

The court turns next to Defendants' objections to Morton's testimony on patent issues, raised in Defendants' Motion *in Limine* [564]. The patent at issue in this case refers to a process that "uniformly dispers[es]" foam throughout the gypsum mixture and results in wallboard that has uniformly dispersed voids. Voids result from small bubbles in the foam, and a lack of foam and void uniformity can cause defects in the board. Morton opines that the processes employed by USG and Lafarge both resulted in uniform dispersal. Defendants contend Morton's opinions on uniformity are bare conclusions not based on any reliable method of analysis. Morton testified that he arrived at his uniformity conclusions by viewing manufacturing processes, reviewing Lafarge production documents and, most importantly, visually inspecting the wallboard core for uniform dispersal. (Morton 7/17/09 Dep. at 349:12-20.) Defendants complain that this visual inspection is insufficient. They want something more precise and, in fact, conducted their own series of CT scans of wallboard to demonstrate that Lafarge wallboard does not have perfectly uniform dispersion.

The court concludes Defendants are attempting to set the bar too high. As the court reads

it, the patent does not require perfect mathematical uniformity. In fact, as far as the court is aware, neither the patented process nor any existing process of wallboard manufacture generates exactly and perfectly uniform void dispersion. Instead, the patent term appears to refer to something closer to apparent uniformity, that is, a lack of obvious void concentration or other defect resulting from foam loss or heterogeneous foam dispersion. To opine on this apparent uniformity, Morton need only employ methods rising to the same level of intellectual rigor that characterize dispersion inspection in the field. *Kumho Tire Co. Ltd.*, 526 U.S. at 152. Wallboard manufacturers do not typically conduct CT scans of wallboard to demonstrate uniformity. The volume and speed of wallboard production precludes such methods. Instead, all the evidence before the court suggests that visual inspection of the core is the standard method of determining foam and void uniformity in the wallboard industry. According to Frederick Schooley, Plaintiff's non-testifying expert, "In the real world of gypsum wallboard manufacturing, the board is analyzed for void uniformity by visual inspection of the core of the board. A trained operator on the wallboard line visually observes the board to ascertain (by experience) whether the void configuration observed will yield commercially acceptable wallboard." (Schooley 06/18/07 Expert Report at 215.) The court is convinced that Morton conducted the same type of uniformity inspection as those regularly relied upon in the wallboard industry. Morton's considerable experience with the methods of inspection employed in the wallboard industry satisfies the court that his opinions on uniformity are reliable and likely to assist the jury.

Further, the court will admit Morton's testimony on the rarity or nonoccurrence of the use of CT scans to determine board uniformity in a commercial setting. Uniformity, as the term is used in the patent, is somewhat context-dependent. It does not require the type of mathematical perfection Defendants urge. Testimony as to how people with ordinary skill in the art actually define and determine uniformity in a commercial setting is relevant to the jury's determination, and the court does not share Defendants' fears that such testimony would somehow confuse the jury. To

the contrary, the court finds testimony about how wallboard makers actually understand and judge uniformity in practice will assist the trier of fact.

### 5. Fluid Mechanics Issues

Another issue implicated by the patent claims is whether Lafarge's accused production process, in which slurry passes through a "gate/canister/boot" after exiting the mixing chamber, "mildly agitates" the foam, as that phrase is used by the patent. Morton opines on the levels of agitation that occur at various stages in the manufacturing process. Defendants contend Morton is not an expert on fluid mechanics and therefore is not qualified to opine on anything having to do with slurry or foam agitation.

The court recognizes that, to the extent any technical testimony might require highly specialized expertise in fluid mechanics, the problem Defendants raise is one for which the court is partly responsible. In an effort to control and simplify what threatened to become an unwieldy and unmanageable trial, Judge Hart limited the parties to one technical expert witness each. The inevitable result of Judge Hart's order is that the testifying experts will have relatively greater expertise in particular technical areas as opposed to others. Defendant's own technical expert, Robert Bruce, though at least minimally qualified in all respects, admits having only a practical familiarity with fluid dynamics and relies on the reports of non-testifying experts to supplement his knowledge.[5] The court stands by its determination to enforce Judge Hart's orders, motivated partly by concern that revisiting them on the eve of trial would result in considerable delay and confusion.

The court further concludes that Morton has sufficient expertise in the mixing that occurs

---

[5] Bruce's candid testimony likely applies to some extent to Morton as well. He said: "I am not an expert in fluid dynamics. . . . I have worked with mixers and adjusted cans to ensure better mixing. I am a hands-on kind of mixer-adjusting guy. So I don't rely on [Defendant's fluid dynamics expert] for that. I rely on him to give me the scientific understanding of what I know is happening in there. I know it is mixing . . . but how does it do it? You know, it separates it and then it comes together again. I know the function that it does, but he puts it into scientific terms for me because I am not a fluid dynamics expert." (Bruce Dep. at 206-207).

13

during wallboard manufacture such that a reconsideration of the court's existing orders is not necessary. That Morton considers information from others in forming his own conclusions does not necessitate the exclusion of his testimony. "[I]t is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert; and it is apparent from the wording of Rule 703 that there is no *general* requirement that the other expert testify as well." *Dura Automotive Systems of Indiana, Inc. v. CTS Corporation*, 285 F.3d 609, 613 (7th Cir. 2002). Such testimony need only be excluded when an expert is "just parroting the opinion" of another expert. *Id.* Otherwise, an expert may rely on information provided by non-testifying experts, so long as he does not merely serve as a spokesman for the absent expert, vouching for the truth of his statements. *In re James Wilson Associates*, 965 F.2d 169, 172-73 (7th Cir. 1992).

The court finds Morton's opinions on the mixing that occurs during wallboard manufacture constitute more than mere parroting or vouching for statements outside of his expertise. Morton is a well-qualified chemical engineer, with years of experience in wallboard manufacture. (Morton 06/24/09 Expert Report, at 5-6.) He received advanced academic training on fluid dynamics and advanced heat and momentum transfer while obtaining his degrees. (*Id.* at 5.) He has been involved in designing entire wallboard manufacturing processes, including the mixing phases he opines on. He has conducted dimensional analysis of flow regimes in other contexts, and that experience translates directly to expertise in the methods and analysis of general fluid mechanics. (*Id.* at 5-6.) In short, Morton is qualified, based on the totality of his training and experience, to opine independently on rates of agitation and mixing throughout the gypsum wallboard manufacturing process.

A review of Morton's report makes it clear that Morton is not merely parroting the views of others. Morton conducted independent analysis to arrive at his conclusions on agitation. He then independently analyzed the computational fluid dynamics models constructed and used by the

14

parties' non-testifying experts to corroborate his own conclusions on mixing and agitation. (*Id.* at 55-61). As he has conducted a fully independent analysis of the matter, the court concludes Morton is entitled to offer opinions resulting from that analysis, including shortcomings he recognizes in Defendants' expert analysis.

Defendants take specific issue with some facets of Morton's methodology. First, Defendants challenge the reliability of Morton's order-of-magnitude analysis, in which he compares the amount of agitation occurring in a conventional mixer with the amount occurring in the canister used by Lafarge. Preliminarily, the court notes that, though inexact, order-of-magnitude analysis is a basic tool of mathematics, engineering, and physics used to roughly compare data sets. *See, e.g.,* G.H. Hardy & E.M. Wright, AN INTRODUCTION TO THE THEORY OF NUMBERS, 260 (5th ed. 1979). Morton's rough comparison begins with an algebraic articulation of the formula for agitation. The patent itself uses the term "agitation" to refer to "the combination of shear forces and time spent under the effect of shear forces that a material being 'agitated' experiences." (635 Pat., Ex. 8 to Pl's [564] Resp., 2:24-32.) One way of articulating this statement is: Agitation = Shear Force $*$ Time. Time under shear can be expressed as a function of the volume of an receptacle in which agitation is occurring (V) divided by the rate at which the material flows through the receptacle (Q). (Morton 06/24/09 Expert Report, at 57-58.) Hence, Morton expresses the patent's description of agitation with the following formula: Agitation = Shear $*$ V/Q.

Morton then performs a computation using assumed numbers for shear forces (taking the "conservative" estimate that shear force in the canister is no more than half the shear force in the mixer) and concludes that agitation in the canister is considerably less than that in the mixer. (*Id.*) The court finds this order-of-magnitudes analysis is reliable. Neither Defendants nor their experts dispute that shear forces are greater in the mixer than the canister. Nor do Defendants articulate a basis to question the reliability of Morton's estimate. Defendants' complaint that Morton's formula fails to take account of the geometry of the canister or mixer overlooks the fact that geometry is

partially what dictates shear force and is therefore built into the formula. The formula Morton applies makes intuitive sense, and the court concludes it will aid a lay jury in forming a technical understanding of what is meant by agitation. As a facet of Morton's opinion, the formula is helpful in that it provides a frame of reference for explaining the ambiguous concept of agitation, albeit without determining the rate with complete precision. Defendants are, of course, correct that the variable Mr. Morton assumes for shear forces largely shapes the outcome of his comparison. The court believes this is a basis for challenging Morton's conclusion, not his methodology. As such, it goes to weight, rather than admissibility.

Defendants further object to Morton's use of power absorption analysis as a means of confirming his opinions on agitation. Morton analyzed gate pressure, the force per unit area of the slurry following mixing, to determine the amount of power absorbed in the manufacturing process. Defendants argue that Morton's analysis is scientifically flawed because Morton failed to account for both potential and kinetic energy and did not control for the possibility that energy would be converted from potential to kinetic energy in the manufacturing process. Morton's testimony, however, clearly refutes this charge. Morton testified at great length on the manner in which he accounted for both potential and kinetic energy and how the distinction was irrelevant for his analysis. (Morton Dep. 426-450.) Defendants also complain that Morton used a slightly different volumetric flow number than Defendants' expert (the two numbers are slightly more than $1/100 \text{ m}^3/\text{s}$ different), but because Defendants never asked Morton to explain this slight difference when he was deposed, this objection too, must be overruled. The same goes for the other minor assumptions about which Defendants complain. Defendants will have the opportunity to attack Morton's assumptions on cross-examination and to contradict his findings with testimony from their own expert. Defendants' motion to exclude Morton's testimony on agitation is denied.

Defendants also object to Morton's opinions on the "intended function" of the canister used in Lafarge's manufacturing process. (Def. [564] Mot. at 11.) Defendants are correct that the intent

of the canister's designer is not relevant. Morton is therefore instructed to refrain from opining on issues of subjective intent. As an expert in the technical aspects of wallboard manufacture, however, Morton is entirely qualified to opine on what the canister does, in fact, do. Of central relevance in this case is whether the Lafarge canister serves a mixing purpose. Morton's expertise in wallboard manufacture qualifies him to opine on this issue. In that context, Morton will be permitted to fully opine on the functionality and design of the canister. Defendant's motion is denied.

### 6. Comparing Agitation in Mixer and Canister

Defendants also object to Morton's comparing agitation in the mixer and canister at all. They contend Morton's testimony on this question is somehow inconsistent with Judge Hart's prior ruling that in the term "mild agitation," the word "mild" had "its ordinary meaning being on the low end of an absolute scale." *United States Gypsum Co.*, 508 F. Supp. 2d at 620. The court fails to understand Defendants' logic. To understand the meaning of "mild" as a point on an absolute scale, a person would need to locate its place by viewing other points on the scale. The mixer, which everyone agrees is designed for the very purpose of agitation, is one such point of comparison. The court sees nothing at all in Morton's comparison that is contradictory to Judge Hart's order. Nothing about the order prohibits the parties from comparing relative states of agitation throughout the wallboard manufacturing process. The court will allow Morton to contrast levels of agitation in the mixer with those in the canister.

### 7. Non-Infringing Substitutes

Morton also offers testimony as to the availability of non-infringing substitutes. Specifically, he asserts that two particular processes, the hard-edge mixer process and the triple mixer process, were not suitable alternatives to the patented process. The availability of non-infringing substitutes is important because it is one of the factors typically used to determine how much a plaintiff may recover for reasonable royalties and lost profits resulting from infringement. *Panduit Corp. v.*

17

*Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978). In order to establish the extent of his damages, a plaintiff bears the burden of showing a lack of acceptable substitutes.

> The patent owner who had proved a long-felt need for a particular invention has a lighter burden in establishing that his customers, as well as the infringer's customers, were in fact seeking to obtain the patented solution to such need or problem. The other side of the coin involves a strong showing by the infringer that although the patent may have embodied some trifling improvement which was patentable to a narrow extent, such improvement did not create any preference for the patented product rather than a noninfringing substitute. . . .

*Id.* at 1162, citing 3 R. White, PATENT LITIGATION: PROCEDURE AND TACTICS § 9.03 (2). An absence of available non-infringing supports the conclusion that, but for infringement, plaintiff would have experienced higher sales (and thus may be entitled to recover more damages) due to the lack of equivalent competitors on the market. Defendants contend that Morton applied an incorrect legal standard in concluding that the hard-edge mixer process and triple mixer process were not suitable substitutes.

The court disagrees. In determining that the hard-edge mixer process was not a suitable alternative for the patented process, Morton asserts that the hard-edge process posed greater safety and maintenance problems and resulted in board of poorer quality and lesser consistency than the board manufactured by the patented process. (Morton, 06/24/09 Expert Report at 49.) An inability to provide the same "benefits or advantages of the patented invention" is sufficient to support a finding that substitutes were not acceptable. *Northlake Marketing & Supply Inc. v. Glaverbel, S.A.*, 72 F. Supp. 2d 893, 910 (N.D. Ill 1999). Plaintiff argues that as a result of its patented process, USG's wallboard was lighter and of a consistently higher quality than its competitors. Morton's experience in the wallboard industry is sufficient to permit him to reach the reasonable conclusion that wallboard with better quality characteristics and consistency also sells better. "A product lacking the advantages of that patented can hardly be termed a substitute 'acceptable' to the customer who wants those advantages." *Panduit Corp.*, 575 F.2d at 1162.

With regard to the triple mixer process, Morton opines that Lafarge was incapable of

adopting it at the time of the alleged infringement.  In fact, while contending that the process was in use elsewhere in the world, Defendants appear to concede that no Lafarge plant in America either used or was configured to use the triple mixer until after Lafarge ceased using the accused process.[6]  Morton opines that Lafarge North America lacked the "necessary equipment, know-how, or experience" to implement the process. (Morton 06/24/09 Expert Report at 49.)  In short, Morton concludes, this alternative was simply not available to Lafarge.  This conclusion is well within Morton's expertise designing and implementing wallboard manufacturing processes.  Defendants are, of course, free to present evidence contradicting that conclusion at trial.

Further, the court concludes that Morton properly considered Lafarge's use of the accused process in the context of considering whether the alternatives were acceptable substitutes. "*Panduit* teaches that the argument of 'acceptable substitutes' must be viewed of limited influence where the infringer knowingly made and sold the patented product for years while ignoring the claimed substitute." *Northlake Marketing & Supply Inc.,* 72 F. Supp. 2d at 910-11.  Plaintiff alleges those circumstances exist here—that Lafarge used USG's patented process for years rather than implement any alternative.  Morton's mention of Lafarge's own admission that the accused process was the "best solution" is permissible in this context.  (Morton 06/24/09 Expert Report at 49.) Morton will be permitted to testify to his opinion on whether the hard-edge mixer process or the triple mixer process constitute acceptable substitutes to the patented process.

### 9.    Wilmington Variation and Bristol Process

In addition to opining on the accused process used at Lafarge's high-speed plants in Silver Grove and Palatka, Morton also considers the manufacturing process in place at Lafarge's older

---

[6]    Though a Lafarge S.A. subsidiary, Lafarge Platres, used a version of the triple mixer process at its St. Loubes facility at the time Lafarge North America was running the accused process, Lafarge North America plants did not adopt the triple mixer process until Lafarge implemented a wholesale switch from the accused process.  (Def. Motion [564] at 17, FN 19.) Lafarge does not say and the record does not indicate when exactly that switch occurred or what kind of reconfiguration it required.

facilities in Wilmington and Bristol. Defendants object to this aspect of his opinion, arguing that Morton failed to adequately review the processes used at Wilmington and Bristol, and that his opinions concerning infringement at those locations must therefore be excluded. The court disagrees. The processes at both plants are detailed in the reports of Plaintiff's non-testifying expert Frederick Schooley, which Morton reviewed and adopted. (Schooley 09/06/07 Expert Report at 258-263.) Morton relied on these reports, listing specific similarities, to conclude that processes at Wilmington and Briston infringe on the patent "for the same reasons as the Accused Process," which Morton analyzed in explicit detail. (Morton 06/24/09 Expert Report at 48.) The court finds no deficiency with Morton's method. Morton will be permitted to offer his opinions on the Wilmington and Bristol processes.

### B. Bruce's Opinions

The court turns now to the expert opinions of Robert Bruce, Defendant's expert, applying the same standard of reliability.

#### 1. Trade Secrets

In order for information to constitute a trade secret under Illinois law, (1) the information must be "sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure;" and (2) the information must be the "subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d)*; Mangren Research and Development Corp. v. National Chemical Co.*, Inc., 87 F.3d 937, 942 (7th Cir. 1996).

Defendant has demonstrated to the court's satisfaction that Bruce has a wide breadth of personal experience with technologies and techniques that are generally available in the wallboard industry. Having worked in the industry for more than 40 years, Bruce certainly is aware of what information is generally available in the wallboard industry and familiar with reasonable efforts to maintain the secrecy of information that is not generally known.

20

Further, a review of Bruce's reports demonstrates that his opinions rest on more than his own speculation or unsubstantiated assertions. Bruce repeatedly points to publicly-available information, such as patents and trade publications, to support his contentions that specific information was generally known or available in the industry during the relevant period and that USG's proprietary versions of information therefore provided Plaintiff with no competitive advantage. (*See, e.g.*, Bruce 08/21/07 Expert Report at 35; 38-39; 43-45; 57-58; 59-60.) To support his opinion that certain information was widely known by USG's competitors, Bruce identifies other wallboard manufacturers using substantially similar techniques. (*See, e.g.*, *id.* at 36.) The court finds Bruce's opinion as to what information was "sufficiently secret" in the wallboard industry to constitute a trade secret is generally reliable and should be admitted.

Bruce offers an opinion about the general availability of two specific techniques that Plaintiff claims are trade secrets: a process for reducing cockles—that is, ripples or imperfections that can occur in the face of the wallboard—and formulation methodology. The court concludes Bruce's testimony with respect to each of these techniques is admissible. Plaintiff's cockle reduction technique involved the application of water to the board in a particular manner at a particular time in the manufacturing process. In his report, Bruce admits that he is not familiar with Plaintiff's particular technique, but he observes that "[p]eople in the wallboard industry commonly experiment with sprays, felts, or dips at various places along the forming line during the initial stages of core settling. . . .They apply water in many places, often in an improvised manner, to address many short-term board formation techniques." (*Id.* at 57). To support his opinion that USG's particular method was not a trade secret, Bruce refers to the testimony of employees at Temple-Inland, another manufacturer of wallboard, who testified that Temple-Inland had long used water to address cockling. (*Id.*) Bruce also refers to the existing body of literature—referencing a USG-patent and several articles by name—that "almost always discusses water as both a cause and a solution for the tendency of cockles to appear on the face

21

(and back) of gypsum board." (*Id.* at 57-58; 7-8). Though Bruce admits a lack of familiarity with Plaintiff's exact process, his conclusion that USG's application was obvious given what was known in the industry is not unreliable. Plaintiff will be free to cross-examine Bruce concerning any unique or unusual aspects of its cockle reduction technique.

Likewise, Bruce's opinion with regard to formulation methodology is sufficiently supported by evidence and logic. What USG calls formulation methodology refers to a series of chemical formulas displayed in spreadsheets with variables adjusted to the specific calibrations for each plant. The court has previously recognized that the use of spreadsheets to track and change wallboard formulas is common in the industry and is not a trade secret. *United States Gypsum Co.*, 508 F. Supp. 2d at 635. Rather, the potential trade secret is "the formula itself, including any relationship between the ingredients indicated by the formulation sheet." (*Id.*) In light of the court's previous ruling, Bruce opines that the same or substantially similar formulas to the one USG used were common in the industry. "[F]ormulations containing the same or similar material are available in numerous patents such as USG's own patents such as U.S. Patent No. 3,190,787. . . U.S. Patent No. 5,643,510. . . as well as patents by other manufacturers [which Bruce also lists] . . . . Using the information in these patents, it would be easy to populate Excel spreadsheets to do the actual calculations for a particular product." (Bruce 08/21/07 Expert Report at 59.) Bruce also notes several public sources where the various ingredients comprising the elements of the formula are discussed. (*Id.* at 59-60.) The court finds Bruce's consultation of public documents that contain the same or substantially similar information to that contained in USG's formulation constitutes a reliable basis to support his opinion that the formula was either generally available in the industry or obvious based on what was commonly known.

Plaintiff also contends, in effect, that Bruce's opinions based on available public

information are irrelevant and legally inappropriate.[7]   In support, Plaintiff cites *Goldberg v. Medtronic, Inc.* for the position that the availability of public information does not per se preclude trade secret liability. 686 F.2d 1219 (7th Cir. 1982).   In *Goldberg*, the Seventh Circuit, applying Minnesota law and citing that state's supreme court, stated:

> Even assuming an alternate means of attaining [trade secret information], this, without more, is not sufficient to establish that the information is generally ascertainable.  The something more. . . is actual reliance by the defendants on the publically available information to the exclusion of the misappropriated information.

*Id.* at 1226 (*citing Chern Industrial, Inc. v. Grounds & Assocs., Inc.*, 278 N.W.2d 81 (Minn. 1979)). Plaintiff's reliance on *Goldberg* and *Chern* is misplaced.   Bruce does not seek to offer opinions exculpating Lafarge's use of USG information by showing there were alternative means of attaining the information.   Lafarge does not concede using USG-specific information at all. Rather, Bruce relies on a survey of public information to corroborate his own experience and demonstrate the state of general knowledge in the industry at a particular time.   Bruce's opinions are highly relevant to a factual inquiry into whether the contested information in this case was sufficiently secret to derive economic value from not being generally known.   This is especially true because many of the supporting public documents Bruce relies on to support his opinions are patents, and "[p]ublication in a patent destroys a trade secret because patents are intended to be widely disclosed." *Bondpro Corp. v. Siemens Power Generation, Inc.*, 463 F.3d 702, 706-07 (7th Cir. 2006) (internal citations omitted).

The fact that Bruce's opinion embraces an ultimate factual issue of the case has no impact on its admissibility. FED. R. EVID. 704(a).   Bruce will be permitted to opine on what information constitutes a trade secret, based on what was known and generally available in the wallboard

---

[7]       As an aside, Bruce's report makes clear that he is applying a lay standard, not a legal one: "I am not a lawyer, but my layman's understanding of the term 'trade secrets' is something that is confidential to the owner of the trade secrets and gives that owner some distinctive commercial advantage *vis á vis* its competitors."  (Bruce 08/21/07 Expert Report at 3.)

industry at the time in question. Plaintiff is free to challenge his conclusions by way of cross-examination.

## 2. General Knowledge

Plaintiff further objects to Bruce's testimony because, it contends, much of Bruce's opinion is based only on his "general knowledge," making his conclusions untestable and therefore unreliable.[8] For reasons similar to those already explained, the court disagrees with Plaintiff's characterization. Bruce adequately corroborated opinions based on his own substantial personal experience with frequent reference to publicly-available information. These references, and Bruce's experience, provide adequate support for Bruce's opinions on the state of general industry knowledge, and enable Plaintiff to challenge the validity of Bruce's conclusions in an objective sense. His opinions are more than "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. Accordingly, the court finds Bruce's opinion testimony meets the required reliability threshold for admission.

## III. Assisting the Trier of Fact

Next the court must decide "whether evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue." *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996) (internal citations and quotations omitted); *see also Daubert*, 509 U.S. at 591. Where the proffered expert offers nothing more than a "bottom line" conclusion, he does not assist the trier of fact. *Clark*, 192 F.3d at 759. Defendants have challenged certain of Mr. Morton's opinions on the basis that they fail to assist the trier of fact and, as explained below, those objections are sustained in part and overruled in part. Plaintiff does not make any further

---

[8] Plaintiff also suggests that Bruce's unwillingness to identify some of his consulting firm's clients due to confidentiality agreements constitutes a "refusal to testify fully and openly as to the industry practices known to him." (Pl.'s [594] Mot. at 13.) The court notes that Bruce's non-party clients are not relevant to the issues before the court, but will permit cross-examination that explores the other manufacturing processes Bruce has observed.

arguments regarding the ability of Mr. Bruce's testimony to assist the trier of fact that the court has not already addressed.

### A. Morton's Opinions

#### 1. Use of USG Technology

Defendants object to Morton's offering his opinion concerning the extent to which Lafarge used and relied on USG information and technology. Defendants contend that Morton's opinions on these matters constitute "wild speculation" and that "he is simply providing his non-technical interpretation of non-technical information" that will not assist the jury. (Def. [561] Mot. at 11-12.) On this issue, the court disagrees. According to Plaintiff, Morton will testify that Lafarge adopted and implemented specific chemical formulas found in documents obtained from USG. (Pl's [561] Resp. at 8-9; Morton Dep. 65-66.) Morton will further opine that, based on his observation of Lafarge's process, he believes USG technical drawings and procedures were implemented at Lafarge to correct equipment failures and other problems. (Morton 7/15/09 Expert Report at 10-14.) Based on a comparison of the documents, Morton opines that USG bulletin information was reproduced in supervisor training guides used at Lafarge's Silver Grove and Palatka plants. (Morton Dep. 64:4-20.) For these opinions, Morton's reports point to specific mechanical, procedural, or chemical similarities. The recognition of unique chemical formulas and specialized techniques in wallboard manufacture are sufficiently technical and outside the experience of a lay jury such that Morton's expert opinion could reasonably assist the trier of fact in understanding the evidence. Further, Morton's opinions in recognizing and describing specialized techniques and formulas are directly linked to his relevant professional experience, gained through years in the wallboard business. The court concludes that Morton's professional experience provides him with a sufficient basis to identify and recognize specialized manufacturing techniques and equipment and to explain to the jury the role these play in the manufacture of gypsum wallboard.

His opinions on this topic will be generally admissible, as they are not unreliable and exceed mere speculation.

On one occasion, Morton does stray into an area that is unlikely to assist the jury. He opines that USG bulletins placed on the mixer at Lafarge's Palatka plant were placed there to provide ready access because they were used so frequently. (*Id.* at 65:18-23.) The inference that a bulletin placed on a mixer might be frequently referred to by the person operating the mixer is accessible to a jury and requires no expert opinion.

Relatedly, Defendants contend that Morton's application of the word "use" in his testimony and reports improperly equates Lafarge's potential use of USG information with its possession of USG information, contrary to applicable law. This argument has traction. At a pretrial conference for consideration of certain evidentiary issues, the parties devoted attention to the problem of conflating the term *use* with the term *possess.* The court reminds counsel that, particularly with respect to the issue of damages, *use* and *possession* are distinct concepts. If Morton knows only, for example, that a Lafarge employee "had in his possession the expert bulletins [of USG]," that knowledge is not sufficient, by itself, to support the conclusion that Lafarge *used* the information contained in the bulletin. (Morton Dep. 298:15-20.) Certainly possession of USG's information furnished Lafarge with the opportunity to use or misuse it. But to conclude that Lafarge must therefore have done so may well misstate the evidence and does nothing to assist the jury in determining whether use occurred. If, however, the evidence shows not only that Lafarge had the opportunity to act but also that Lafarge in fact subsequently adopted a process identical to Plaintiff's, then Morton's conclusions about use (informed by his own substantial experience with wallboard manufacturing methods) would be reliable and would likely assist the trier of fact. Again, the parties are reminded that in this respect, too, Morton will not be permitted to offer any testimony that violates any of the court's prior rulings.

### 2.    Targeting of USG Employees

Defendants object to Morton's opinions on Lafarge's alleged targeting and hiring of USG employees on the grounds that Morton's opinions are derived exclusively from non-technical inferences and will therefore not assist the trier of fact. Judge Hart has already ruled that Frederic Schooley, who co-authored Morton's report on Lafarge's hiring, will not be permitted to testify with respect to hiring and evaluation of former USG employees. (D.E. 446 at 2.) If Schooley may not opine on hiring, certainly his co-author is similarly barred. Schooley and Morton have substantially similar expert backgrounds, as senior managers with technical understanding of the wallboard manufacture process. Neither is particularly qualified to comment on Lafarge's hiring strategy or practice. That Morton has hired some number of manufacturing employees during the course of his career, which appears to be the full extent of his qualifications on the topic, does not make him an expert in analyzing hiring strategy and practice. In any event, the court views it as an obvious inference, for which the jury requires no special assistance, that if Lafarge hired senior manufacturing employees away from USG, Lafarge may have done so with the effect and intent of obtaining USG's "know-how."[9] And Defendants and other Lafarge employees will be available to testify and be cross-examined regarding their intentions. Morton's potential testimony provides no additional clarity or assistance to the jury on that score. Morton will therefore not permitted to testify as to his opinions on Lafarge's hiring practices or its intent in hiring former USG employees.

The court also notes that Defendant's motion [564] contests the extent to which Morton adopts Schooley's fact-based opinions on USG policies, protocol, and technology development. To the extent Schooley was acting as a fact witness and Morton lacks personal knowledge,

---

[9]    Although the alleged theft of proprietary information may be unlawful, the court notes there is nothing improper or particularly unusual about the practice of hiring staff who have experience in the relevant industry.

Morton may not regurgitate Schooley's testimony. As a wallboard manufacturing expert, however, Morton is entitled to rely on any facts that wallboard experts reasonably rely on in forming opinions or inferences. FED.R.EVID. 703. No doubt this would include review of USG's policies, protocol, and technology. Accordingly, the court expects Morton to limit his testimony to his independent opinions based on available facts.

### 3. Incorporating Thomas Parker's Testimony

In an order of January 15, 2009, Judge Hart ruled that the testimony of Thomas Parker, who compiled a report purporting to detail Lafarge's misappropriation of trade secrets, would be excluded. (D.E. 446.) Nevertheless, Morton's reports incorporates Parker's report by reference. The court will not permit such an end around its prior ruling. Morton is to refrain from offering the excluded opinions of Thomas Parker in his testimony.

### B. Bruce's Opinions

Plaintiff does not argue that Bruce's testimony will fail to assist the trier of fact. His opinions relate to a highly technical set of processes and industry-specific knowledge that is far outside the average experience of a lay juror. Given the complexity of the evidence at issue in this case, the court finds Bruce's testimony will assist the jury.

### CONCLUSION

Defendants' substituted motion *in limine* (No. 10) [561] is granted in part and denied in part. Morton will be permitted to testify within his expertise in the area of gypsum wallboard manufacture generally. This includes the importance of "know-how" to the manufacturing process and the type of measures wallboard manufacturers take to safeguard know-how from dissemination to competitors. It also includes differences in the wallboard manufacture process in Europe and the United States. To the extent his testimony relies on customer complaints or

evaluations from Lafarge's sales force, Morton will not be permitted to testify to the objective quality of Lafarge wallboard during the time in question, though he will be permitted to challenge the empirical quality findings of Defendants' experts. He will not be permitted to testify to his opinion that Lafarge was at risk of shutting down or exiting the business. Morton may testify to his opinion on what contested items constitute trade secrets based on what information was generally available in the wallboard industry at the time, so long as that testimony does not run afoul of the court's prior rulings. Morton may testify to his opinion on the extent of Lafarge's use of USG technology, though he will not be permitted to equate use with possession by employing the terms interchangeably. Finally, Morton is barred from offering testimony concerning Lafarge's hiring practices or its intent in hiring former USG employees, and will not be permitted to offer the excluded testimony of Thomas Parker.

Defendant's Motion *in Limine* [564] to exclude Morton's testimony on Plaintiff's patent claims is denied. Morton will be permitted to opine on the uniformity of foam and void dispersion, and the court will admit Morton's testimony on the rarity or nonoccurrence of the use of CT scans to determine board uniformity in a commercial setting. Morton will be permitted to opine on matters of "fluid mechanics," including opinions relating to his order-of-magnitude analysis, power absorption analysis, and the functionality and design of the canister. He will also be permitted to compare rates of agitation in the mixer and canister. Morton may opine on the availability of non-infringing alternatives to the patented process. He may testify to his opinion on the Wilmington and Bristol processes, as well. With regard to his incorporating the fact testimony of Frederick Schooley and others, the court instructs Morton to testify only to his independent opinions based on facts reasonably relied on by experts in the field of wallboard manufacture.

Plaintiff's Motion *in Limine* (No. 1) [594] to exclude the testimony of Robert Bruce is denied. Bruce will be permitted to opine on technical practices and information constituting general knowledge in the wallboard industry. In addition, Bruce will be permitted to opine on whether the proprietary information claimed by Plaintiff USG was, in fact, a trade secret at the time in question.

ENTER:

Dated: October 27, 2009

_____
REBECCA R. PALLMEYER
United States District Judge

(USG-Final-Morton-Bruce-Combined)